**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS**

| | | |
|---|---|---|
| GENOCIDE VICTIMS OF KRAJINA, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | Case No. 10 CV 5197 |
| | ) | |
| L-3 SERVICES, INC. | ) | Judge Ruben Castillo |
| | ) | |
| Defendants. | ) | |

_____

**SECOND AMENDED COMPLAINT**

Plaintiffs Genocide Victims of Krajina, including Milena Jovic and Zivka Mijic,

individually and on behalf of all others similarly situated, for their Complaint against Defendants

L-3 Communications Corp. ("L-3") and MPRI, Inc. ("MPRI"), allege the following:

**Nature of the Action**

1.      This is a class action brought by ethnic Serbs who resided in the Krajina region of

Croatia up to August 1995 and who then became victims of the Croatian military assault known

as Operation Storm – a military attack and bombardment on a demilitarized civilian population

under the protection of the United Nations.  The Operation Storm battle plan was designed by

MPRI, a private military contractor subsequently acquired by L-3.  The purpose of the plan was

to carry out an organized, systematic, widespread attack on a civilian population.  MPRI then

aided and abetted the implementation of Operation Storm as detailed below.  Operation Storm

became the largest land offensive in Europe since World War II and resulted in the murder

and/or inhumane treatment of thousands of ethnic Serbs, the forced displacement of

1

approximately 200,000 ethnic Serbs from their ancestral homes, and the pillaging and destruction of hundreds of millions of dollars worth of Serbian-owned property. The victims of Operation Storm and their heirs and next of kin herein claim that MPRI was complicit in genocide and aided and abetted a crime against humanity.

### Parties

2.    Plaintiff **Milena Jovic** ("Jovic") is a natural person, an alien, and now a resident of Serbia.

3.     In August, 1995, Jovic, along with her husband and two children, a four year old son and a six year old daughter, resided near the center of the town of Knin in the Krajina region of Croatia. Early in the morning of Friday, August 4, 1995, at approximately 2 a.m., Operation Storm commenced with an intensive artillery bombardment of the Knin town center. Numerous artillery shells fired during the bombardment landed in close proximity to the Jovic residence causing Jovic and her family to flee their residence and to seek shelter in the basement of their mother-in-law's home. Upon emerging from the basement shelter, Jovic and her family saw streams of their fellow Knin residents fleeing in panic from the bombardment.

4.    Jovic and her family returned to their residence, quickly packed some belongings into a small trailer attached to their family automobile and fled from Knin. As they escaped, they saw dozens of bodies scattered throughout the streets and roads leading out of Knin and houses and buildings burning as a result of shelling with incendiary explosives. Jovic and her family also saw and heard artillery shelling and small arms fire directed at the columns of fleeing Knin residents.

5.      While driving through the Lika area in the Krajina region, the Jovic's refugee column was shelled by artillery, and bombed and strafed by Croatian military aircraft. People were wounded and dying all around them.

6.      Jovic and her family escaped the Krajina region by traveling through Bosnia into Serbia where they continue to reside. Jovic and her family lost all of their personal and real property during Operation Storm other than what they were able to pack in the small trailer attached to their automobile.

7.      Plaintiff **Zivka Mijic** ("Mijic") is a natural person, an alien, and a resident of the United States.

8.      In August, 1995, Mijic, and her husband and three children, resided in the village of Titovi Karemice in the Krajina region of Croatia. Early in the morning of Friday, August 4, 1995, at approximately 2 a.m., Operation Storm commenced with an intensive artillery bombardment of Titovi Karemice. As a result of the bombardment of their village, Mijic and her family in panic fled from home and away from the Krajina region.

9.      As Mijic and her family escaped from Titova Korenica in a refugee column headed for Bosnia, they were repeatedly shelled by artillery and were also attacked by a Croatian military mechanized unit. A neighbor traveling with them was decapitated when struck by an artillery projectile during one of the shellings. The Mijic family witnessed this and many other attacks by Croatian forces resulting in refugees being wounded and killed in their exodus from the Krajina.

10.     Mijic and her family fled initially to Bosnia and then to Kosovo where they resided in a refugee camp until hostilities began in Kosovo in 1999. They were granted residency

in the United States in July 2000, and currently reside in the United States.

11.     The Mijic's property in Titovi Karemice was stripped and damaged by Croatian military forces during Operation Storm. It remains abandoned and landmines surround the property making it unsafe to return.  The Mijic family currently resides within this judicial district.

12.     Defendant **L-3 Services, Inc.,** (hereinafter "L-3")is a Delaware corporation with its principal place of business and company headquarters located at 1320 Braddock Place, Alexandria, Virginia, 22314.  According to its website, L-3 "offers professional services, products and integrated solutions to meet the security needs of customers in the public and private sectors in the US and overseas."[1]  L-3 is a wholly-owned subsidiary of L-3 Communications Corporation.  L-3 does business throughout the United States and the world.

## Additional Entities and Individuals of Note[2]

13.     **L-3 Communications Corporation, Inc.,** is a Delaware corporation with its principal place of business and company headquarters located at 600 Third Avenue, New York City, New York. L-3 is a prime defense contractor in Intelligence, Surveillance and Reconnaissance, secure communications, government services, training and simulation, and aircraft modernization and maintenance.  L-3 Communications, Corp. acquired MPRI in June of 2000, for $40 Million.  L-3 Services, Inc., merged with MPRI in 2007, a merger which eliminated MPRI's separate incorporated status.

14.     **MPRI,** which stands for Military Professional Resources Inc., is a division of L-3

---

[1] Found at: http://www.l-3com.com/divisions/overview.aspx?id=82

[2] Plaintiffs reserve the right to request permission to file a Third Amended Complaint for the sole purpose of naming the individuals listed in paragraphs 15-18 as Defendants in this action, should further investigation and case law

and operates as a private military contractor that provides a wide range of services to both public and private customers. MPRI was started in 1988 by a group of high-ranking American military officers. All specific references in this Complaint to MPRI implicitly include L-3.

15.     Carl Vuono is the immediate past-President of MPRI and the current Senior Vice President of L-3 Communications, as well as the President of Services Group for L-3 Communications, the parent organization of MPRI.  Carl Vuono, who is considered an expert artillery officer, previously served numerous times in the U.S. Army's Training and Doctrine Command.  Carl Vuono eventually became the TDC's 4-star commander in 1986.  Carl Vuono was selected to be the 31st Chief of Staff of the U.S. Army in 1987, where he served until 1991. Carl Vuono joined MPRI in 1993.

16.     Harry "Ed" Soyster is a current spokesman for MPRI.  Ed Soyster is the former Director of the Defense Intelligence Agency, as well as the former Commanding General of the United States Army Intelligence and Security Command (INSCOM).

17.     Vernon Lewis is the former President of MPRI.  Vernon Lewis is one of the founding members of MPRI and Cypress International, a weapons supply firm.  Vernon Lewis served as CEO of Cypress International for 11 years, and served as the CEO and later Chairman of the Board of MPRI until MPRI was sold to L-3 Communications in 2000.  Vernon Lewis is a retired U.S. Army Major General.

18.     Crosbie "Butch" Saint is the Vice-President , Europe for MPRI, as well as the former commander of the U.S. Army in Europe from 1988-1992.  Crosbie Saint retired from the Army in 1992.

---

developments warrant .

19.     All of the individuals described in paragraphs 15 through 18 managed and controlled MPRI's work in Croatia from 1994-1996, and were involved in providing and facilitating MPRI's assistance with Operation Storm.

### Jurisdiction and Venue

20.     This Court has jurisdiction over this matter under the Alien Tort Statute ("ATS"), 28 U.S.C. §1350: "The district courts shall have original jurisdiction of any civil action by an alien for a tort only, committed in violation of the law of nations or a treaty of the United States."

