UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| GENOCIDE VICTIMS OF KRAJINA, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | No. 10 CV 5197 |
| | ) | |
| L-3 SERVICES, INC., | ) | Judge Ruben Castillo |
| | ) | |
| Defendant. | ) | |

## MEMORANDUM OPINION AND ORDER

Milena Jovic and Zivka Mijic bring this putative class action on behalf of themselves and all others similarly situated (collectively, "Plaintiffs"), against L-3 Services, Inc. ("L-3").[1] (R. 26, Second Am. Compl.) Plaintiffs allege violations of the law of nations actionable under the Alien Torts Statute ("ATS"), 28 U.S.C. § 1350. (*Id.*) Presently before the Court is L-3's motion to dismiss under Rules 12(b)(2) and 12(b)(3) of the Federal Rules of Civil Procedure or, in the alternative, to transfer venue under 28 U.S.C. § 1404(a). (R. 29, L-3's Mot.) For the reasons stated below, L-3's motion is denied.

## RELEVANT FACTS

Military Professional Resources Inc. ("MPRI") is a private military contractor currently operating as a division of L-3. (R. 26, Second Am. Compl. ¶ 14.) In 1988, MPRI was founded by a group of high-ranking American military officers. (*Id.*) According to Plaintiffs, in or about October 1994, MPRI negotiated an agreement to "train, and modernize as quickly as possible the

---

[1] This suit was originally filed against MPRI, Inc. and L-3 Communications Corp. (R. 1, Compl.) Upon discovering that L-3 Communications had merged MPRI with L-3 Services, Inc., Plaintiffs amended their complaint, naming L-3 Services, Inc. as the sole defendant. (R. 26, Second Am. Compl.)

Croatian Army into a competent fighting force able to invade the Krajina region and expel the ethnic Serbian population from Croatian territory." (*Id.* ¶ 42.) Plaintiffs allege that MPRI staff assisted the Croatian Army in generating a plan, modeled after Operation Desert Storm in Iraq and known as Operation Storm, to attack the civilian, ethnic Serbian population of Krajina. (*Id.* ¶¶ 48-51.) On August 4, 1995, Croatian armed forces launched Operation Storm. Operation Storm sent approximately 150,000 Croatian troops supported by heavy artillery, mechanized armor, and air power into demilitarized zones in the Krajina region. (*Id.* ¶ 56.) During Operation Storm, thousands of ethnic Serbs were murdered and inhumanely treated and hundreds of thousands were displaced from the Krajina region. (*Id.* ¶ 1.) Plaintiffs allege that in addition to helping with planning and training for the attack, MPRI also monitored and assisted in the execution of Operation Storm. (*Id.* ¶¶ 75-76.)

Plaintiffs are survivors of Operation Storm. Milena Jovic fled Croatia and currently resides in Serbia. (*Id.* ¶¶ 2-6.) Zivka Mijic also fled during the offensive and currently resides in Illinois. (*Id.* ¶¶ 7-11.) Plaintiffs bring this action on behalf of the victims of Operation Storm and their heirs and next of kin, alleging that MPRI was complicit in genocide and aided and abetted a crime against humanity. (*Id.* ¶ 1.)

L-3 is a Delaware corporation with its principal place of business and company headquarters located in Alexandria, Virginia. (*Id.* ¶ 12.) L-3 is a wholly-owned subsidiary of L-3 Communications Corporation. (R. 31, Blair Cert. ¶ 2.) L-3 Communications Corporation and its parent, L-3 Communications Holdings, Inc., are headquartered in New York, New York. (*Id.* ¶ 9.) L-3 is licensed to do business in Illinois. (*Id.* ¶ 12.) In June of 2000, L-3 Communications,

Corp., L-3's parent, acquired MPRI. (R. 26, Second Am. Compl. ¶ 13.) In 2007, L-3 merged with MPRI. (*Id.*) MPRI is now an unincorporated division of L-3. (*Id.*)

## PROCEDURAL HISTORY

On August 17, 2010, Plaintiffs initiated this class action against L-3 Communications Corp. and MPRI on behalf of all similarly situated victims of Operation Storm. (R. 1, Compl.) Plaintiffs amended their complaint on November 11, 2010. (R. 7, First Am. Compl.) On January 18, 2011, L-3 Communications Corp. and MPRI filed a motion to dismiss or, in the alternative, to transfer venue. (R. 18, L-3 Communications' Mot.) On February 18, 2011, Plaintiffs moved for leave to file their Second Amended Complaint. (R. 22, Pls.' Mot.) After the Court granted their motion and denied L-3 Communications Corp and MPRI's pending motion as moot, Plaintiffs filed their Second Amended Complaint (the "complaint") naming L-3 Services, Inc., as the sole defendant on March 2, 2011. (R. 26, Second Am. Compl.) In their complaint, Plaintiffs assert five violations of international law cognizable under the Alien Tort Statute ("ATS"), 28 U.S.C. § 1350: (1) complicity in genocide; (2) aiding and abetting forced population transfer; (3) aiding and abetting the plunder of property; (4) aiding and abetting the wanton destruction of cities, towns, and villages; and (5) aiding and abetting crimes against humanity. (R. 26, Second Am. Compl.)