21.     ATS is a jurisdiction-conferring statute that also creates a limited number of causes of action based upon violation of rules of international law and U.S. treaties.[3]  See *Estate of Marcos*, 25 F.3d 1467, 1474 (9th Cir. 1994); *Papa v. United States*, 281 F.3d 1004, 1013 (9th Cir. 2002). The leading case of *Sosa v. Alvarez-Machain*, 542 U.S. 692 (2004), found that when ATS was enacted in 1789 there were at least three causes of action based directly on violations of international law, namely, violations of safe-conducts, infringements of the rights of ambassadors, and piracy. *Sosa*, 524 U.S. at 716. Congress intended ATS to "furnish jurisdiction for a relatively modest set of actions alleging violations of the law of nations." *Id*. at 720. "Federal courts should not recognize private claims . . . for violations of any international law norm with less definite content and acceptance among civilized nations than the historical paradigms" of safe-conducts, rights of ambassadors, and piracy. *Id*. at 732. '"Actionable violations of international law must be of a norm that is specific, universal, and obligatory.'" Sosa, 524 U.S. at 732, quoting *In re Estate of Marcos Human Rights Litigation*, 25 F.3d 1467, 1475 (9th Cir. 1994).  Additionally, a cause of action may be brought under the ATS for any

---

[3] This aspect of ATS is an issue "lying at the intersection of the judicial and legislative powers." *Sosa*, 542 U.S. at

violation of a U.S. treaty.

22.     Even if ATS did not provide jurisdiction in this case, an American national or corporation can be sued by any person[4] harmed as a result of a non-frivolous violation of international law.  For "International law is part of our law, and must be ascertained and administered by the courts of justice of appropriate jurisdiction, as often as questions of right depending upon it are duly presented for their determination." *The Paquete Habana*, 175 U.S. 677, 700 (1900). According to Secretary of State Legal Adviser Harold Koh, "under current practice, federal courts regularly incorporate norms of customary international law into federal law."  Harold Hongju Koh, *Is International Law Really State Law*? 111 Harv. L. Rev. 1824, 1827 (1998). Genocide and crimes against humanity are *a fortiori* candidates for incorporation.

23.     This Court has personal jurisdiction over Defendant L-3 because L-3 conducts substantial business within this judicial district, maintains employees within this district, has divisions operating within this district, has a registered agent within this district and is licensed to do business within this district.

24.     Venue is proper because:

(a)  numerous Plaintiffs reside in this district;

(b)  the Chicago metropolitan area is the home of the largest number of refugee victims of Operation Storm in the United Sates;

(c)  the Chicago metropolitan area is the home of the largest Serbian-American community in the United States; and

---

730.

[4] Including aliens. "Alien citizens, by the policy and practice of the courts of this country, are ordinarily permitted to resort to the courts for the redress of wrongs and the protection of their rights." *Disconto Gesellschaft v. Umbreit*,

(d)  the spiritual and administrative center of the Serbian Orthodox Church in the

United States is in this district (Libertyville, Illinois)

25.     Venue is also proper because L-3 conducts substantial business within this

District, maintains employees within this District, has divisions operating within this District and

is licensed to do business within this District.

### General Factual Allegations

26.     Paragraphs 27 through 59 below are stated upon information and belief derived

from the historical record, numerous press reports, scholarly articles, investigative reporting

pieces, books, trial testimony and transcripts from the International Criminal Tribunal for the

former Yugoslavia and internal MPRI and Croatian Ministry of Defense documents.  These

allegations based upon information and belief are also supported by strong circumstantial

evidence.  However, given the nature of the allegations and the unique abilities of the Defendant

to conceal direct evidence of its involvement in these crimes, i.e. Defendant MPRI is a private

military consulting business with much experience in covert operations and intelligence

operations, much of the direct evidence remains hidden and in the sole possession of Defendant

and/or the Croatian Ministry of Defense.  Plaintiffs suggest that discovery will yield more direct

evidence to provide additional support to the following allegations.

27.     On June 25, 1991, under the leadership of the Croatian Democratic Union

("HDZ"), Croatia, a constituent republic of the Socialist Federal Republic of Yugoslavia,

declared its independence.  From 1945 through 1991, the Federal Republic of Yugoslavia had

consisted of six constituent republics:  Bosnia-Herzegovina; Croatia; Macedonia; Montenegro;

---

208 U.S. 570, 578 (1908).

Serbia; and, Slovenia.

28.     The HDZ, a right wing nationalist party, identified itself with the World War II Croatian government imposed and controlled by the government of Germany.  This Nazi puppet government ("Ustache") proclaimed itself the Independent State of Croatia, under the ostensible leadership of Ante Pavelic.  Under this World War II Croatian regime, a program of genocide was carried out against the Serbian, Jewish, and Gypsy populations of Croatia.  In one concentration camp alone, Jasenovac, approximately 750,000 Serbs and tens of thousands of Jews were exterminated.

29.     These Croatian Ustache atrocities were well known and well documented as part of World War II history.

30.     The HDZ's public identification with the Ustache was evidenced by:

> (a)     Proclaiming as the national symbol a flag strikingly similar to the Ustache flag of World War II;
>
> (b)     Appointing notorious members of the Ustache to prominent government positions;
>
> (c)     Inflammatory speeches directed against the Serbian population of Croatia and praising Ante Pavelic and the Ustache government.  These speeches were given by the most prominent leaders of the government, including President Franjo Tudjman.  In Tudjman's 1988 book, "*Wastelands of Historical Truth,*" he wrote:
>
>> Genocidal violence is a natural phenomenon in keeping with the human-social and mythologically divine nature.  Genocide is not only allowed but even recommended.[5]
>
> (d)     Acts of the Croatian Parliament in 1991, reducing the status of Serbs under the new Constitution from that of a "constituent nation" to that of a "national minority."

---

[5] Gibbs, David, N. <u>First Do No Harm:  Humanitarian Intervention and the Destruction of Yugoslavia</u>. Nashville: Vanderbilt University Press, 2009 at p. 67.

31.     In April 1991, the Serbian population of Croatia, unwilling to accept the status of "national minority" under a government led by President Tudjman and the HDZ, declared its independence from Croatia and proclaimed the establishment of the Republic of Serbian Krajina ("RSK") with its capital city, Knin.

32.     By June 1991, armed conflict had erupted in certain areas of Croatia between the Croatian armed forces and the Yugoslav People's Army ("JNA") and other Serb forces.  These JNA forces were commanded and directed out of the JNA headquarters in Belgrade, Serbia.

33.     On September 25, 1991, with fighting raging throughout Croatia and threatening to engulf Bosnia, the United Nations Security Council passed Resolution 713, immediately implementing a complete embargo on any and all weapons and military equipment into the territory of the former Yugoslavia.   Additionally, the Resolution called upon all States "to refrain from any action which might contribute to increasing tension and to impeding or delaying a peaceful and negotiated outcome to the conflict in Yugoslavia . . . . "  This Resolution was repeatedly extended through October of 1996.

34.     By the end of 1991, the JNA and various Serb forces controlled approximately one-third of the territory of the Republic of Croatia.

35.     By February 1992, following the establishment of a UN-brokered cease fire, the JNA had withdrawn from Croatia (including the territory encompassing the proclaimed RSK), leaving the Croatian Serbs with no significant organized military force within the RSK. Following the departure of the JNA from Croatia, the Krajina Serbs' primary defense consisted of small, lightly armed and poorly trained patrol groups similar to civilian defense units. Usually, there was one such group assigned to protect a region of several villages.  Additionally,

the Krajina Serbs retained vastly reduced stocks of artillery shells and rocket launchers, as well as some antiquated World War II era tanks.