On March 16, 2011, L-3 filed the present motion to dismiss or, in the alternative, to transfer venue. (R. 29, L-3's Mot.) In this motion, L-3 asks the Court to dismiss this case under Rules 12(b)(2) and 12(b)(3), arguing that the Court lacks personal jurisdiction over L-3 and is the improper venue for this action. (*Id.*) In its supporting memorandum, L-3 argues that the Court lacks personal jurisdiction and is the improper venue for this complaint because L-3's contacts

3

with Illinois are merely isolated and sporadic. (R. 30, L-3's Mem. at 3-6.) In the alternative, L-3

asks the Court to transfer this case to either the Southern District of New York or the Eastern

District of Virginia pursuant to 28 U.S.C. § 1404(a). (R. 29, L-3's Mot.) L-3 contends that

either the Southern District of New York or the Eastern District of Virginia would be more

convenient for the witnesses and parties involved and would better serve the public interest. (R.

30, L-3's Mem. at 6-15.)

## LEGAL STANDARDS

Rule 12(b)(2) of the Federal Rules of Civil Procedure provides for dismissal where a

court lacks personal jurisdiction over a party. Fed. R. Civ. P. 12(b)(2). Once the defendant

moves to dismiss the complaint under Rule 12(b)(2) for lack of personal jurisdiction, the plaintiff

bears the burden of demonstrating the existence of jurisdiction. *Purdue Research Found. v.

Sanofi-Synthelabo, S.A.*, 338 F.3d 773, 782 (7th Cir. 2003) (citations omitted). In ruling on a

motion to dismiss pursuant to Rule 12(b)(2), a court may consider matters outside of the

pleadings. *See id.* When a court rules on a personal jurisdiction issue based on the submission

of written materials, the plaintiff must make out a prima facie case of personal jurisdiction. *Id.*

(citing *Hyatt Int'l Corp. v. Coco*, 302 F.3d 707, 713 (7th Cir. 2002)). In evaluating whether the

prima facie standard has been satisfied, the plaintiff is entitled to the resolution in its favor of all

disputes concerning relevant facts presented in the record. *Id.* (citing *Nelson v. Park Indus., Inc.*,

717 F.2d 1120, 1123 (7th Cir. 1983)).

Rule 12(b)(3) provides that a party may move to dismiss based on improper venue. Fed.

R. Civ. P. 12(b)(3). In ruling on a motion to dismiss for improper venue, the court follows the

same standard as for a Rule 12(b)(2) dismissal, taking all the allegations in the complaint as true

and drawing all reasonable inferences in favor of the plaintiff. *See Faulkenberg v. CB Tax Franchise Sys., LP*, 637 F.3d 801, 806 (7th Cir. 2011) (citing *Kochert v. Adagen Med. Int'l, Inc.*, 491 F.3d 674, 677 (7th Cir. 2007)).

Section 1404(a) provides that a party may move to transfer an action to any other district where it might have been brought. 28 U.S.C. § 1404(a). The moving party bears the burden of showing that the forum should be changed. *Coffey v. Van Dorn Iron Works*, 796 F.2d 217, 219-220 (7th Cir. 1986). Section 1404(a) gives district courts discretion to adjudicate motions to transfer on a case-by-case consideration of convenience and fairness. 28 U.S.C. § 1404(a). District courts have broad discretion in denying or granting a motion to transfer under Section 1404(a). *Coffey*, 796 F.2d at 219. District courts are permitted to make any necessary factual findings when determining venue issues. *In re LimitNone, LLC*, 551 F.3d 572, 577 (7th Cir. 2008).

## ANALYSIS

### I.      Personal Jurisdiction

L-3 first argues that this case should be dismissed for lack of personal jurisdiction. In the absence of a federal statutory provision for service, as in this case, Rule 4(k)(1)(A) and Rule 4(e)(1) limit personal jurisdiction to the forum state's long-arm statute. *Tamburo v. Dworkin*, 601 F.3d 693, 700 (7th Cir. 2010). The Illinois long-arm statute contains a "catch-all" provision that "permits its courts to exercise jurisdiction on any basis permitted by the Illinois and United States Constitutions." *Hyatt Int'l Corp.*, 302 F.3d at 714-15 (citing 735 Ill. Comp. Stat. 5/2-209(c)). The Seventh Circuit has found no "operative difference between the Illinois and federal

5

limits on personal jurisdiction." *Id.* at 715. As a result, the state and federal due process analyses merge.