36.    In February 1992, in accordance with the Vance Plan, the United Nations Security Council established a United Nations Protection Force ( "UNPROFOR")[6], parts of which were deployed in United Nations Protected Areas ("UNPAs") in Croatia.  The UNPAs were areas in Croatia where Serbs constituted a majority or substantial minority of the population and where inter-ethnic tensions had already led to armed conflict.  There were four UNPAs, known as Sectors North, South, East, and West.

37.    The Krajina region, including the area covered by UNPA Sector South and UNPA Sector North, was part of or within the territory claimed by the RSK.  The southern portion of the Krajina region included, without limitation, the following municipalities:  Benkovac, Civljanie, Donji Lapac, Drnis, Ervenik, Gracac, Kijevo, Kistenje, Knin, Lisane Osrovikce, Lisicic, Lovinac, Nadvodo, Obrovac, Oklaj, Orlic, Polaca, Smilcic, Titova Korenica and Udbina.

38.    In 1992 and 1993 Croatian leaders, officials, and armed forces formulated and implemented various small scale operations to retake part of the territory claimed by the RSK, which included operations into the UNPAs and adjacent areas involving the area of the Milevacki Plateau in June 1992; the area of the Maslenica bridge in northern Dalmatia in January 1992; and the Medak pocket in September 1993.

39.    Although these relatively small-scale operations had no effect on the overall military balance in Croatia, they succeeded in their primary purpose of terrifying the Serbian civilian population throughout Croatia by virtue of their notoriety.

---

[6] Although the name of the UN's mission changed periodically during the conflict in Croatia, for simplicity and

40.     In Medak, actions of Croatian armed forces under the leadership of Rahim Ademi, Mirko Norac and Janko Bobetko, were particularly notorious.  Defenseless Serbian civilians under UN protection in the villages of Divoselo, Pocitelji, and Citluk were attacked by 2,500 Croatian troops, tanks, and heavy weapons.  Croatian troops occupied these villages for several days before Canadian UNPROFOR troops helped negotiate a cease-fire agreement.  The Canadian UNPROFOR units were themselves, for a period of those days, subjected to attacks by Croatian forces to delay the peacekeepers entry into Medak.  Upon entering Medak, these peacekeepers found evidence of atrocities amounting to genocide committed by the Croatian forces.  They did not find one Serbian civilian left alive; they found numerous mutilated corpses and mass graves; they found Serb-owned property systematically looted and destroyed so as to render the area uninhabitable; they found personal belongings, household goods, furniture, housing items, farm animals, farm machinery, and other equipment looted or destroyed; and they found drinking wells polluted to make them unusable.  These UNPROFOR findings were duly reported and were well publicized throughout the world by 1994 and 1995.

41.     By October 1994, Croatian civilian and military leaders faced a Serb civilian population occupying approximately one-third of Croatia, primarily in the Krajina region. Croatian leaders did not undertake a major offensive in the Krajina region and against Knin itself because: (a) the Croatian forces were not sufficiently trained and equipped to conduct such a major offensive; and (b) the Croatian leadership itself had no experience in planning and conducting such a major and highly coordinated operation.

42.     In or about October 1994, the Croatian leadership, through Minister of Defense

---

continuity, the mission is referred to as "UNPROFOR" throughout the Complaint.

Gojko Susak, negotiated an agreement with Defendant MPRI.  Under the agreement, MPRI was

to train, and modernize as quickly as possible the Croatian Army into a competent fighting force

able to invade the Krajina region and expel the ethnic Serbian population from Croatian

territory.[7]  Susak specifically told MPRI negotiators that "I want to drive the Serbs out of my

country."[8]  MPRI was willing to engage in this project because of the money Croatia was willing

to pay for such services.  According to Ed Soyster, when referring to MPRI's activities, "We do

it for the money, I'm not ashamed to say."[9]

43.    Recognizing that MPRI's obligations under the agreement would violate

Resolution 713 and would also amount to participation in violations of international law, the

parties conspired to represent that MPRI's conduct was limited to providing "democracy

transition assistance" by indoctrinating Croatian armed forces with the principles of

democratization including civilian control of the military.  The parties entered a written

agreement reflecting this "cover" arrangement while concealing the true purpose of MPRI's

engagement.  MPRI has maintained this cover story to the present day.

44.    Had MPRI performed no more services than those acknowledged in its agreement

with Croatia, which it is alleged herein it most certainly did, MPRI's presence and service to

Croatia during the period immediately preceding and covering Operation Storm would alone

---

[7] The International Criminal Tribunal for Yugoslavia (ICTY) Case Information Sheet for Case number IT-06-90, Gotovina *ET AL.*, describes the purpose of Operation Storm as follows:

The indictment alleges that Ante Gotovina, Ivan Cermak, Mladen Markac and others including President Franjo Tudjman, participated in a joint criminal enterprise, the common purpose of which was the permanent removal of the Serb population from the Krajina region by force, fear or threat of force, persecution, forced displacement, transfer and deportation, appropriation and destruction of property or other means.

[8] Halberstam, David. War In A Time of Peace.  New York: Touchstone, 2001 at p. 335.

have constituted aiding and abetting the crimes committed during that operation. This in and of itself constitutes a violation of international law. However, upon information and belief, MPRI's role went much further than simply providing "democracy transition assistance."

45.     Notwithstanding the provisions of its contract, MPRI undertook, from October 1994 through July 1995, to train and modernize the Croatian Army into a competent fighting force and to place the Croatian forces in a position of great advantage, relative to their Serbian enemies, prior to Operation Storm. MPRI did this, in part, by:

>       (a)     Dispatching a 14 member "advisory" team led by Retired U.S. Major General Richard Griffiths, then the Vice President of MPRI, to Croatia in October 1994;
>
>       (b)     Training the Croatian military forces in basic infantry tactics, coordination of medium unit assaults, creation of covering fields of fire, flanking maneuvers, field artillery tactics and techniques, and numerous other battlefield tactics. According to one newspaper account at the time, MPRI also provided training in anti-tank warfare, anti-urban guerrilla warfare and strategies on warfare of reduced intensity;[10]
>
>       (c)     Instructing the Croatian General Staff in the Air-Land 2000 doctrine, a U.S. military doctrine previously developed for the U.S. military by MPRI executives; and
>
>       (d)     Enhancing the morale of Croatian soldiers by the visible presence of famous and distinguished US Army officers recently retired, including Carl Vuono, Vernon Lewis and Richard Griffiths. The presence of MPRI personnel in Croatia at the time of the planning and execution of Operation Storm drastically improved the morale of the Croatian Armed Forces and helped to boost the confidence of the rank and file Croatian soldiers.

46.     In May of 1995, Croatian forces utilized these newly acquired skills in a brief and relatively small-scale attack called "Operation Flash." Operation Flash was an attack directed

---

[9] *US Companies Hired to Train Foreign Armies*, Esther Shrader, April 14, 2002 in the Los Angeles Times.

[10] *How West Let Croatia Sneak Arms*, Uli Schmetzer, August 20, 1995 in the Chicago Tribune.

against the Krajina Serbs in the Western Slavonia region of the Krajina. The attack resulted in hundreds of Serbian civilian deaths, and over 30,000 Serbian refugees. The Hague Tribunal was preparing a war crimes indictment against then Croatian President Franjo Tuđjman for Operation Flash, but this process ended when Tuđjman died in 1999. Operation Flash was widely considered to be a precursor to, and practice for, the "main event", Operation Storm.

47.     By July 1995, MPRI had, by training and facilitating the equipping of Croatia's army, transformed that army into a military force capable of executing a modern, large scale, NATO-model military operation against the Serbian population of the Krajina.[11]

48.     Despite the rapid progress in the capability of the Croatian armed forces to conduct an offensive invasion, the Croatian General Staff had no experience in planning and conducting such an operation. Instead, the Croatian General Staff once again enlisted MPRI to develop a battle plan for the ground invasion of the Krajina region by Croatian forces, and to assist in the implementation of that battle plan.