The due process clause protects defendants from being haled into a court unless they have sufficient "minimum contacts" with the forum state such that the maintenance of the suit "does not offend traditional notions of fair play and substantial justice." *Int'l Shoe Co. v. Washington*, 326 U.S. 310, 316 (1945) (internal quotation marks omitted). To establish such minimum contacts, the defendant must have "continuous and systematic business contacts" with the forum state. *Helicopteros Nacionales de Colombia, S.A. v. Hall*, 466 U.S. 408, 415-16 (1984). To determine whether the contacts of the defendant are sufficiently systematic and continuous, courts analyze the nature as well as the substantiality of the defendant's contacts with the forum state such as whether and to what extent the defendant conducts business in the forum state, whether the defendant maintains an office or employees within the forum state, whether the defendant sends agents into the forum state to conduct business, whether the defendant advertises or solicits business in the forum state, and whether the defendant has designated an agent for service of process in the forum state. *See id.* at 416-18.

All of these factors are present in this case and support a finding that the Court has general jurisdiction over L-3. L-3 conducts business in Illinois. L-3 admits to conducting more than $19 million worth of business in Illinois in 2010, more than $16 million in 2009, and more than $7 million in 2008, including more than $2 million in sales from MPRI, the division at issue

in this case, alone in those three years.[2] (R. 35-3, L-3's Am. Resp. to Pls.' Jurisdictional Interrog.

¶ 1.) L-3 also maintains employees in Illinois. L-3 admits to having between 91 and 113

employees working in Illinois in the past three years, including dozens of MPRI personnel.[3] (*Id.*

at 9-10, Resp. to Unnumbered Interrog.) L-3 sends agents into Illinois to conduct business and

solicits business in Illinois. In addition to advertising in national publications, L-3 admits to

communicating with eight companies that "may have offices in Illinois" and attending five trade

shows in Illinois in the past three years, including MPRI's visits to four trade shows in 2010. (*Id.*

¶¶ 13, 15-16.) L-3 is licensed to do business in Illinois and has designated an agent for service of

process in Illinois. (R. 26, Second Am. Compl. ¶ 23.)

Further, L-3 regularly contracts with Illinois businesses. Over the past four years, L-3,

through the MPRI division, has entered into 10 warranty contracts with Illinois businesses. (*Id.* ¶

6.) Additionally, MPRI had a software license with another Illinois business and a training

service contract with the Bureau of Operations. (*Id.*) Another division of L-3 has had contracts

---

[2] The record is unclear as to the precise sales numbers attributable to L-3. L-3 admits to having more than $19 million in sales in Illinois in 2010, however, nearly $11 million of that comes from wholly and partially-owned subsidiaries. The parties in this case failed to brief the Court on how such sales should be treated in assessing minimum contacts nor on the degree to which L-3 controlled its subsidiaries, information that would have aided this Court in making this determination. *See Purdue Research Found.*, 338 F.3d at 788 n.17 (7th Cir. 2003); *see also Richard Knorr Int'l, Ltd. v.Geostar, Inc.*, 2010 WL 1325641 at *4-5 (N.D. Ill. Mar. 30, 2010). L-3's insistence on only referencing its Illinois sales numbers as a percentage of its total revenue throughout its memoranda, without revealing its total revenue, further muddled the issue and left the Court to puzzle over whether L-3's percentages were derived by excluding the subsidiaries' sales or whether L-3 included revenues from subsidiaries and conceded the subsidiary question. Without any argument contrary and drawing all inferences in favor of Plaintiffs, the Court includes the sales of the subsidiaries in its jurisdictional analysis.

[3] Again, neither party briefed the Court on the treatment of employees of subsidiaries. In this instance, however, L-3 used the total number of employees including those of subsidiaries and joint ventures in its memoranda. The Court follows L-3's lead in including these employees in its figures and attributing jurisdictional facts from subsidiaries and joint ventures to L-3.

for the sale of commercial products to an Illinois entity. (*Id.*) A wholly-owned subsidiary of L-3 has had a contract for the sale of products with an Illinois business. (*Id.*) In addition, a joint venture, of which L-3 owns a controlling share, has sub-leased space in Illinois. (*Id.*)

L-3 argues that personal jurisdiction is not conferred by "income alone," by "the presence of [a] small number of employees," by "merely having a business agreement with an Illinois company," by "participation in trade shows," (R. 35, L-3's Reply at 3-7), or by "being licensed to do business in a given state." (R. 30, L-3's Mem. at 6.) In each instance, L-3 is correct. General personal jurisdiction is not created by the mere presence of any one of these factors. This does not mean, however, that these factors are given no weight in the analysis. General personal jurisdiction is assessed on a case-by-case basis taking into account the nature and substantiality of all of the contacts of the defendant.