49.     By July 1995, MPRI had developed and provided to the Croatian General Staff a classic NATO battle plan which required "lightning" speed with highly sophisticated coordination of these key elements: artillery, ground movement, air support, real time intelligence gathering, and destruction of Serbian command and control networks. MPRI provided the Croatian General Staff instruction in the plan's execution through the use of instructional seminars and war-gaming via sophisticated computer simulations, developed by

---

[11] One investigative report at the time said the following of MPRI's training activities in Croatia:

One Croatian officer said: 'They lecture us on tactics and big war operations on the level of brigades, which is why we needed them for Operation Storm when we took the Krajina.' (please see *Invisible US Army Defeats Serbs*,

MPRI for precisely this type of project.

50.     This plan was modeled after Operation Desert Storm, conducted in 1991 against the Republic of Iraq.  MPRI executives, including Carl Vuono and Vernon Lewis, were involved in authoring the Air-Land 2000 Doctrine that heavily influenced the U.S. battle plan in Operation Desert Storm.

51.     The plan of attack against the Serbian Krajina in 1995 was called "Operation Storm."  As conceived by MPRI, Operation Storm would be an attack on a demilitarized civilian population protected only by an UNPROFOR presence and the aforementioned lightly armed and poorly trained civilian defense networks.  As designed by MPRI Operation Storm was a widespread, organized, systematic attack on a civilian population.  The purpose and intent of Operation Storm was to forcibly and permanently displace the Serbian population of the Krajina region from Croatian territory.[12] MPRI knew the purpose and intent of Operation Storm and knew, or should have known, that its implementation would cause the deaths and/or permanent removal from the Krajina of scores of thousands of innocent Serbian civilians.

52.     The Operation Storm plan was a direct violation of Resolution 713 and of a UN-

---

Charlotte Eagar, November 5, 1995 in The Observer)

[12] According to transcripts acquired by ICTY investigators of former Croatian President Franjo Tudjman, speaking at an Operation Storm planning session on Brioni Island in July of 1995:

*We have to inflict such blows that the Serbs will to all practical purposes disappear*, that is to say, the areas we do not take at once must capitulate within a few days.  [emphasis added]

English translation of Brioni meeting transcript found at:
http://icr.icty.org/exe/ZyNET.exe?ZyActionD=ZyDocument&Client=LegalRefE&Index=ExhibitE&Query=Brioni&
File=E%3A%5CLegal_Ref%5CBatchStore%5CExhibit%5CEnglish%5CExportedText%5C0000002M%5C200015
XE0V.txt&QField=DocumentId%5E2000226733&UseQField=DocumentId&FuzzyDegree=1&ImageQuality=r85g
16%2Fr85g16%2Fx150y150g16%2Fi500&Display=hpfrw&DefSeekPage=f&SearchBack=ZyActionL&Back=ZyA
ctionS&BackDesc=Results+page&MaximumPages=1&ZyEntry=1&SeekPage=f&User=ANONYMOUS&Password
=ANONYMOUS

negotiated ceasefire agreement. A key element of the plan was speedy execution so that the Serbian civilian population would be decimated and forcibly displaced, the Serbian culture in the Krajina destroyed and the Serbian territory occupied before JNA forces could be mobilized from Serbia.

53.     As an element of Operation Storm, in the weeks immediately preceding the physical invasion of Krajina, Croatian forces undertook a psychological operations/disinformation campaign against the Serbian civilian population in Krajina.  Croatian operatives spread information that the attack by Croatian forces was imminent for the purpose of instilling panic and fear in a Serb population that had experienced or had become aware of crimes and human rights abuses in prior Croatian operations.  Information was distributed by radio, television, and other means that the Serbs were free to leave and that large convoys of Serbs were already leaving the area.  At the same time, maps depicting "exclusive Croat" territory were shown to the Serb civilians and "exit routes" were made known.  Later, during the 84-hour duration of Operation Storm, these "exit routes" were randomly shelled, killing civilians on their way out of the Krajina.  Serbs who did not evacuate but rather stayed huddled in their homes were later murdered by the Croatian infantry.  All these steps were taken to increase the likelihood and magnitude of success of Operation Storm's primary objective - the permanent displacement of the Serbian population of Krajina after the Croatian army's physical invasion.

54.     In the final days and weeks prior to the launch of Operation Storm, local Croatian press reported that Carl Vuono and other MPRI advisors met with members of the Croatian General Staff on at least 10 separate occasions.[13]  One of these meetings, between Carl Vuono

---

[13] Singer, P.W. Corporate Warriors:  The Rise of the Privatized Military Industry. Ithaca and London:  Cornell

and General Zvonimir Cervenko, the Croatian officer in charge of planning Operation Storm, was secretly held on Brioni Island off the Croatian coast. Internal MPRI documents acquired by Plaintiffs' investigators support this account by placing Carl Vuono in Croatia during this time period. According to a June 6, 1995 letter signed by Carl Vuono and addressed to General Janko Bobetko, the Chief of Staff of the Croatian Armed Forces:

> I am honored to be associated with the Republic of Croatia and most particularly to be your friend and **comrade-in-arms**[…[I know we had tentatively planned to meet in June in Dubrovnik, but my responsibilities do not permit me to return to Croatia in June **so I am arranging a visit in July**. I have asked MG Griffitts to coordinate with your office on the timing for this visit. [emphasis added][14]

The letter also describes a four day seminar to be given by MPRI in August 1995 for the benefit of Croatian military leaders. This period covered the operational time frame of Operation Storm.[15]

55.     Upon information and belief, during these meetings in the days and weeks before the launch of Operation Storm, MPRI officials and the Croatian General Staff finalized and solidified the operational planning for Operation Strom. MPRI approved and endorsed the final operational plan and the Croatian General Staff took steps preparing for its imminent execution.

56.     Shortly before dawn on August 4, 1995, Croatian armed forces launched Operation Storm. Storm sent approximately 150,000 Croatian troops supported by heavy artillery, mechanized armor, and air power into UN Sectors North and South. These sectors were designated demilitarized zones with an essentially defenseless civilian population under the

---

University Press, 2003 at p. 127.
[14] Letter from Carl Vuono to General Janko Bobetko, Chief of Staff of the Croatian Armed Forces, dated 6 June 1995. (See Attached Exhibit 1 – filed under seal in accord with Court Order)
[15] Janko Bobetko, Vuono's "comrade-in-arms", was indicted by the ICTY for his role in the Medak Pocket attack. However, these proceedings were terminated upon Bobetko's death in 2003. Please see ICTY Case Information

protection of UNPROFOR.

57.     A key component of the battle plan was the reliance on artillery shelling in the early stages of the attack.  The artillery explosions panicked and terrorized the Serbs, driving them out of their homes and sending them fleeing out of the Krajina.  The artillery shells were fired into the residential areas of the Krajina.  The missiles traveled so quickly as to be virtually unobservable, and the explosions appeared to come out of nowhere and for that reason were all the more frightening.

58.     Only Serbs living in the Krajina area were targeted for expulsion by the Croatian military forces.  Croatian citizens living in Krajina were spared.  Serbs who refused to leave were shot and burned to death in their homes.  Serbian civilian stragglers were shot.

59.     Operation Storm routed the Serbian population of the Krajina region in less than 72 hours and became the largest land offensive in Europe since World War II.  The actions of Croatian leaders before and during Operation Storm eventually gave rise to criminal indictments of those leaders at the International Criminal Tribunal for the former Yugoslavia (ICTY).  That indictment detailed the human rights and international law violations that took place during and after Operation Storm.  Paragraphs 60 through 65, taken verbatim from the ICTY indictment and highlighted below in italics, recount those human rights and international law violations.