Each of the cases L-3 relies upon to reject jurisdiction involved a narrower range of contacts than is present in this case. For example, L-3 relies on *McGill v. Gigantex*, No. 05-C-5892, 2005 WL 3436403, at *3 (N.D. Ill. Dec. 12, 2005), to support the proposition that if only a small proportion of revenue is derived from a forum the defendant is not subject to general personal jurisdiction. (R. 30, L-3's Mem at 5.) The defendant in that case, however, had less extensive contacts with Illinois than L-3 has in this case. In fact, the court noted that defendant was a foreign corporation with a foreign principal place of business and no offices, agents, employees, or property in Illinois. *McGill*, 2005 WL 3436403 at *3. The defendant did not advertise or otherwise solicit business in Illinois and had no agent for service of process. *Id.* The defendant's only contact in Illinois was selling bicycle parts to an individual located in Illinois. *Id; see also uBid, Inc., v. GoDaddy Group, Inc.*, 623 F.3d 421, 426 (7th Cir. 2010) (no general

personal jurisdiction found where contacts were "limited to the marketing and sale of registrations for Internet domain names, as well as contracts with many Illinois customers and the hosting of websites accessible from Illinois"); *Richter v. INSTAR Enter. Int'l, Inc.*, 594 F. Supp. 2d 1000 (N.D. Ill. 2009) (no general personal jurisdiction where a small company, not licensed to do business in Illinois, derived less than one-tenth of one percent of $900,000 in total sales from Illinois and had no other contacts beyond having some products displayed at crafts fairs by independent vendors); *Ferris Mfg. Corp. v. S.P.R.D.*, No. 07-cv-00466, 2007 WL 1438375, *3 (N.D. Ill. May 15, 2007) (no general personal jurisdiction found where defendant derived only three percent of $10 million in total sales from Illinois, had one part-time employee on medical leave, and no other contacts); *Merck & Co. v. Barr Labs.*, 179 F. Supp. 2d 368, 374-75 (D. Del. 2002) (no general personal jurisdiction found where defendant derived less than $1 million annually from forum state and only had one account manager who visited at most three times a year and no other contacts). In fact, one of the cases relied upon by L-3 nicely summarizes the state of the law in Illinois: "Those cases in Illinois that have declined to exercise general jurisdiction in Illinois on the basis of the volume of sales did so because the non-resident defendant had no other contact with the forum state." *Abbott Labs. v. Mylan Pharm.*, No. 05-cv-06561, 2006 WL 850916, at *4 (N.D. Ill. Mar. 28, 2006) (citations omitted). In that case, the court found general jurisdiction based on the defendant's license to distribute pharmaceuticals, substantial in-state revenues, website, and contracts with Illinois businesses. *Abbott Labs.*, 2006 WL 850916 at *3-4.

9

This pattern repeats itself with L-3's arguments that a small number of employees does not confer jurisdiction,[4] that business agreements do not confer jurisdiction,[5] and that participation in trade shows does not confer jurisdiction.[6] In each instance, the defendants at issue had less extensive contacts than L-3 in this case. Given L-3's wide-ranging and substantial contacts with Illinois, the Court finds that Plaintiffs have met their prima facie burden of demonstrating that personal jurisdiction properly lies with the Court.

## II.   Transfer of Venue

L-3 next argues that this case should be transferred to either the Southern District of New York ("SDNY") or the Eastern District of Virginia ("EDVA") under 28 U.S.C. 1404(a). Section 1404(a) provides: "[f]or the convenience of parties and witnesses, in the interest of justice, a district court may transfer any civil action to any other district or division where it might have been brought." 28 U.S.C. 1404(a). In other words, a transfer under § 1404(a) is appropriate if: (1) venue is proper in the transferor court; (2) venue and jurisdiction would be proper in the

---

[4] Cases cited by L-3 for this proposition are off-point and offer no support. *See Tamburo*, 601 F.3d at 700 (no general jurisdiction found where defendants had no employees in forum state, sporadic visits, a few sales, no license, no office, and no agents); *Illinois v. Hemi Grp. LLC*, 622 F. 3d 754, 757 (7th Cir. 2010) (no general jurisdiction found where defendant only had a website and no in-state employees).

[5] *See Corus Int'l Trading Ltd. v. Ereğli Demir ve Çelik Fabrikalari, T.A.S.*, 765 F. Supp. 2d 1079, 1083-84 (N.D. Ill. 2011) (no general jurisdiction found where defendant regularly purchased goods from Illinois but had no other contacts); *Am. Top English, Inc. v. Golden Gate Capital, L.P.*, No. 03-cv-07021, 2004 WL 407031, *3 (N.D. Ill. Feb. 25, 2004) (no general jurisdiction where defendant merely had a business relationship with an Illinois distributor and occasionally sold video tapes in Illinois and no other contacts).