60.     *On commencing the major operation of August 4, 1995, Croatian forces engaged in looting Serb owned or inhabited civilian property almost at the beginning, starting on the second day.  Large scale looting was carried out on a systematic basis, involving both homes and businesses. Convoys of looters were observed going empty-handed into particular towns and*

---

Sheet, found at: http://www.icty.org/x/cases/bobetko/cis/en/cis_bobetko_en.pdf

*then leaving fully-loaded, with household goods, personal belongings and even livestock.*
*Homes, including those occupied by international representatives, were ransacked and*
*completely emptied of their contents, including refrigerators, stoves, electronic equipment,*
*furniture and clothes, down to doors and window frames. In some instances, detained Serb*
*civilians were ordered to conduct looting on behalf of Croatian forces. After loading the stolen*
*property onto military trucks, the detained Serbs were then forced to also unload the stolen*
*items. Most of the looting occurred in homes which had been abandoned by fleeing Serbs, but*
*there were also many instances where the persons were present while their belongings were*
*stolen under threat of physical violence.*

61. *The ethnic cleansing operation included the organized and systematic plunder*
*and destruction of Serb owned or inhabited property. This conduct was not sporadic or limited,*
*but part and parcel of the whole campaign, intended to drive any remaining Serbs from the area*
*and/or to prevent or discourage those who had fled from returning. Some who were attempting*
*to flee were rounded up, loaded into vehicles and transported to detention facilities and*
*"collection centers" to better ensure that they did not return to their settlements.*

62. *This wanton destruction of Serb inhabited towns and villages commenced within*
*one or two days following the beginning of Operation Storm. Croatian forces and some Croat*
*civilians under their watch, implemented a scorched earth, ethnic cleansing campaign, as they*
*systematically destroyed civilian property which was owned or had been inhabited by Serbs and*
*livestock throughout the Krajina region. These forces, including HV and special police,*
*destroyed Serb homes, barns, businesses, buildings, crops and livestock. Often operating in*
*arson squads using inflammable fuels, incendiary bullets and explosives, the Croatian forces left*

*some towns and numerous villages completely destroyed. In places where Serb and Croat*

*properties were side-by-side, Croat houses were spared whilst Serb house were burned.*

*Livestock, such as cattle and pigs, were shot or burned to death in barns and stables. Wells and*

*water supplies were intentionally spoiled. By November 15, 1995, the devastation of Serb*

*properties in the southern Krajina region was so extensive that the Krajina region Serb*

*community and habitat was virtually destroyed.*

63.     *Many Serb civilians who remained in the area rather than fleeing , including men*

*not of military status and unarmed, elderly, women and invalids, were unlawfully killed during*

*Operation Storm and the continuing related operations and/or actions, as evidence, in part, by*

*mass grave excavations. Soldiers opened fire on groups of civilians. Persons were observed*

*being shot at point-blank range and killed execution style, and many persons had to look on*

*while family members were killed. Some persons were burned alive and others were dumped*

*into wells. Other persons died as a result of multiple stab wounds. Persons mysteriously*

*disappeared from their homes and neighborhoods. Some were later found dead and others were*

*never found.*

64.     *In the course of Operation Storm and the continuing related operations and/or*

*actions, Croatian forces inflicted inhumane acts on Serb civilians and persons taking no part in*

*hostilities, including persons placed hors de combat, causing not only mental abuse, humiliation*

*and anguish (including threats to kill such persons or their families), but also severe physical*

*injury, by shooting, beating, kicking and burning people, including extensive shelling of civilian*

*areas and an aerial attack on fleeing civilians. Family members were often forced to watch*

*while other family members were beaten and abused. Inhumane acts and cruel treatment were*

*especially inflicted on the most vulnerable victims, including elderly women and civilians in*

*hospitals.*

65.     *A demographic policy was also implemented whereby much of the Serb Krajina*

*was to be colonized with Croats, whereby Croatian forces and other Croats were moved into*

*many of the abandoned Serb houses that survived.  Homes belonging to Serbs were expropriated.*

*While rights to return to the area or reclaim property may have formally existed, the destruction*

*of Serb property and their papers, under the circumstances of mass flight, made such relief*

*largely artificial and unavailable, and intentionally so.*

66.     Canadian UNPROFOR officer General Andrew Leslie testified at the ICTY trial

of Croatian General Ante Gotovina that Croatian forces intensively shelled Serbian towns,

hitting mostly civilian targets during Operation Storm.  Leslie, an expert artillery officer in the

Canadian military, testified that Croatian forces seemed to indiscriminately target the town of

Knin, in which there were only three possible military targets.   UN forces in the Krajina would

later estimate that more than 80% of civilian structures in Sector South had been completely

destroyed or damaged so badly as to be uninhabitable.  This near total destruction of residential

buildings served to further the goal of preventing the return of Krajina Serbs to Croatia, after the

cessation of hostilities.

67.     Also according to that ICTY indictment, Croatian leaders, including President

Tudjman and Defense Minister Susak, were responsible for the following acts committed during,

or in the immediate aftermath of, Operation Storm:

> (a) Beginning on August 5, 1995, an estimated 150,000–200,000 Krajina Serbs fled
>     or were forced to flee their homes as a result of the offensive;
> (b) Many who did not flee because of sickness, infirmity or age were systematically

harassed and/or unlawfully killed. Some were shot, while others were stabbed and burned to death;

(c) Beginning on August 5, 1995, Croatian forces subjected the Krajina Serbs to inhumane treatment, humiliation and degradation by beating and assaulting them;

(d) Beginning on August 5, 1995, Croatian forces forcibly removed property, including livestock, outbuildings and barns of the Krajina Serbs;

(e) Beginning on August 5, 1995, Croatian forces set fire to and wantonly destroyed villages, homes, outbuildings, barns and livestock of the Krajina Serbs who fled, as well as those who stayed behind;

(f) Beginning on August 5, 1995, Croatian forces committed numerous acts of killing, arson, looting, harassment, terror and threat of physical harm to person and property. By these acts, Croatian forces intimidated and coerced Krajina Serbs into leaving their villages, hamlets and homes; and,

(g) On August 4, 1995 and August 5, 1995, Croatian forces directed a massive artillery assault on Knin, the capital of the RSK. Artillery fire was also directed on civilian targets in the towns of Benkovac, Obrovac, Drnis, Vrginmost, Vonjic, Glina, Petrinja and many villages in the Krajina region.

68. During, or immediately after Operation Storm, Croatian forces destroyed approximately 25,000 Serbian homes, 13,000 Serbian businesses, 56 medical facilities, 78 Orthodox churches, 29 Serbian cultural museums, 181 Serbian Orthodox cemeteries, 352 small shops, all large state-owned factories in RSK, 920 monuments, 211 cafes and restaurants, and 410 craftsmen shops belonging to the Serbian population.

69. Operation Storm resulted in the largest act of ethnic cleansing in Europe since World War II. Nearly the entire pre-war Serbian population in the Krajina region was expelled. Thousands of Serbian villages and hamlets in the Krajina region were destroyed, and thousands of innocent civilians were attacked and killed.

70. Today, the vast majority of Krajina refugees have not returned to Croatia. Tens of thousands of Serbians from the Krajina region continue to live in refugee camps near Belgrade, Serbia. In addition, thousands of Serbian villages and hamlets in the Krajina region remain in ruins and are presently uninhabitable. Upon information and belief, many of these villages and

hamlets remain obstructed by landmines planted during the war.

71.     MPRI had a substantial effect on the success of Operation Storm and the crimes committed during the operation including the period from August 4, 1995 through November 15, 1995.  This effect was provided through direct participation in designing and planning the battle strategy for Operation Storm and through the training provided to Croatian forces in advance of Operation Storm, but also through the moral support and encouragement MPRI officers lent to the Croatian military during Croatia's preparations for Operation Storm.  The mere presence of MPRI advisors in Croatia during this time period instilled the Croatian military and its leaders with much needed confidence.