[6] *See Stein v. Rio Parismina Lodge*, 695 N.E.2d 518, 523-24 (1st Dist. 1998) (no general jurisdiction found where defendant visited trade shows, advertised, and had no other contacts with Illinois); *CF Indust. v. Ben-Trei, Ltd.*, No. 09-cv-01353, 2009 WL 2765972, *4 (N.D. Ill. Aug. 7, 2009) (no general jurisdiction found where defendant derived less than one percent of business with Illinois vendors, sent two employees to an annual convention of an Illinois trade association, and leased railcars from an Illinois company but had no other contacts).

transferee court; and (3) transfer will serve the convenience of the parties and witnesses and the interest of justice. *See Coffey*, 796 F.2d at 219-20 (citations omitted). While examining all the factors for and against transfer, a court must bear in mind that the moving party bears the burden of establishing that the transferee court is the more convenient forum. *Coffey*, 796 F.2d at 219-20. Weighing the factors for and against transfer is committed to the discretion of the trial court. *Id.* at 219.

### A.    Venue

As an initial matter, venue is proper in the Northern District of Illinois ("NDIL"). Section 1391(c) provides, in relevant part, that "[f]or purposes of venue under this chapter, a defendant that is a corporation shall be deemed to reside in any judicial district in which it is subject to personal jurisdiction at the time the action is commenced." 28 U.S.C. 1391(c). L-3 is subject to general personal jurisdiction in Illinois, and venue in the Court is thus proper. Venue is also proper in the transferee courts of the Southern District of New York ("SDNY") and the Eastern District of Virginia ("EDVA") because L-3's principal place of business and headquarters are located in Virginia and L-3 consents to jurisdiction in New York. 28 U.S.C. §1391. The parties devote most of their discussion to the issues of convenience to the parties and witnesses and the interests of justice. Consequently, the Court will proceed to address the various factors militating for and against transfer.

### B.    Convenience of parties and witnesses

In considering the convenience of the parties and witnesses, the court should consider: (1) the plaintiff's choice of forum; (2) the situs of material events; (3) the relative ease of access to sources of proof; (4) the convenience of the witnesses; and (5) the convenience to the parties of

11

litigating in the respective forums. *See Research Automation v. Schrader-Bridgeport Int'l, Inc.*, 626 F.3d 973, 978 (7th Cir. 2010).

### 1. Plaintiffs' choice of forum

Because there is no relationship between the NDIL and the material events of this case, the plaintiff's choice of forum is given less weight in this case. Generally, a plaintiff's choice of forum is given considerable deference. *See FDIC v. Citizens Bank and Trust Co.*, 592 F.2d 364 (7th Cir. 1979). That deference is lessened, however, if the forum does not have a significant relationship to the material events leading to the litigation. *See Research Automation*, 626 F.3d at 979. There is no evident relationship alleged between the NDIL and the material events leading to this litigation, and there is a relationship alleged between the EDVA and the material events leading to this litigation. The deference to plaintiff's choice of forum is therefore lessened in this instance.

### 2. Situs of material events

Both parties concede that the bulk of material events took place abroad. However, L-3 contends that "the important decisions bearing on MPRI's work in Croatia were made at its Alexandria, Virginia headquarters" making the EDVA "the forum encompassing the situs where key domestic conduct occurred." (R. 30, L-3's Mem. at 13.) Plaintiffs argue that "[t]he focus of this case is primarily on MPRI's activities in Croatia, not in the EDVA, and as such the location of MPRI's Virginia headquarters is not a sufficient factor to warrant transfer." (R. 34, Pls.' Resp. at 19.) While MPRI's activity in Virginia giving rise to this case may be minimal, no evidence is offered that the NDIL is in any way related to material events, and Plaintiffs do not claim it is. Thus, the situs of material events slightly favors a transfer to the EDVA.

### 3. Access to sources of proof

The Court next considers the ease of access to sources of proof. L-3 argues that many relevant documents will be obtained from four sources: (1) the headquarters of L-3's parent company, L-3 Communications, in New York; (2) L-3's headquarters in Virginia; (3) the United Nations ("U.N."), headquartered in New York; and (4) departments of the United States federal government, including the State Department, located in the Washington, D.C. region. (R. 30, L-3's Mem. at 9-10, 13-14.) Plaintiffs contest the importance of all four of these sources, arguing that "[m]ost if not all the documentary evidence of MPRI's involvement in Operation Storm is to be found in the Balkans or in the Hague, not in Virginia. This appears to be particularly so where MPRI's cover story is that its assistance to the Croatian military in August 1995 had nothing to do with Operation Storm." (R. 34, Pls.' Resp. at 19.) Plaintiffs contend that the relevant U.N. archives are held in their original form in the Hague, not New York, and are available in their entirety online. (R. 34, Pls.' Resp. at 17-18.) Plaintiffs also provide an affidavit from an attorney with the International Criminal Tribunal for the Former Yugoslavia to confirm that these documents can be easily accessed anywhere in the world. (*Id.*, Ex. 5, O'Sullivan Aff.) Given the easy electronic access to documents, the access to source of proof factor is given less weight than it has in the past. *See, e.g., Rabbit Tanaka Corp. USA v. Paradies Shops*, 598 F. Supp. 2d 836, 840 (N.D. Ill. 2009) ("In this day and age, transferring documents from one district to another is commonplace and, given the widespread use of digital imaging in big-case litigation, no more costly than transferring them across town."). Even given Plaintiffs' success in minimizing its importance, the access to sources of proof factor slightly favors transfer to either the EDVA or the SDNY.