72.     Over the course of 15 years since Operation Storm concluded, MPRI and its officers and employees have consistently denied the company's involvement in training Croatia's armed forces prior to Storm, and in helping the Croatian General Staff plan and prepare the battle plan for Operation Storm.  Additionally, MPRI and its officers and employees have attempted to conceal any and all evidence of its involvement in these activities.

73.     The details of MPRI's deep involvement in Operation Storm have only recently started to emerge with the passage of time and the progression of the war-crimes trials of Croatian military officers and politicians in the International Criminal Tribunal for the former Yugoslavia.  Within the last 12-18 months, Croatian military officers, semi-official Croatian military journals and newly discovered Croatian Ministry of Defense documents have implicated MPRI in the planning and preparation of Operation Storm.

74.     On July 15 of 2009, General Slobodan Praljak, a former high ranking Croatian Military of Defense official and personal advisor to Franjo Tudjman, testified to the following

during cross examination in his trial for war crimes:

> So that's why we hired the organization MPRI in Croatian Army, with top American generals **whom we paid and who helped us to prepare (Operations) Flash and Storm.** They proposed, and Franjo Tudjman appointed people, but they were not to blame if something didn't go well.[16] [emphasis added]

75.     A 2005 article in the semi-official Croatian military publication *"Polemos"* highlighted the presence of MPRI personnel in Croatian operations centers during Operation Storm:

> MPRI (Military Professional Incorporated) is a private American company headed by the retired General Richard Griffiths that was retained by the MORH in June of 1994; this firm's team of 15 experts had trained the higher and lower ranking HV officers for the era of transition. After Operation Flash they provided training in troops' combat training, **and they monitored the HV's actions from the operations centers.** The NPPs were partially changed to conform to the MPRI—DATP curriculum and to meet the requirements of contemporary military training and the NATO standards.[17] (emphasis added)

76.     An order from the Croatian Ministry of Defense, issued on the eve of the commencement of Operation Storm and signed by the Chief of the General Staff, directly tasks MPRI in the execution of Operation Storm. The document, which was recently acquired by investigators hired by plaintiffs' c ounsel, orders the following:

> Pursuant to my decision instructors-leaders, as well as employees of the Command Headquarters level MPRI-DTAP, shall be engaged to reinforce the Headquarters Operations Team when needed.[18]

---

[16] Please see trial transcript, page 43098, July 15, 2009, in *The Prosecutor v. Prljic, et. al.* (IT-04-74). Slobodan Praljak is described in the indictment as a Senior Croatian Army officer, Assistant Minister of Defence and senior representative of the Croatian Ministry of Defence to the Herceg-Bosna/HVO government. He is also described as a close advisor to President Franjo Tudjman. (The first page and the referenced page of Praljak's testimony is attached hereto as Exhibit 2)

[17] Marko Bukljias, *Schooling of Officers at Petar Zrinski, The Officers' School of the Croatian Army's University, From 1994-1996, Polemos*, at 85-103 (25 Nov. 2005).

[18] Order of the Chief of the Croatian Army General Staff, Zvonimir Cerveneko, to Operational Commanders, dated 3 August 1995. (See attached exhibit 3 – filed under seal in accord with Court Order)

77.     Finally, the Commander of the UNPROFOR unit in Sector South in August 1995, Canadian Major General Alain Forand, testified at the ICTY trial of Ante Gotovina that he, Forand, personally believed MPRI provided assistance to the Croatian military in its planning and preparation for Operation Storm.[19]  Forand was in a unique position to make such an estimation, as he had a necessary understanding of the Croatian military capabilities and the assistance the Croatian military would require to successfully execute an operation such as Storm.

78.     While MPRI continues to deny its involvement in Operation Storm, privately, MPRI has been quite willing to use its role in Operation Storm to earn new business contracts. According to Ed Soyster, referring to allegations of MPRI's involvement, "But it's a great myth. It's good for our business."[20]  Thus, MPRI continues to try to have it both ways – both denying its involvement in Operation Storm and, when trying to make a sales pitch, using the success in that operation as evidence of MPRI's capabilities.

### Class Action Allegations

79.     Plaintiffs seek to certify this suit as a class action under Rule 23(b)(3), and/or 23(c)(4) on behalf of a class or subclasses consisting of all Serbs residing in the Krajina region of Croatia immediately before and/or during the execution of Operation Storm by the Croatian military (the "Class").

80.     The exact number of the members of the Class (or subclasses) is not currently known, but is believed to be in the tens or hundreds of thousands.  The members of the Class are

---

[19] Please see trial transcript, pp. 4438-4439, June 6, 2008, in *The Prosecutor v. Gotovina, et. al.* (IT-06-90-PT).

[20] *Mercenary Inc.,* by Ken Silverstein, Source: Washington Business Forward Magazine, Issue: April, 2001

so numerous that joinder of all Class members is impracticable.

81.     There are questions of law or fact which are common to every member of the

Class, including:

    (a) Whether Operation Storm was a widespread or systematic attack directed against a civilian population;
    (b) Whether an objective of Operation Storm was the deportation or forcible transfer of the Serbian residents of Krajina from Croatian territory;
    (c) Whether Operation Storm would constitute a crime against humanity if implemented consistent with its objectives;
    (d) Whether Operation Storm was implemented consistent with its objectives and whether it constituted a crime against humanity;
    (e) Whether MPRI trained the Croatian military in preparation for Operation Storm;
    (f) Whether MPRI developed the battle plan for Operation Storm, and whether MPRI assisted the Croatian military with the implementation of Operation Storm;
    (g) Whether MPRI provided crucial moral support and encouragement to the Croatian military before, during and immediately after the implementation of Operation Storm;
    (h) Whether MPRI's training, creation of the Operation Storm battle plan, assistance of the implementation of Operation Storm and the moral support and encouragement provided to the Croatian military during Operation Storm was done with the knowledge and/or purpose that the Croatian army forcibly expel or transfer the Serbian residents of the Krajina region from Croatian territory;
    (i) Whether MPRI's actions constituted aiding and abetting crimes against humanity and violations of the laws and customs of war under principles of international law;
    (j) Whether MPRI is liable to Serbian residents of the Krajina region that were forcibly expelled or transferred from Croatian territory for damages resulting from that forcible transfer; and
    (k) Whether MPRI's actions constituted complicity in genocide.

82.     Plaintiffs' claims are typical of the claims of the Class because Plaintiffs and

Class members were injured by the same common course of conduct, namely MPRI's assistance

of the Croatian military with the creation and implementation of Operation Storm which was

designed to, and did result in the forcible transfer of Serbian residents of the Krajina region from

Croatian territory, the destruction of Serbian property in the Krajina region, and the destruction,

in large part, of the Serbian ethnic and religious population, as such, of the Krajina.

Additionally, MPRI's training and moral support provided to Croatia and its military in advance of Operation Storm constituted elements of the same common course of conduct which injured the members of the Class.

83.    Plaintiffs will fairly and adequately protect the interests of the Class because they have no conflicts of interest with any Class members, and because they have retained counsel that are experienced in international law and class action litigation.

84.    Questions of law or fact which are common to the Class, as set forth in paragraph 81 above, predominate over questions affecting individual members because Class members are similarly situated downstream victims of MPRI's common course of conduct, and MPRI's relevant conduct did not vary with respect to any Class member.   In addition, MPRI does not have any defenses specific to individual Class members, and its defenses, if any, apply equally to all Class members.

85.    A class action is superior to any other theoretically available method for the fair and efficient adjudication of this controversy.   Significant economies of time, effort, and expense will inure to the benefit of the Court and the parties in litigation of essentially identical issues on a class-wide rather than a repetitive individual basis.   No unusual difficulties are likely to be encountered in the management of this class action, and concentrating the litigation in this forum is convenient to the parties.


## Count I: Complicity in Genocide

86.    Plaintiffs seek restitution from MPRI for its complicity in the genocide of 1995 perpetrated against Serbian residents of the Krajina area—some 200,000 unarmed civilians.