### 4.    Convenience of witnesses

The convenience of the witnesses is often considered the most important factor in the transfer analysis. *See Schwartz v. Nat'l Van Lines, Inc.*, 317 F. Supp. 2d 829, 836 (N.D. Ill. 2004).  Additionally, the convenience of non-party witnesses is more significant than party witnesses because party witnesses normally must appear voluntarily. *Amorose v. C.H. Robinson Worldwide, Inc.*, 521 F. Supp. 2d 731, 735 (N.D. Ill. 2007).  "To determine the convenience to the witnesses, the court must look to the nature and quality of the witnesses' testimony with respect to the issues of the case." *Schwartz*, 317 F. Supp. 2d at 836.

First, regarding party witnesses, likely witnesses include some of the thousands of victims of Operation Storm as well as employees of L-3.  The putative class in this case is hundreds of thousands of Krajina refugees.  Most of these refugees live in the Balkans.  However, Plaintiffs provide affidavits from the Serbian Consulate in Chicago and the Bishop of the Midwest/New Gracanica Diocese of the Serbian Orthodox Church estimating that the number of Krajina refugees in the Chicago area is in the thousands, more than any other area outside of Serbia itself. (R. 34, Pls.' Resp., Ex. 6, Consulate Letter; Ex. 7, Bishop Aff.)  These individuals are members of a refugee community struggling to rebuild their lives, and the supportive Serbian community in the Chicago area overwhelmingly makes the NDIL a more convenient forum for putative plaintiffs residing both in and outside of the United States.  Taking into consideration the disparity of means between Plaintiffs and L-3, the convenience of party witnesses strongly favors the NDIL.

The convenience of non-party witnesses also slightly favors the NDIL.  Non-party

14

witnesses likely include elderly "former" executives of MPRI, living in Virginia;[7] former

members of the Croatian government and military, likely residing in either the Balkans or in

prison under the control of the U.N.;[8] former Canadian military personnel, one of whom was

identified as currently living in Montreal; a former Ambassador to Croatia, who is now a state

senator in Vermont; a former U.S. military attaché to Croatia, who resides in Virginia; and

civilian witnesses from Operation Storm, likely living in the Chicago region or the Balkans.

Regarding foreign non-party witnesses, the parties disagree on the convenience of the

different forums. L-3 argues that both the SDNY and the EDVA are closer to all foreign

witnesses, (R. 30, L-3's Mem. at 10, 14), and that it would be more manageable for the U.N. to

transfer the Croatian witnesses in custody to either the SDNY or the EDVA. (R. 35, L-3's Reply

---

[7] In their pleadings, Plaintiffs identify "Individuals of Note"–individuals whom Plaintiffs hope to name as defendants in an amended complaint "should further investigation and case law developments warrant." (R. 26, Second Am. Compl. ¶¶ 15-18, p. 4 n.2.) All of these individuals are identified in L-3's memoranda as former employees of L-3 and retired U.S. Army Generals currently residing in Northern Virginia. (R. 30, L-3's Mem. at 11.) Plaintiffs allege that these individuals "managed and controlled MPRI's work in Croatia from 1994-1996, and were involved in providing and facilitating MPRI's assistance with Operation Storm."(R. 26, Second Am. Compl. ¶ 19.) The weight given to convenience of these witnesses is minimized for two reasons. First, the Court questions that these individuals will refuse to testify and notes that these are not the type of witnesses likely to be reluctant to testify. *See, e.g., Ratner v. Hecht,* 621 F. Supp. 378, 383 (N.D. Ill. 1985) (noting that current and past employees are not the type to be reluctant to testify). Second, the Court notes that while these witnesses are repeatedly and forcefully represented as *former* MPRI employees in L-3's memoranda, they are identified in the certification of James Blair, a senior vice president at L-3, as *"either current or former* MPRI employees." (R. 31, Blair Cert. ¶ 13) (emphasis added.) The Court assumes that this discrepancy is merely that and not an attempt to mislead the Court.