87.     In order to establish complicity in genocide, it is first necessary to allege and show that the underlying crime of genocide occurred and, second, that it was perpetrated in the Krajina in 1995.

88.     The definition of genocide is word-for-word the same in the Genocide Convention, the statutes of the United States, the statutes of the International Criminal Tribunals for Former Yugoslavia and Rwanda, and the Rome Statute of the International Criminal Court:

> **[G]**enocide means any of the following acts committed with intent to destroy, in whole or in part, a national, ethnical, racial or religious group, as such:
> (a) Killing members of the group;
> (b) Causing serious bodily or mental harm to members of the group;
> (c) Deliberately inflicting on the group conditions of life calculated to

89.     Croatian forces targeted a national minority of ethnic Serbs with artillery fire during Operation Storm.  The specific intent of Operation Storm was not only to bring about the physical destruction of the group in the Krajina, but to kill as many members of the group as possible—just because they were Serbs.  The planned shelling of fleeing civilians was an act of genocide.  The destruction of Serbian homes, the placement of land mines and the poisoning of well water on August 4, 5, 6, and 7 as part of the Operation Storm plan were specifically intended to destroy forever the community that the Serbs had built and were also acts of genocide.

90.     MPRI is liable for complicity in genocide.  Like virtually all crimes, a civil action in tort for compensation can be based upon a crime: the state's criminal interest is in deterrence; the victims' civil interest is in restitution.

91.     Complicity in Genocide is a separate crime under conventional international law. In the *Convention on the Prevention and Punishment of the Crime of Genocide,* 78 UNTS 277

(1948), Article III provides:

> The following acts shall be punishable:
>    (a) Genocide;
>    (b) Conspiracy to commit genocide;
>    (c) Direct and public incitement to commit genocide;
>    (d) Attempt to commit genocide;
>    (e) Complicity in genocide.

The statute of the International Criminal Tribunal for Former Yugoslavia repeats the format of the Genocide Convention. However, there is a variation in the statute of the International Criminal Tribunal for Rwanda. After repeating the five punishable acts (as quoted above) in Article 2, the ICTR statute has a new provision called "Individual Criminal Responsibility." Article 6 ¶ 1 states:

> A person who planned, instigated, ordered, committed or otherwise aided and abetted in the planning, preparation or execution of a crime[…]

Since Article 6 ¶ 1 defines aiding and abetting in specific reference to complicity in genocide (one of the five crimes in listed in Article 2), it is clear that aiding and abetting is distinct from complicity. Thus it would be possible to be an aider and abettor of complicity itself. By contrast, Article 6 ¶ 1 of the ICTR statute provides a formula for the personal attribution of legal responsibility for the underlying crime. Thus there is a clear difference in international conventional law between complicity in genocide and aiding and abetting.

     92.     In ratifying the Genocide Convention, the United States added a number of reservations. See U.S. Reservations and Understandings to the Geneva Convention, 28 ILM 782 (1989). None of these reservations or understandings touched upon Complicity in Genocide. To the same effect, the U.S. implementing legislation for the Genocide Convention is silent on Complicity in Genocide. The United States thus has raised no objection to the listing of

Complicity in Genocide as a stand-alone crime in international law. The crime of Complicity in

Genocide remains in the treaty as ratified by the United States. It is part of the supreme law of

the land under Article VI of the Constitution.

93.     If the present case relied solely upon the Genocide Convention as ratified by the

United States and therefore as constituting the supreme law of the land, then a question might be

raised as to whether the Convention is self-executing in the sense that a private right of action

can be based upon it. Since there is nothing in the Convention itself or in the implementing

legislation that addresses the question of self-execution, the Convention as a whole must be

interpreted as to whether it is self-executing. An oft-cited district court opinion offers a

functional analysis of self-execution of treaties. The relevant formula is as follows:

> The extent to which an international agreement establishes affirmative e and
> judicially enforceable obligations without implementing legislation must be
> determined in each case by reference to many contextual factors: [1] the purposes
> of the treaty and the objectives of its creators, [2] the existence of domestic
> procedures and institutions appropriate for direct implementation, [3] the
> availability and feasibility of alternative enforcement methods, and [4] the
> immediate and long-range social consequence of self or non-self-execution.
> *Handel v. Artukovic*, 601 F.Supp. 1421 (C.D. Cal., 1985)

When the treaty to be interpreted involves genocide, all four factors point in the same direction.

Genocide can be committed during a war or in peacetime.  It can be committed by many persons

or even just one person.[21] It can be committed entirely within a nation's borders or

internationally. It is the single most universally condemned act in all of international law. Thus

in applying the four factors there can be no doubt that [1]  the purposes of the treaty and the

objectives of its creators are aligned in the goal of deterring and punishing genocide by any

---

[21] See Prosecutor v. Nikola Jorgic, Supreme Court, Federal Republic of Germany, 30 April 1999.

judicial means, criminal or civil. [2] The courts of the United States are appropriate for dealing

with liability for genocide, just as are the courts of nearly every country which recognize

"universal jurisdiction" over genocide and crimes against humanity. [3] Whether alternative

enforcement methods are available or feasible is not, in the particular case of genocide, an

excuse for declining jurisdiction. [4] The immediate and long-range social consequences of self-

or non-self-execution can only be favorable across the board for self-execution. There should be

"no place to hide" for any person committing genocide. That person should not find asylum in

the United States if prosecutors do not wish to prosecute (because of political considerations, for

example). A private civil lawsuit against the alleged perpetrator might in some cases be

welcomed by a prosecutor whose hands are tied politically. Therefore, as to all four contextual

factors listed by the *Artukovic* court, the Genocide Convention as ratified by the United States

should be held to be self-executing.

94. But even if the Genocide Convention were non-self-executing, Plaintiffs do not

rely solely upon conventional international law for Count I. The prohibition of genocide is one of

the clearest and most important rules of customary international law. At the International

Military Tribunal at Nuremberg in 1947, *before* the Genocide Convention came into force, and

before the adoption of any other resolution or convention on genocide, the indicted defendants

were alleged to have conducted deliberate and systematic genocide; viz., the extermination of

racial and national groups, against the civilian population of certain occupied territories in order

to destroy particular races and classes of people, and national, racial, or religious groups,

2 *Trial of the Major War Criminals Before the International Military Tribunal* 60 (1947)

(Indictment).

95.     Inasmuch as the jurisdiction of the Nuremberg Military Tribunal was limited to acts in execution of, or connected with, World War II, the Tribunal refrained from inquiring whether genocide was committed prior to 1939. However, there was no question as to its criminality under customary international law of genocide after 1939. See *The Nurnberg Trial*, 6 F.R.D. 69, 131 (1946). Genocide today is regarded as a *jus cogens* norm of customary international law.[22]

96.     Complicity in Genocide is a separate crime from Genocide under conventional and customary international law.  In this respect it resembles the separate and distinct crime of Conspiracy in American criminal law. Both Complicity and Conspiracy are separate from aiding and abetting. Complicity is a completed crime even if the genocide is thwarted, whereas aiding and abetting can only be charged if the genocide occurs. Furthermore, aiding and abetting can be predicated upon an omission—for example, a bank guard who could have prevented the robbery without any danger to himself but instead just watched it happen could be charged with aiding and abetting the robbery by virtue of his inaction. However, a person who failed to act—and had no duty to act—cannot be charged with complicity in genocide. See Judgment, *Akayesu* (ICTR-96-4T0, at § 548, Trial Chamber I, Sept. 2, 1998.[23]

97.     Although a person charged with genocide must be shown to have a specific intent to harm a national, ethnical, racial or religious group as such, this requirement does not apply to

---

[22] Anthea Elizabeth Roberts, *Traditional and Modern Approaches to Customary International Law* 757, 783 (2001) (a *jus cogens* norm is one from which no derogation is permitted).