[8] In their pleadings, Plaintiffs mention several former members of the Croatian military and government including President Franjo Tudjman, Former Minister of Defense Gojko Susak, General Ante Gotovina, General Ivan Cermak, General Mladen Markac, General Janko Bobetko, General Slobodan Praljak, and General Zvonimir Cerveneko. (R. 26, Second Am. Compl. ¶¶ 42, 42 n.7, 54, 76 n.18.) According to L-3, Generals Gotovina and Markac have recently been convicted in the International Criminal Tribunal for the Former Yugoslavia and are imprisoned. (R. 35, L-3's Reply at 14 n.9.) The current locations of all of these officers and officials are not identified by either party.

at 14 n.9.)  Plaintiffs argue that Chicago has the only direct flights from the former Yugoslavia, making it more convenient for witnesses living in the Balkans, and that the one Canadian military officer identified has voiced his willingness and preference to testify in Chicago.  (R. 34, Pls.' Resp., Ex. 4, General Forand Aff.)  Further, Plaintiffs provide an affidavit from the Serbian Consulate in Chicago, offering to provide any logistical and diplomatic assistance necessary to Serbian citizens called to testify.  (Id., Ex. 6, Consulate Letter.)  The availability of flights and the support of the Serbian community make the NDIL more convenient for non-party Serbian witnesses.

It is less clear which forum would best serve other foreign non-party witnesses. Of particular importance is the accessibility of former Croatian military leaders who may be called upon to testify regarding MPRI's involvement in Operation Storm.  Some of these leaders have been sentenced by the International Criminal Tribunal for the Former Yugoslavia and are under the control of the U.N.  Neither party identifies where these individuals are located.  Nor do the parties discuss the process by which the generals' testimony can best be secured beyond L-3's bare assertion that it is "beyond cavil" that either of its preferred fora is more convenient for the U.N.  (R. 35, L-3's Reply at 14 n.9.)  With no arguments to the contrary, the Court concludes that no forum is more convenient for these witnesses.  Given that the NDIL is more convenient than the SDNY or EDVA for Serbian witnesses, the Court finds that the convenience of foreign, non-party witnesses favors the NDIL.

Regarding domestic non-party witnesses, a few live closer to the EDVA or SDNY.  For example, the four "former" MPRI executives discussed in Plaintiffs' complaint all reside in Northern Virginia.  (R. 31, Blair Cert. ¶ 13.)  L-3 identifies a potential key defense witness,

16

Lieutenant Colonel Richard C. Herrick, former U.S. military attaché to Croatia. (R. 35, L-3's Reply at 11.) This witness also currently resides in Virginia. (*Id.* at 12.) L-3 also identifies former Ambassador to Croatia and current Vermont State Senator Peter Galbraith as a potential witness. (*Id.* at 11-12.) The SDNY is slightly more convenient for Senator Galbraith; however, travel between Vermont and the SDNY, EDVA, and NDIL is almost similarly inconvenient. Given the questionable status of the "former MPRI executives," the most that can be said regarding domestic non-party witnesses is that one would favor the EDVA and another would favor the SDNY. The inconvenience of traveling to the NDIL would be minimal for these few witnesses, however, given the easy and wide availability of flights to and from the NDIL. These witnesses could easily access flights from New York or Virginia to and from Chicago. Meanwhile, a substantial number of foreign witnesses will not be substantially inconvenienced by the choice of one forum over another. Witnesses arriving from Serbia would best be served by the NDIL, offsetting the minimal convenience to the few witnesses identified as best served by the SDNY and the EDVA. The convenience of non-party witnesses therefore also favors the NDIL.

### 5. Convenience of the parties

Fifth, the convenience of the parties favors maintaining the suit in the NDIL. In considering the convenience of the parties, a court should consider the parties' respective residences and their ability to bear the expenses of litigating in a particular forum. *Hanley v. Omarc, Inc.*, 6 F. Supp. 2d 770, 776 (N.D. Ill. 1998). As neither party resides in the SDNY, transfer to that venue would have both parties litigate in a foreign forum. This weighs against transfer to the SDNY. L-3 is an international corporation with billions of dollars in revenue and

17

an expertise in logistics. While L-3 is headquartered in Virginia, it can bear the expense of litigating in Illinois. Plaintiffs, on the other hand, are refugees from a brutal conflict. While the majority still live in the Balkans, the largest population of Krajina refugees outside of Serbia lives in the Chicago area. In addition to relatively easy transport to the Chicago area, foreign putative plaintiffs are able to rely on the logistical and diplomatic assistance of the Serbian Consulate in Chicago as well as the most extensive network of community support outside of Serbia itself. This Court also takes judicial notice that any lodging costs would probably be less expensive in the NDIL than in the SDNY or EDVA. The NDIL provides the most convenient forum for Plaintiffs, and the convenience of the parties favors maintaining the suit in Illinois.