[23] As one commentator concludes, "'complicity' is to nominate a crime in substance, while . . . 'aiding and abetting' is to prescribe a mode of attributing responsibility for the crime substantively nominated." Chile Eboe-Osuji, '*Complicity in Genocide' versus 'Aiding and Abetting Genocide'*, 3 J. Int'l Criminal Justice 56 (2005).

a person charged with complicity in genocide. If it did apply to such a person, then he would be a participant in the genocide and not merely complicit in it. Then there would be no separate crime of Complicity in Genocide—that crime would simply fold into the general crime of conspiracy. Yet there is a universally recognized distinction between committing genocide and being complicit in it. As previous examples have shown, a person can be complicit in a crime by selling weapons to the perpetrator even if he sincerely hoped that the perpetrator would not fire the weapons. Thus the seller may have had the specific intent to sell the arms at a profit without having a specific intent that anyone be killed.

98.     International courts and tribunals have uniformly held that the requirement of *mens rea* is met if a person charged with complicity knew that the perpetrators had the specific intent to commit genocide.  Article 30 of the Rome Statute of the International Criminal Court defines "knowledge" as follows:  "'[K]nowledge' means awareness that a circumstance exists or a consequence will occur in the ordinary course of events."

99.     In sum, MPRI is liable for complicity in genocide if it knew, or reasonably and commonsensically should have known, that the Croatian Armed Forces had the specific intent to commit genocide. With the details spelled out in this Complaint taken as a whole and considering their immense scale, there is no alternative explanation for the illation that MPRI knew its client Croatia was intent upon a campaign of genocide.

100.    Without MPRI, the genocide could not have taken place, for reasons previously stated. MPRI provided the artillery and other material and provided a successful battle plan based on Operation Desert Storm that updated the AirLand Battle Doctrine. In short, MPRI's

role was necessary in enabling the genocide in Krajina.

101.    By providing the means for committing genocide with knowledge that Croatian Forces had the specific intent to commit it, MPRI's liability for complicity in genocide is established.

WHEREFORE, the Plaintiffs Milena Jovic and Zivka Mijic, individually and on behalf of all others similarly situated, request compensation for property damage and loss of property proximately caused by Operation Storm.  Additionally, Plaintiffs request punitive damages against the Defendants for MPRI's role in complicity in genocide.  Plaintiffs further request any and all other relief that the Court deems just and equitable.

## Count II: Aiding and Abetting Forced Population Transfer

102.    MPRI's conduct, through its employees and executives and as set forth in paragraphs 1 through 78 above, aided and abetted Croatia's violation of the law of nations prohibiting crimes against humanity.  Specifically, it materially assisted Croatia's preparation for and implementation of Operation Storm with the understanding and knowledge that Operation Storm was designed and intended as a widespread, organized systematic attack against a civilian population which would result in the forcible transfer of that civilian population.  Forced population transfers are considered violations of international law and customary international law.[24]

WHEREFORE, the Plaintiffs Milena Jovic and Zivka Mijic, individually and on behalf of

---

[24] Please See Article 49 of Fourth Geneva Convention

all others similarly situated, request compensation for property damage and loss of property proximately caused by Operation Storm. Additionally, Plaintiffs request punitive damages against the Defendants for MPRI's role in aiding and abetting Crimes Against Humanity. Plaintiffs further request any and all other relief that the Court deems just and equitable.

## Count III: Aiding and Abetting the Plunder of Property

103.    MPRI's conduct, as set forth in paragraphs 1 through 78 above, aided and abetted Croatia's violation of the laws or customs of war because it materially assisted Croatia's preparation for and implementation of Operation Storm with the understanding, knowledge and purpose that Operation Storm would result in the plunder of public and private property in majority-Serb population areas by Croatian forces.

WHEREFORE, the Plaintiffs Milena Jovic and Zivka Mijic, individually and on behalf of all others similarly situated, request compensation for property damage and loss of property proximately caused by Operation Storm. Additionally, Plaintiffs request punitive damages against the Defendants for MPRI's role in violation of the laws or customs of war. Plaintiffs further request any and all other relief that the Court deems just and equitable.

## Count IV: Aiding and Abetting the Wanton Destruction of Cities, Towns and Villages

104.    MPRI's conduct, as set forth in paragraphs 1 through 78 above, aided and abetted Croatia's violation of the laws or customs of war, because it materially assisted Croatia's preparation for and implementation of Operation Storm with the understanding, knowledge and

purpose that Operation Storm would result in the wanton destruction of cities, towns and villages in majority Serb populations areas of the Krajina region of Croatia.

WHEREFORE, the Plaintiffs Milena Jovic and Zivka Mijic, individually and on behalf of all others similarly situated, request compensation for property damage and loss of property proximately caused by Operation Storm. Additionally, Plaintiffs request punitive damages against the Defendants for their role in violations of the laws or customs of war. Plaintiffs further request any and all other relief that the Court deems just and equitable.

### Count V:  Aiding and Abetting Crimes Against Humanity

105.  MPRI's conduct, through its employees and executives and as set forth in paragraphs 1 through 78 above, aided and abetted Croatia's violation of the law of nations prohibiting crimes against humanity. Specifically, it materially assisted Croatia's preparation for and implementation of Operation Storm with the understanding and knowledge that Operation Storm was designed and intended as a widespread, organized systematic attack against a civilian population which would result in the forcible transfer of that civilian population.

WHEREFORE, the Plaintiffs Milena Jovic and Zivka Mijic, individually and on behalf of all others similarly situated, request compensation for property damage and loss of property proximately caused by Operation Storm. Additionally, Plaintiffs request punitive damages against the Defendants for MPRI's role in aiding and abetting Crimes Against Humanity. Plaintiffs further request any and all other relief that the Court deems just and equitable.

## JURY DEMAND

Plaintiffs demand a jury trial on all issues so triable.


By: /s/ Robert J. Pavich
ROBERT J. PAVICH
Attorneys for Plaintiffs
PAVICH LAW GROUP
20 South Clark Street, Suite 700
Chicago, Illinois 60603
(312) 782-8500
(312) 853-2187 (FAX)
rpavich@pavichlawgroup.com


ANTHONY D'AMATO
Leighton Professor of Law
Northwestern University School of
Law
375 E. Chicago Avenue
Chicago, Illinois 60611
(312) 503-8474
(312) 587-9969 (FAX)

JEFFREY A. LEON
Freed & Weiss LLC
111 West Washington St., Suite 1331
Chicago, Illinois 60602
(312) 222-0000
(312) 220-7777 (FAX)
jeff@freedweiss.com

KEVIN ROGERS
Attorney At Law
307 N. Michigan Ave., Suite 305!
Chicago, Illinois 60601
(312) 332-1188
(312) 332-0192 (FAX)

KevinRogersLaw@gmail.com

JOHN OSTOJIC
Ostojic & Scudder
332 South Michigan Ave., Suite 1024
Chicago, Illinois 60604
(312) 913-0860
(312) 913-0868 (FAX)
jostojic@ameritech.net

JOHN PAVICH
PAVICH LAW GROUP
20 South Clark Street, Suite 700
Chicago, Illinois 60603
(312) 782-8500
(312) 853-2187 (FAX)
jpavich@pavichlawgroup.com

**Certificate of Service**

I, Robert J. Pavich, an attorney for Plaintiffs, do hereby certify that on February 18, 2011,

I filed the foregoing documents and that service was performed upon all parties via the ECF

filing system.

Respectfully submitted:   /s/_____

                                Robert J. Pavich
                                PAVICH LAW GROUP
                                20 South Clark Street
                                Suite 700
                                Chicago, Illinois 60603
                                (312) 782-8500 (Telephone)
                                (312) 853-2187 (Fascimile)
                                rpavich@pavichlawgroup.com