## C.     Interest of justice

Next, the Court must consider whether a transfer is in the interest of justice. This inquiry "is a separate element of the transfer analysis that relates to the efficient administration of the court system." *Research Automation,* 626 F.3d at 978. In considering the interest of justice, a court should consider, *inter alia*: (1) the speed at which the case will proceed to trial; (2) the court's familiarity with the applicable law; (3) the desirability of resolving controversies in each locale; and (4) the relation of each community to the occurrence at issue. *See Research Automation,* 626 F.3d at 978; *Coffey,* 796 F.2d at 221. The interests of justice "may be determinative in a particular case, even if the convenience of the parties and witnesses might call for a different result." *Coffey,* 796 F.2d at 220 (internal citations omitted).

First, regarding docket congestion and the likely speed to trial, L-3 notes that the median time to trial is 28.3 months in this district, 30.9 months in the SDNY, and 11.1 months in the EDVA. (R. 30, L-3's Mem. at 11-12 n.10;15 n.12.) Plaintiffs argue that the median time to

18

disposition for civil cases is a better measure of docket congestion than the median time to trial. (R. 34, Pls.' Resp. at 20 n.27.) In this district that number is 6.2 months, while in the EDVA it was 4.9 months. (*Id.*) The Court agrees that the median time to disposition is a better indicator of the parties' expected experience with court congestion, and given the small difference between the courts, this factor is neutral.

The court's familiarity with relevant law is likewise neutral. L-3 argues that the SDNY has an advantage in that it is the home of the U.N. headquarters and often adjudicates cases involving foreign sovereigns. (R. 30, L-3's Mem. at 12.) In the alternative, L-3 argues that the EDVA, by dint of its location in the National Capital Region, would have more familiarity with matters bearing on national defense, military law, and international conventions. (*Id.* at 15.) We are not persuaded that any court has a particular advantage in this area of the law, and the NDIL has seen its fair share of Alien Tort Statute cases. *See, e.g., Victims of Hungarian Holocaust v. Hungarian State Rys*, No. 10-cv-00868, 2011 WL 2672400 (N.D. Ill. July 8, 2011).

Finally, the relationship to the dispute of the communities in which the respective courts sit does not favor any forum. L-3 argues that New York courts have a strong interest in adjudicating this suit because L-3's parent and grandparent corporations are headquartered there. This is unpersuasive. The case L-3 cites to support the argument that venue properly belongs in the forum of a parent corporation says nothing of the sort. It involved no subsidiaries and merely notes that a state has an interest in adjudicating disputes where the conduct of businesses operating out of the state is at the heart of the matter. *Vanguard Mun. Bond Fund v. Thomson Publ. Corp.*, 974 F. Supp. 1159, 1162 (N.D. Ill. 1997). In this case, that would be Virginia, the location of MPRI headquarters during its involvement in the Balkans and the current

headquarters of L-3. L-3's argument that New York has a meaningful interest in resolving disputes touching upon the activities of the U.N. is also unpersuasive. To support this argument, L-3 cites *United States v. Kim*, 246 F.3d 186 (2d Cir. 2001), a criminal case from the Second Circuit. In *Kim*, the Second Circuit found that venue was proper under the federal wiretapping statute over a former U.N. employee who defrauded the U.N. using banks based in Manhattan. *Id.* at 191-93. The analysis never mentions a special relationship between the SDNY and the U.N., and given that the role of the U.N. in the case before the Court is merely as a source of witnesses and documents, it is unclear what reason there could be for granting it such a special relationship.

More persuasive are L-3's arguments that the EDVA has an interest in regulating the actions of a Virginia-based military contractor. However, the interest of the EDVA to regulate its businesses must be weighed against the interests of the NDIL in redressing the wrongs done to its citizens. Illinois has absorbed thousands of Krajina refugees and helped to resettle them. The Court believes that both Illinois and Virginia have interests in this dispute.

The Court finds that L-3 fails to meet its burden of establishing that another forum is more convenient than the NDIL. While the interest of justice factors favor neither party, the private interest factors favor maintaining the suit in the NDIL. Though the situs of material events and the ease of access to sources of proof slightly favor transferring the case to the EDVA, the convenience of witnesses strongly favors maintaining the suit in Illinois.

## CONCLUSION

For the reasons stated above, the Court denies L-3's motion to dismiss or, in the alternative, to transfer venue. (R. 29.) The parties are directed to reevaluate their settlement

positions in light of this opinion and to exhaust all efforts to settle this case. The parties shall

appear for a status on September 27, 2011 at 9:45 a.m. to set a firm litigation schedule.

Entered: _____

**Judge Ruben Castillo**
**United States District Court**

**Dated:** August 17, 2011