**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| MILENA JOVIC, ZIVKA MIJIC, | ) | |
| MIRA GRUBOR, BOSKO BJEGOVIC and | ) | |
| DALIBOR MRKALJ, and all others similarly | ) | |
| situated. | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | Case No. 10 CV 5197 |
| | ) | |
| L-3 SERVICES, INC.; and | ) | Judge John Lee |
| ENGILITY HOLDINGS, INC. | ) | |
| | ) | |
| Defendants. | ) | |

_____

## PLAINTIFFS' RESPONSE TO DEFENDANTS' MOTION TO DISMISS

# TABLE OF CONTENTS

INTRODUCTION ................................................................................................................9

ARGUMENT...................................................................................................................... 10

I.       PLAINTIFFS' CLAIMS ARE NOT TIME-BARRED ....................................... 10

    A.    War Crimes of the Type Alleged In the TAC Are not Subject to Statute of Limitations ............................................................................................... 10

    B.    Equitable Tolling From Fraudulent Concealment Applies To This Case................................................................................................................ 12

    C.    The Continuing Violation Doctrine Precludes Application of the Statute of Limitations ............................................................................................... 16

II.    THIS COURT HAS FEDERAL JURISDICTION OVER PLAINTIFFS' CLAIMS UNDER 28 U.S.C. 1331 and 28 U.S.C. 1350 ...................................................... 17

    A.    This Court Has Subject Matter Jurisdiction Over Plaintiffs' Claim Under U.S.C 1350 ........................................................................................... 17

        1.    The TAC Alleges That Defendant's Conduct That Occurred Exclusively Within The United States Violated Universal Norms of International Law, and Thus the U.S. Conduct Alone Provides This Court With Subject Matter Jurisdiction Over Plaintiffs' ATS Claims .................................................................................................. 17

        2.    The Facts Plead in the TAC, When Considered as a Whole, Overcome Any Presumption Against Extraterritoriality that Would Apply to Defendants Conduct in Croatia.................................... 19

    B.    This Court Has Jurisdiction Over Plaintiffs' Federal Common Law Claims Pursuant to U.S.C. 1331 ....................................................................... 22

C.      This Court Has Jurisdiction Over Plaintiffs' Claim Pursuant To The
         Class Action Fairness Act ...................................................................................... 24

III.     PLAINTIFFS HAVE ADEQUATLY PLEAD CLAIMS FOR WHICH RELIEF CAN BE
         GRANTED ............................................................................................................... 25

         A.      Plaintiffs Have Adequately Alleged That Defendants Acted With The
                  Requisite Mens Rea To Sustain Counts I,IV,V, ....................................... 26

         B.      Plaintiffs Have Alleged Sufficent Facts That Defendant Purposefully Aided
                  and Abetted Violations of International Law ........................................... 28

         C.      Plaintiffs Have Sufficently Pled Principal Liability ............................................. 30

         D.      Plaintiffs State a Claim Under State Conspiracy Law .......................................... 31

IV.      THE ACT OF STATE DOCTRINE DOES NOT REQUIRE DISMISSAL OF THIS
         CASE ...................................................................................................................... 33

CONCLUSION ................................................................................................................... 38

<u>**TABLE OF AUTHORITIES**</u>

**Cases**

*Abiola v. Abubakar,*
   2005 WL 3050607 at *2 (N.D.IL, 2005) ................................................................ 37

*Adkins v. VIM Recycling, Inc.,*
   644 F.3d 483 (7th Cir. 2011) .............................................................................. 25

*Al Shimari v. CACI Int'l, Inc.,*
   62013 WL 3229720 (E.D. Va., 2013) ................................................................. 21

*Bissessur v. Indiana Univ. Bd. of Trustees,*
   581 F.3d 599 at 603 (7th Cir. 2009), reh'g denied (Nov. 24, 2009) ..................... 25

*Bodner v. Banque Paribas,*
   114 F. Supp. 2d 117 (E.D.N.Y. 2000) ............................................................. 14, 16

*Cada v. Baxter Healthcare Corp.,*
   920 F.2d , 446 (7th Cir., 1990) ......................................................................... 12

*Chapple v. Nat'l Starch & Chem. Co. & Oil,*
   178 F.3d 501, 506 (7th Cir. 1999) ...................................................................... 12

*Chavez v. Carranzal,*
   559 F. 3d 486 (6th Cir., 2009) ........................................................................... 16

*Dasgupta v. University of Wisconsin Bd. of Regents,*
   121 F.3d 1138 (7th Cir. 1997) ........................................................................... 16

*Doe v. Exxon Mobile Corp.,*
   *654 F.3d 11 (2009)* ........................................................................................... 26

*Daventree Ltd v. Republic of Azerbaijan,*
   *349 F.Supp.2d 736 (S.D.N.Y.2004)* .................................................................. 37

*DRFP, LLC v. Republic Boliviana de Venezuela,*
   *2013 WL 2096652 at *15 (S.D. Ohio May 14, 2013)* ....................................... 34

*Flomo v. Firestone Nat. Rubber Co., LLC,*
   643 F.3d 1013  (7th Cir. 2011) ......................................................................... 17

*Galloway v. General Motors Service Parts Oper.,*
   78 F.3d 1164,(7th Cir.1996) ............................................................................. 16

*Garcia v. Chapman,*
   911 F. Supp.2d 1222,(S.D. Fla. 2012) ............................................................. 35

*Giannopoulos v. Iberia Lineas Aereas de Espana, S.A.,*
   2011 WL 3166159 ........................................................................................................ 25

*Giraldo v. Drummond Co., Inc.,*
   2013 WL 3873960 (July 25, 2013) ................................................................................ 21

*Gonzalez v. Hardy,*
   11 C 8578, 2012 WL 3292845 (N.D. Ill. Aug. 9, 2012) ............................................... 26

*Hoffman-La Roche, Inc. v. Greenberg,*
   447 F2d 872 (7th cir 1971) ......................................................................................... 30

*Holocaust Victims of Bank Theft v. Magyar Nemzeti Bank,*
   807 F.Supp.2d 689 (2011) .............................................................................. 14, 23, 34, 37

*Illinois v. City of Milwaukee,*
   403 U.S. 91 (1972) ........................................................................................................ 22

*In re Air Cargo Shipping Services Antitrust Litigation,*
   2008 WL 5958061 (2008) ............................................................................................. 25

*In re Tesch,*
   13 Int'l L. Rep. 250 (1947) ........................................................................................... 27

*In re. Agent Orange Product Liability Lit.,*
   375 F. Supp.2d 7, 63 (E.D.N.Y. 2005) ......................................................................... 10

*Jogi v. Voges,*
   480 F.3d 822 (7th Cir. 2007), ..................................................................................... 23

*Kadic v. Karadzic,*
   70 F.3d 232 (2nd Cir. 1995). ....................................................................................... 36

*Konowaloff v. Metro. Museum of Art,*
   702 F.3d 140 (2d Cir. 2012) .......................................................................................... 37

*Kiobel v. Royal Dutch Petroleum Co.,*
   133 S.Ct. 1659 (2013) ........................................................................................... *passim*

*Konowaloff v. Metro. Museum of Art,*
   702 F,3d 140 (2d Cir. 2012) .......................................................................................... 37

*Lizarbo v. Rondon*
   642 F.Supp.2d 473 (D.Md. 2009) ............................................................................ 34, 36

*Matthews v. Homecoming Financial Network,*
   2005 WL 2387688 (N.D.Il., 2005) ............................................................................... 13

*Max M v. Thompson*,
  585   F. Supp. 317 (N.D. Ill 1984) ...............................................................17, 21

*Mohamed v. Rajoub*,
  634 F.3d 604(D.C. Cir. 2011)..........................................................................24

*Moore v. Morales*,
  415 F.Supp.2d 891(2006)................................................................................12

*Paquete Habana*,
  175 U.S. 677  (1900)........................................................................................22

*Reiser v. Residential Funding Corp.*,
  380 F.3d 1027 (7th Cir.2004)...................................................................12, 13

*Reiser v. Residential Funding Corp.*,
  380 F.3d 1027 (7th Cir.2004). ................................................................12, 13

*Rosner v. United States of America*,
  231 F.Supp.2d 1202 (S.D.Florida, 2002)....................................................15, 16

*Banco Nacional de Cuba v. Sabbatino*
  376 U.S., at 423 ................................................................................................34

*Sanjuan v. Amer. Bd. of Psychiatry and Neurology, Inc.*,
  40 F.3d 247, 251 (7th Cir.1994)....................................................................25

*Sarei v. Rio Tinto, PLC*,
  2011 WL 5041927 at *17 (2011) .....................................................................35

*Cabello v. Fernandez-Larios*,
  402 F.3d 1148, 1161 (11th Cir. 2005)...........................................................26

*Serra v. Lappin*,
  600 F.3d 1191 (9th Cir. 2010) .......................................................................24

*Siderman de Blake v. Republic of Argentina*,
  965 F.2d 699, 714 (9th Cir.1992) ..................................................................35

*Smith v. Med. Benefit Administrators Group, Inc.*,
  639 F.3d (7th Cir. 2011) ................................................................................25

*Smith v. Northwestern Memorial Hospital*,
  2011 WL 5025240 at *3 (N.D.Ill., October 17, 2011)......................................16

*Sosa v. Alvarez-Machain*,
  542 U.S. 692 (2004)). ................................................................................ *passim*

*Swanson v. Citybank, N.A.,,*
    614 F.3d 400 (7th Cir.2010)....................................................................................33

*Texas Industries, Inc. v. Radcliff Materials, Inc.,*
    451 U.S. 630, 641 (1981)..................................................................................22, 23

*Thelen v. Marc's Big Boy Corp.,*
    64 F.3d 264, 267 (7th Cir. 1995) ..........................................................................12

*United States v. Rivera-Ventura,*
    72 F.3d 277, 281 (2d Cir. 1995).............................................................................17

*Walden v. City of Chicago,*
    2010 WL 5168789, at *15 (N.D. Ill. Dec. 21, 2010) ..........................................17

*Xuncax v. Gramajo,*
    886 F.Supp. 162 (D. Mass. 1995)..........................................................................24

***Other Authoreties***
*Prosecutor v. Blagojevic and Jokic,* IT-02-60-A, Appellate Judgment, 9 May April 2007 …...28

*Prosecutor v. Blaksic* , IT-95-14 A, Appellate Judgment, p. 18, 2 9 July 2004...............28

*Prosecutor v. Furundzija*, IT-95-17, Judgment, p. 93-94, 10 December 1998................27

*Prosecutor v. Krstic,* IT-98-33-A, Appelate Judgment, p. 48, 19 April 2004...................27

*Prosecutor v. Ntakirutimana*, ICTR-96-10-A and ICTR 96-17-A, Appellate Judgment p. 166, 13 December........................................................................................................28

*Prosecutor v. Simic,* IT-95-9-A, Appelate Judgment, p. 48, 19 April 2004 ....................28

*Restatement (Third) Foreign Relations Law*
*§ 404*..............................................................................................................*passim*

*United States v. Flick, 6 Tr. War Crim.* 1217(1947)..................................................27

## Statutes

*28 U.S.C.§ 1350* ....................................................................................... *passim*

*29 U.S.C.§ 1331* ........................................................................................................................... *passim*

18 U.S.C. §§ 1091-93 ……………………………………………………………………..*passim*

## INTRODUCTION

Defendant L-3 Services, Inc., a Corporation headquartered and incorporated in the United States in the State of Virginia, moves for dismissal under Rules 12(b)(1) and 12(b)(6) of the Federal Rules of Civil Procedure contending that U.S. courts lack jurisdiction to hear claims against it. These claims arise from the actions of Defendants' predecessor Military Professional Resources Inc. (MPRI), a U.S. private military contractor. The gist of the Third Amended Complaint (hereinafter "TAC") is that MPRI masterminded a conspiracy when it devised, named and planned a genocidal attack on a U.N. protected safe haven (hereinafter "Operation Storm"). It did this from its offices in Virginia. The complaint makes clear that the Croatian co-conspirators came to Virginia and contracted with MPRI because the Croatians had no experience in planning and conducting such an operation (TAC ¶ 48). The TAC details how MPRI planned and managed Operation Storm from Virginia, sent its U.S. citizen employees to assist and train the Croatian military and that it contractually profited from its role in this ethnic cleansing. American courts are the only courts which have jurisdiction over Plaintiffs' claims. There is no jurisdiction over the Defendants' in Croatia and even if there were, Plaintiffs could never receive a fair trial where Operation Storm is celebrated as a national holiday.

L-3's other arguments similarly fail to account for the well-pled allegations of the TAC. For example, the facts of the TAC defeat L-3's statute of limitations argument because MPRI fraudulently concealed its role in Croatia as providing "democracy training" and the truth of MPRI's role only came to light in trial testimony within the statute of limitations period from the war crimes trial of Croatian military commanders. L-3's foreign policy arguments similarly fail as the State Department has not come to L-3's aid, as it did in the recent Hungarian Holocaust

cases, and even with State Department filings, courts regularly exercise the independence of the Article III function by not accepting the State Department's position, as the Seventh Circuit and Judge Der-Yeghiayan did in the Hungarian Holocaust cases.

If this Court does not assert jurisdiction, an American mercenary corporation would not be called to account in any court for actions constituting genocide and crimes against humanity. But jurisdiction does exist and it should be exercised.

## ARGUMENT

### I. Plaintiffs Claims Are Not Time-Barred

L3's assertion that a ten-year statute of limitation applies to Plaintiffs' claims and that Plaintiffs have failed to timely file the instant action ignores that: 1) There are no statutes of limitations for war crimes; 2) Any statute of limitations found to apply would be equitably tolled in this case due to fraudulent concealment; and 3) The application of the continuing violation doctrine prevents the tolling of any statute of limitations defense in this case.

#### A. War Crimes of the Type Alleged in the TAC Are Not Subject To Statutes of Limitations.

There is an international legal consensus that statutes of limitations simply do not apply to violations of international law. As one court presented with this issue explained, " 'under international law there are no statutes of limitations with respect to war crimes'", a fact codified in several treaties which established "a rule under customary international law that no statute of limitations should be applied to war crimes and crimes against humanity." *In re. Agent Orange Product Liability Lit.*, 375 F. Supp.2d 7, 63 (E.D.N.Y. 2005)(reversed on other grounds).

Numerous international treaties confirm this principle.[1] For example, there is a

---

[1] Article 1 of the European Convention Non-Applicability of Statutory Limitations to War Crimes and Crimes Against Humanity states that "Each Contracting State undertakes to adopt any necessary measures to secure that statutory limitation shall not apply to the prosecution of[…]the crimes against humanity

Convention on the Non-Applicability of Statutory Limitations to War Crimes and Crimes Against Humanity (hereinafter "U.N. Convention") which states that "**No statutory limitation shall apply to the following crimes**, irrespective of the date of their commission" and the crimes covered include "war crimes" and "crime against humanity whether committed in time of war or in time of peace."[2]

Recognizing the exclusion of statutes of limitations conforms with customary international law and the ATS. As the U.N. Convention explains in its preamble, "[W]ar crimes and crimes against humanity are among the gravest crimes in international law…[and] the effective punishment of war crimes and crimes against humanity is an important element in the prevention of such crimes, the protection of human rights[…]and the promotion of international peace and security[.]" Thus, providing for the criminal and civil punishment of such crimes is in the interest of international peace, and statutes of limitations are appropriately not applied to such crimes, especially when only the gravest violations of international law may be brought

---

specified in the Convention on the Prevention and Punishment of the Crime of Genocide…[and] the violations specified in Article 50 of the 1949 Geneva Convention[…]and Article 147 of the 1949 Geneva Convention relative to the Protection of Civilian Persons in Time of War[.]" (Convention accessed at http://conventions.coe.int/Treaty/en/Treaties/Html/082.htm on August 2, 2013). The United States Congress has followed this international consensus in legislating its own war crimes statutes. For example, the United States' War Crimes statute, 18 USC §2441, does not include any statute of limitations. Also, the U.S. Genocide Implementation Act, 18 USC §1091, explicitly disallows any statute of limitations defense. 18 USC 2441 (f) states "[I]n the case of an offense under this section, **an indictment may be found**, or information instituted, **at any time without limitation**." (emphasis added).

[2]*G.A. res. 2391 (XXIII), annex, 23 U.N. GAOR Supp. (No. 18) at 40, U.N. Doc. A/7218 (1968), entered into force Nov. 11, 1970.* The Treaty defines the crimes covered as follows:

(a) **War crimes** as they are defined in the Charter of the International Military Tribunal, Nurnberg . . . particularly the "grave breaches" enumerated in the Geneva Conventions of 12 August 1949 for the protection of war victims;

(b) **Crimes against humanity whether committed in time of war or in time of peace** as they are defined in the Charter of the International Military Tribunal, Nurnberg . . . **eviction by armed attack** or occupation and inhuman acts resulting from the policy of apartheid, and **the crime of genocide** . . . . (emphasis added).

under the ATS. *See Sosa v. Alvarez-Machain*, 542 U.S. 692 (2004)).[3]

**B. Equitable Tolling From Fraudulent Concealment Applies in This Case.**

It is well settled that "the statute of limitations…is an affirmative defense and 'is rarely a good reason to dismiss under Rule 12(b)(6).'" *Moore v. Morales*, 415 F.Supp.2d 891 at 894 (2006) (citing *Reiser v. Residential Funding Corp.,* 380 F.3d 1027, 1030 (7th Cir.2004)). As the 7th Circuit has noted, "[i]n a motion to dismiss, 'the question is only whether there is *any* set of facts that if proven would establish a defense to the statute of limitations.' " *Id.* (citations omitted). Should this Court determine that a statute of limitations applies here, this case involves fact questions of equitable tolling which cannot be resolved in a motion to dismiss.

Equitable tolling is a doctrine which "permits a plaintiff to avoid the bar of statute of limitations if despite all due diligence he is unable to obtain vital information bearing on the existence of his claim." *Cada v. Baxter Healthcare Corp.,* 920 F.2d 446 at 451 (7th Cir., 1990) (citations omitted). Furthermore, equitable tolling is appropriate where a plaintiff knows that he has been injured but "**cannot obtain information necessary to decide whether the injury is due to** wrongdoing and, if so, **wrongdoing by the defendant**." *Id.* (emphasis added). Equitable tolling also applies where the defendant actively concealed its role, facts which the TAC pleads in detail. *See, e.g., Thelen v. Marc's Big Boy Corp.*, 64 F.3d 264, 267 (7th Cir. 1995) "Equitable estoppel-sometimes referred to as fraudulent concealment-'comes into play if the defendant takes active steps to prevent the plaintiff from suing in time,'" (internal citations omitted); *Chapple v. Nat'l Starch & Chem. Co. & Oil*, 178 F.3d 501, 506 (7th Cir. 1999) "a defendant who conceals

---

[3] Defendant cites to several cases supporting the imposition of the ten year statute of limitations period to ATS claims, but these cases are not controlling and fail to take into consideration the international consensus detailed above. The ATS itself noticeably does not include a statute of limitations. While Plaintiffs acknowledge that some courts have applied the Torture Victims Protection Act's ten-year statute of limitations to claims brought under the ATS, Plaintiffs suggest that this has been done improperly and without adequate analysis into the treatment of war crimes under international law.

vital information about the existence of a plaintiff's claim or makes representations to the plaintiff causing it to delay bringing the claim, can be estopped from relying on the statute of limitations as a defense."

Where equitable tolling appears as a possible defense to a motion to dismiss based upon an allegedly expired statute of limitations, that motion should be denied. "Whether a plaintiff will be able to respond to the statute of limitations defense with equitable estoppel or tolling **will require evidence that is not required at the motion to dismiss stage**. See *Reiser v. Residential Funding Corp.*, 380 F.3d 1027, 1030 (7th Cir.2004) (stating that tolling or estoppel should not be decided on a motion to dismiss because generally more evidence is required)." *Matthews v. Homecoming Financial Network,* 2005 WL 2387688 at *3 (N.D.Il., 2005)(emphasis added); See also *Holocaust Victims of Bank Theft v. Magyar Nemzeti Bank*, "[T]here are factual issues regarding potential tolling under the equitable tolling doctrines that cannot be assessed at the pleadings stage." *Holocaust Victims of Bank Theft v. Magyar Nemzeti Bank*, 10 C 1884, 2011 WL 1900340 (N.D. Ill. May 18, 2011) *remanded on other grounds*.

Here, the TAC pled sufficient evidence to apply equitable tolling, and additional evidence will likely surface through discovery to support application of the doctrine. The TAC details how MPRI's involvement in Operation Storm only began to surface with the 2007 war crimes trials of the Croatian generals involved in executing Operation Storm (See ¶ 114 of the TAC). The TAC also pleads facts as to how MPRI actively concealed its role in the planning and preparation of Operation Storm (See ¶¶ 32, 40 and 113, of TAC). Thus, Plaintiffs have adequately alleged that, while they were aware of their injuries sustained on August 4, 1995, they were not, and could not have been, knowledgeable of MPRI's role in causing these injuries until much later. In fact, because the Defendant was a group of highly trained, skilled and experienced covert operators, it

would have been nearly impossible for plaintiffs, all of whom were refugees expelled from their ancestral homeland and with minimal survival resources, to "discover critical facts underlying their claim", when those critical facts were expertly concealed by the Defendant. See *Bodner v. Banque Paribas*, 114 F. Supp.2d 117 at 135 (E.D.N.Y, 2000).

Defendant, in its most recent motion to dismiss, has engaged in a remarkable use of doublespeak that would not even work on summary judgment, let alone on a Rule 12 motion where the allegations in the complaint must be taken as true.[4] It was not until the 2009 ICTY testimony of Croatian armed force personnel and of Croatian President Tudjman's inner circle that MPRI's role in Operation Storm was publicly acknowledged.[5] Also, as discussed in the TAC, crucial documents revealing MPRI's role in Operation Storm first surfaced at these trials.[6]

Plaintiffs could not, in good faith have filed suit based upon nothing more than press reports and anonymous sources.[7] Sufficient evidence to enable these serious claims to be

---

[4] Defendant argues that the doctrine should not apply because, although it continues to claim MPRI had no involvement in Operation Storm, its involvement was sufficiently well known and documented by 2005 to require Plaintiffs to file suit. (See Defendant's Motion to Dismiss, p. 1, "Defendants' purported involvement in aiding the Croatian Government was documented in the media in 1995 and continuously thereafter.") This disingenuous argument should be rejected.

[5] Following the April, 2011 ICTY convictions of Croatian Generals Ante Gotovina and Mladen Markac for their role in Operation Storm, additional former high ranking Croatian military officers have elected to comment on the Defendant's role in Operation Storm. See, e.g., *French and US experts assisted Croatia in preparing Operation Storm* - Daily - tportal.hr, April 15, 2011: "Retired Croatian Army (HV) Brigadier Ante Kotromanovic […]stressed that US Army officers had also provided great assistance in the preparation of Operation Storm, citing retired US Army General Carl Vuono. Kotromanovic asked if that meant that the French and Americans were also part of the joint criminal enterprise and participated in the expulsion of Serbs from occupied areas of Croatia during Operation Storm." Story accessed at http://daily.tportal.hr/122769/French-and-US-experts-assisted-Croatia-in-preparing-Operation-Storm.html on August 3, 2013.

[7] Of course, Plaintiffs are aware that media reports cast suspicion on Defendant's role in Operation Storm as early as September of 1995. However, all of these reports were based upon anonymous sources and speculation, so it remained impossible to put any degree of faith in, or context to, them until additional details emerged at the ICTY. And, in fact, the media reports cited by Defendant in its second motion to dismiss **highlight the Defendant's repeated denials of its involvement in Operation Storm**: "[Soyster] insists, the company played no role in the Krajina campaign. 'It's impossible, no matter how good you are, to turn around an army in a few months,' he says. 'But it's a great myth. It's good for our business.'"

brought in good faith did not emerge prior to 2009. [8]

The law supports equitable tolling under these facts. For example, in *Rosner v. United States of America*, 231 F.Supp.2d 1202 (S.D.Florida, 2002), Plaintiffs Hungarian Jewish Holocaust survivors, sued the United States for the actions of its military personnel who, toward the end of World War II, allegedly captured a "gold train" from pro-Nazi Hungarian soldiers which contained millions of dollars of confiscated Jewish wealth. Rather than returning the valuables, the United States allegedly auctioned off some of the property and donated other property to international relief organizations. The statute of limitations defense was rejected even though events surrounding U.S. involvement in the capture of the so-called "Gold Train" had been the subject of much reporting over a period of at least 54 years because the Plaintiffs had alleged that the U.S. had hidden evidence regarding its involvement in the "Gold Train" incident, that the U.S. had ignored repeated requests for information, and that information vital to the claim had not surfaced until a U.S. government report on the events was released in 1999:

> Because this issue is arising on a motion to dismiss, the Court must accept as true that "[p]laintiffs and other members of the class have been kept in ignorance of vital information essential to pursue their claims, without any fault or lack of diligence in their part."[…]In particular, Plaintiffs allege that in addition to seizing and subsequently not returning the Gold Train property, the United States Government has also continued to wrongfully claim that the property on the Gold Train was unidentifiable and thus unreturnable[…]"**It was only in October 1999, when the Presidential Advisory Commission on Holocaust Assets released its report on the Gold Train" that the facts necessary to file their Complaint came to light**[…]Taken as true, these allegations present the Court with a set of circumstances that warrant equitable tolling of the limitations period.
>
> *Id.* at 1209 (emphasis added).In addition to fraudulent concealment, equitable tolling is

___

(Ken Silverstein, *Mercenary Inc.?*, Washington Business Forward, April 26 2001); "MPRI categorically denies any involvement in Operation Storm or related training[.]", (Peter Warren Singer, *Corporate Warriors: The Rise of the Privatized Military Industry*, at p. 126 (Cornell University Press, 2003)); "A spokesman for the American group [MPRI] insisted the presence of the retired U.S. military men was strictly in a non-combat capacity designed 'to help Croatia reorganize its army along democratic lines.'", (Uli Schmetzer, *How West Let Croatia Sneak Arms*, Chicago Tribune, August 20, 1995).
[8] See *Ashcroft v. Iqbal*, 556 U.S. 662 (2009).

also available where "the claimant[…]'has been prevented in some extraordinary way from filing his complaint in time.'" *Smith v. Northwestern Memorial Hospital*, 2011 WL 5025240 at *3 (N.D.Ill., October 17, 2011). Several courts dealing with claims brought by victims of human rights abuses and/or war crimes have pointed to the "extraordinary circumstances" suffered by those plaintiffs in applying the equitable tolling doctrine.[9]

Such circumstances exist here because Plaintiffs in the case at bar are refugees from a fierce and tragic conflict. Plaintiffs have alleged in the TAC that they were brutally expelled, through the use of force, from their ancestral homeland. In many instances, the property they left behind was destroyed, or repopulated with Croatians, ensuring that Plaintiffs would be unable to return. Not surprisingly, these individuals have struggled over the past 15 years to rebuild their lives. While Defendant argues that it was reasonable to expect a brutalized refugee population to uncover a sophisticated covert operation, orchestrated, denied and concealed by a highly experienced private military and intelligence corporation, this would have been not only unreasonable, but practically impossible given Plaintiffs' desperate circumstances.

**C.      The Continuing Violation Doctrine Precludes Application of the Statute of Limitations.**

Under the "continuing violation" doctrine, the statute of limitations period for a continued offense does not begin until the last offense is complete. *Bodner v. Banque Paribas*, 114 F. Supp. 2d 117, 134 (E.D.N.Y. 2000); *Dasgupta v. University of Wisconsin Bd. of Regents*, 121 F.3d 1138, 1139 (7th Cir. 1997); *Galloway v. General Motors Service Parts*

---

[9] See, e.g., *Bodner*, 114 F.Supp.2d at 135 ("[P]laintiffs argue that the Holocaust, World War II, and the subsequent diaspora of the French Jewish community constitute extraordinary circumstances in and of themselves sufficient to invoke the doctrine of equitable tolling[…]This Court, under its powers in equity, finds that application of the equitable tolling provisions is merited in this case."); *Rosner*, 231 F.Supp.2d at 1209 ("In addition, the Court notes that, for the majority of Plaintiffs, the years following World War II were particularly difficult. This, combined with the fact that the Government cannot benefit from its own alleged misconduct, tips the balance in favor of tolling the limitations period."); and also *Chavez v. Carranza*, 559 F.3d 486 (6th Cir., 2009).

*Oper.*, 78 F.3d 1164, 1166 (7ᵗʰ Cir.1996); *Walden v. City of Chicago*, 2010 WL 5168789, at *15

(N.D. Ill. Dec. 21, 2010); *see also United States v. Rivera-Ventura*, 72 F.3d 277, 281 (2d Cir.

1995). Plaintiffs' complaint below makes clear that the expulsion of the Serbian population from

the Krajina is a crime which, in large part, continues to this day (*See* TAC ¶ 109) Thus, as the

perpetuation of an old injury has been a basis for applying the continuing violation doctrine,

Plaintiffs here have adequately alleged the continuation of an injury caused and facilitated, in

part, by the Defendant's actions. This continuing wrong tolls the statute of limitations.[10]

## II.   This Court Has Federal Jurisdiction Over Plaintiffs' Claims Under 28 U.S.C. 1331 and 28 U.S.C. 1350 and Diversity Jurisdiction Over Plaintiffs' State Law Claims Under CAFA.

**A.     This Court Has Subject Matter Jurisdiction Over Plaintiffs' Alien Tort Statute Claims Pursuant To 28 U.S.C. 1350**

**1.     The TAC Alleges That Defendant's Conduct That Occurred Exclusively Within The United States Violated Universal Norms of International Law, and Thus the U.S. Conduct Alone Provides This Court With Subject Matter Jurisdiction Over Plaintiffs' ATS Claims.**

Defendants' attack on ATS subject matter jurisdiction is entirely predicated on the

Supreme Court's Kiobel decision (*Kiobel v. Royal Dutch Petroleum Co.*, 133 S.Ct. 1659 (2013)),

which solely focused on when U.S. courts have jurisdiction over acts that lacked any nexus to the

United States.[11]  But Defendants' attacks on ATS subject matter jurisdiction ignore the

---

[10] Defendants also argue that a statute of repose applies to ATS claims rather than a statute of limitations and, therefore, equitable tolling does not apply.  Defendants cite to no ATS case law in support of such a position, because no court has ever held that the doctrine of equitable tolling does not apply to ATS cases. If there is any case in which equitable tolling is appropriate, it is one involving grave violations of international law.

[11] It must be briefly noted that Defendants' suggestion that corporate liability under the ATS is somehow unsettled after *Kiobel* is baseless.  *Kiobel* did not touch on corporate liability whatsoever.  In *Flomo v. Firestone,* Judge Posner made clear that in the 7th Circuit, corporate liability under the ATS is the law. "The Alien Tort Statute, moreover, is civil, and corporate tort liability is common around the world[…] If a corporation complicit in Nazi war crimes could be punished criminally for violating customary international law, as we believe it could be, then *a fortiori* if the board of directors of a corporation directs the corporation's managers to commit war crimes, engage in piracy, abuse ambassadors, or use slave labor, the corporation can be civilly liable." *Flomo v. Firestone Nat. Rubber Co., LLC*, 643 F.3d 1013, 1019 (7th Cir. 2011).  See *Max M. v. Thompson*, 585 F. Supp. 317 at 324 amended, 592 F. Supp. 1450

significant well pled facts in the TAC that detail how Defendants violated international law while sitting in the State of Virginia.  There is no contention that U.S. courts do not have jurisdiction over U.S. citizens for wrongful conduct in the United States, and this U.S. based conduct, by itself, states a claim under the ATS and establishes subject matter jurisdiction.

The TAC alleges that a U.S. corporation headquartered in Virginia masterminded a joint criminal enterprise when it planned, from Virginia, an organized, widespread, systematic attack on a civilian population intended to destroy in whole or in part the Serbian community of Krajina.  Defendants' role was to make the plan.  There is no contention that Defendants fired any weapons.  The contract from which defendants were compensated for developing the plan was made in Virginia, and the plan was developed in Virginia with full knowledge that the plan, if implemented, would constitute a clear violation of *jus cogens* norms of international law.  (¶¶ 37, 38, 39, 41 and 52)  Under either the knowledge or the purpose standard, this development of the plan constitutes participation in genocide and is a crime against humanity, and therefore states a claim under the ATS.  The extent of Defendants' relevant conduct within the United States comes from Defendants' own mouths, in statements Defendants made when attempting (and failing) to get this matter transferred to Virginia.  In that briefing, Defendants admitted: "Plaintiffs cannot refute the reality that any relevant decisions MPRI made concerning its contract with Croatia -- such as the decision to enter into such a contract, the scope and duties under that contract, and any staffing or operational decisions relevant thereto -- would have occurred at MPRI's offices in Virginia."  [D.E. 35 at 8, May 5, 2011].  The fact that the crime or attack itself was conducted abroad is irrelevant.  It is hornbook law that a co-conspirator/participant need not be present at the scene of the crime to be held responsible.

(N.D. Ill. 1984); "In the absence of a controlling Supreme Court ruling, a federal district court is required to give great weight to the pronouncements of its Court of Appeals[.]"

Certainly, the fact that subsequent acts in furtherance of the conspiracy took place abroad does not absolve the co-conspirator planner.

**2. The Facts Pled in the TAC, When Considered as a Whole, Overcome Any Presumption Against Extraterritoriality that Would Apply to Defendants' Conduct in Croatia.**

The Supreme Court in *Kiobel* did not rule that the ATS can never have extraterritorial application. Rather, the Court ruled in a bare 5-4 majority that there is a presumption against extraterritorial application and that the presumption was not overcome when a foreign defendant committed acts against foreign nationals entirely from foreign soil. While the decision in *Kiobel* was unanimous on the facts, finding that the "mere corporate presence" of a ***foreign multi-national corporation*** is insufficient to displace a presumption against extra-territorial application in cases involving foreign plaintiffs, foreign defendants and activities that occurred entirely abroad (*Kiobel*, 133 S.Ct. at 1669), the unanimity of the Court broke down when attempting to lay down general principles to guide future courts, with the Court issuing four opinions on such a future. The majority opinion, joined by 5 justices, concluded, quite narrowly, that "[o]n these facts, all the relevant conduct took place outside the United States. And even where the claims touch and concern the territory of the United States, they must do so with sufficient force to displace the presumption against extraterritorial applications. *Id.* at 1669. In this case, critical relevant conduct is alleged to have occurred ***within the United States***, and the defendant being a U.S. corporation subject to American law forcefully touches and concerns American interests in ensuring its companies do not commit gross violations of international law. The guidance that future courts must take when applying *Kiobel* must necessarily come from the fractured approaches expressed in the concurrences. Indeed, the explicit words of the concurrences make clear that at least 7 of the 9 justices would find that, under appropriate circumstances, the

presumption against extraterritoriality can be overcome (indeed, 4 of the 9 justices voted that there is no such presumption to begin with).

Three members of the five justice majority wrote separately in concurrences to note their views that the door to extraterritorial application of the ATS was not being swung shut. For example, Justices Alito and Thomas wrote a separate concurrence in which they explained that, in their view, "[…]a putative ATS cause of action[…]will therefore be barred -- **unless the domestic conduct is sufficient to violate an international law norm** that suffices Sosa's requirements of definiteness and acceptance among civilized nations." *Id.* at 1670 (emphasis added). Indeed, as Justices Alito and Thomas noted,

> I concur in the judgment and join the opinion of the Court as far as it goes. Specifically, I agree that when Alien Tort Statute (ATS) "claims touch and concern the territory of the United States, they must do so with sufficient force to displace the presumption against extraterritorial application." *Ante,* at 1669. This formulation obviously leaves much unanswered, and **perhaps there is wisdom in the Court's preference for this narrow approach**.

*Id.* Justice Kennedy also left the door open to extraterritorial application under appropriate facts, stating that "**[t]he opinion of the Court is careful to leave open a number of significant questions regarding the reach and interpretation of the Alien Tort Statute** . . . . [C]ases may arise with allegations of serious violations of international law . . . and in those disputes the proper implementation against extraterritorial application may require some further elaboration and explanation." *Id.* at 1669 (emphasis added).

The Breyer concurrence, joined by Justices Kagan, Ginsburg and Sotomayor, explained that they "would find jurisdiction under this statute where (1) the alleged tort occurs on American soil, (2) the defendant is an American national, or (3) the defendant's conduct substantially and adversely affects an important American interest, and that includes a distinct interest in preventing the United States from becoming a safe harbor (free of civil as well as

criminal liability) for a torturer or other common enemy of mankind." *Kiobel v. Royal Dutch Petroleum Co.*, 133 S.Ct. 1659 at 1671 (2013).

Plaintiffs have alleged that the Defendant, a U.S. corporation led by U.S. citizen officers and employees, devised and planned, at its offices in Virginia, a genocidal attack on the Serbian community of Krajina, an attack which resulted in numerous violations of international law. Defendants then exacerbated their violation of international law by traveling to Croatia, briefing the generals there, training troops, and sitting in the war room during the implementation of the battle plan Defendants developed.[12] Under the totality of the facts alleged, the TAC meets all of the factors (any one of which is sufficient) for subject matter jurisdiction identified in the Breyer concurrence, as well as the approaches of the Alito and Kennedy concurrences.[13]

---

[12] It is also alleged in the TAC that Defendant's conduct was in violation of relevant United Nations Security Council Resolutions and stated U.S. foreign policy.

[13] Two post *Kiobel* decisions [*Giraldo v. Drummond Co., Inc.,* 2013 WL 3873960 (July 25, 2013) and *Al Shimari v. CACI Int'l, Inc.,* 2013 WL 3229720 (E.D.Va., 2013)] have reached the curious conclusion that there can never be extraterritorial reach under the ATS and that only Congress can provide such reach. But such a conclusion ignores entirely the language of the concurrences which facially reject such an absolutist reading of *Kiobel.* Indeed, neither district court opinion mentions the concurrences let alone discusses the broader language of the concurrences. How those courts, for example, thought Justices Alito and Thomas embraced such an absolutist approach is difficult to understand when they stated that they "concur in the judgment and join the opinion of the Court as far as it goes. Specifically, I agree that when Alien Tort Statute (ATS) "claims touch and concern the territory of the United States, they must do so with sufficient force to **displace the presumption** against extraterritorial application." *Ante,* at 1669. This formulation obviously leaves much unanswered, and **perhaps there is wisdom in the Court's preference for this narrow approach.**" Yet the Drummond and *Al Shimari* courts do not see *Kiobel* as "a narrow approach", nor do they explain how, if *Kiobel* is an absolute barrier to extraterritorial application, the presumption against extraterritoriality can be "displaced". Similarly, the two decisions fail to account for Justice Kennedy's statement that "**[t]he opinion of the Court is careful to leave open a number of significant questions regarding the reach and interpretation of the Alien Tort Statute** . . . . [C]ases may arise with allegations of serious violations of international law . . . and in those disputes the proper implementation against extraterritorial application may require some further elaboration and explanation." *Id.* at 1669 (emphasis added). Indeed, just adding Justice Kennedy to the four justices who reject the presumption against extraterritoriality entirely creates a majority rejecting the absolutist reading embraced by *Drummond* and *Al Shimari.* As this Court has noted, higher courts do not write simply to be ignored: "While not excused from making an independent examination of the precise issue presented, **we cannot assume that our Court of Appeals writes merely for intellectual exercise**." *Max M. v. Thompson*, 585 F. Supp. 317 at 324 amended, 592 F. Supp. 1450 (N.D. Ill. 1984)(emphasis added).

**B. This Court Has Jurisdiction Over Plaintiffs' Federal Common Law Claims Pursuant to 28 U.S.C. 1331.**

This Court has jurisdiction over Plaintiffs' federal common law claims under 28 U.S.C. § 1331, which on its face provides federal jurisdiction for claims alleging violations of customary international law so long as they are part of federal common law.  29 U.S.C. § 1331 ("The district courts shall have original jurisdiction of all civil actions arising under the Constitution, **laws**, or treaties of the United States.") (emphasis added).  The scope of Section 1331 has been reaffirmed by repeated court rulings.[14]

Only nine years ago, the Supreme Court reiterated that claims based upon international law are cognizable under federal common law:

> For two centuries we have affirmed that the domestic law of the United States recognizes the law of nations. It would take some explaining to say now that federal courts must avert their gaze entirely from any international norm intended to protect individuals.

*Sosa*, 124 S. Ct. at 2764-65 (citing *Sabbatino,* 376 U.S., at 423 ("[I]t is, of course, true that United States courts apply international law as a part of our own in appropriate circumstances").[15]

---

[14] *See, e.g., Illinois v. City of Milwaukee*, 406 U.S. 91, 100 (1972) ("The word 'laws' in § 1331 should be construed to include laws created by federal judicial decisions as well as by congressional legislation. The rationale of the 1875 grant of federal question jurisdiction – to insure the availability of a forum designed to minimize the danger of hostility toward, and specially suited to, the vindication of federally created rights – is as applicable to judicially created rights as to rights created by statute. **We see no reason not to give 'laws' its natural meaning . . . and therefore conclude that § 1331 jurisdiction will support claims founded upon federal common law as well as those of a statutory origin")** (citations omitted; emphasis added); *Treiber & Straub, Inc. v. U.P.S., Inc.*, 474 F.3d 379 (7th Cir. 2007) (citing cases and holding that a federal common law claim available under § 1331 where the only related federal statute was inapplicable).

[15] In fact, the Supreme Court had earlier identified in *Texas Industries, Inc., v. Radcliffe Materials, Inc.,* 101 S.Ct. 2061 (1981), as cited in *Sosa* at p. 2764, international law as one of the narrow and restricted areas in which a federal common law remedy exists without congressional authorization. This is "necessary in order to protect uniquely federal interests." *Texas Industries* at 2068, citing *Banco Nacional de Cuba v. Sabbatino*, 376 U.S. 398 at 426 (1964).  *See also The Paquete Habana,* 175 U.S. 677 at 700 (1900) ("International law is part of our law, and must be ascertained and administered by the courts of justice of appropriate jurisdiction, as often as questions of right depending upon it are duly presented for

Justice Breyer's Sosa concurrence went on to identify a narrow subset of behavior universally condemned by international law:

> Today international law will sometimes similarly reflect not only substantive agreement as to certain universally condemned behavior but also procedural agreement that universal jurisdiction exists to prosecute a subset of that behavior. **That subset includes torture, genocide, crimes against humanity, and war crimes.**

*Sosa v. Alvarez-Machain*, 124 S. Ct. 2739, 2783 (2004) (citing Restatement § 404, and Comment *a;* International Law Association, Final Report on the Exercise of Universal Jurisdiction in Respect of Gross Human Rights Offences 2 (2000). (emphasis added).

Additionally, the Northern District of Illinois has itself found § 1331 jurisdiction in cases involving questions of international law. According to the court in *Holocaust Victims of Bank Theft v. Magyar Nemzeti Bank:*

> Pursuant to 28 U.S.C. § 1331 (Section 1331), "[t]he district courts shall have original jurisdiction of all civil actions arising under the Constitution, laws, or treaties of the United States." *Id.* The Seventh Circuit in *Jogi v. Voges*, 480 F.3d 822 (7th Cir. 2007), made clear that "the assertion of a claim arising under any one of those sources of federal law [listed in Section 1331] is enough to support subject matter jurisdiction unless the claim is so plainly insubstantial that it does not engage the court's power." *Id.* at 825. Plaintiffs contend that Defendants have violated certain non-U.S. treaties (Non-U.S. Treaties), U.S. treaties (U.S. Treaties), and customary international law. These foregoing authorities establish the basis for the claim herein: "the laws . . . of the United States" provision of § 1331 includes a federal common law claim arising from a violation of customary international law (here genocide)[.]

*Holocaust Victims of Bank Theft v. Magyar Nemzeti Bank,* 807 F.Supp.2d 689 at 692 (2011) (remanded on other grounds). Because Plaintiffs' claims arise under federal common law, this Court has Section 1331 jurisdiction.

---

their determination"); *The Nereide,* 9 Cranch 388 (1815) ("[T]he Court is bound by the law of nations which is a part of the law of the land"); *Texas Industries, Inc. v. Radcliff Materials, Inc.,* 451 U.S. 630, 641 (1981) (recognizing that "international disputes implicating ... our relations with foreign nations" are one of the "narrow areas" in which "federal common law" continues to exist)).

Defendants' argument to the contrary relies upon clearly inapplicable authority. *Serra v. Lappin*, 600 F.3d 1191 (9th Cir. 2010) doesn't help Defendants here as that case attempted to invoke the ATS to allege that the low pay of federal prisoners violated the law of nations. The case was dismissed because the plaintiffs were not aliens and not because their claims did not arise under federal common law. The two other decisions Defendants cite misread *Sosa* as excluding international law claims from federal common law.[16] Not only are these cases wrong as demonstrated above, but the Supreme Court had every opportunity to abrogate *Sosa* in *Kiobel* yet it did not do so. Accordingly, Section 1331 provides an independent basis for subject matter jurisdiction based on federal common law arising from universally condemned violations of international law including genocide.

**C.      This Court Has Jurisdiction Over Plaintiffs' Claims Pursuant To The Class Action Fairness Act.**

Defendant next argues, without any authority, that the Class Action Fairness Act (hereinafter "CAFA") does not extend to claims involving international and/or foreign law. Of course, nothing in CAFA itself suggests such a limitation. CAFA simply creates a mechanism for aggregating small claims to establish diversity jurisdiction.[17] This case is a class action, Plaintiffs clearly meet the jurisdictional threshold, and have so pled in the Complaint. Indeed,

---

[16] The D.C. Circuit in *Mohamed v. Rajoub*, 634 F.3d 604 (D.C. Cir. 2011) affirmed the dismissal of a claim alleging defendants tortured and killed an American citizen in Israel. It did so following the "guidance" of *Sosa*, which it read as not allowing § 1331 claims for violation of federal common law. *Id.* at 600. As demonstrated above, this reliance on *Sosa* was misplaced because *Sosa* and the other authorities previously cited do allow federal common law claims under § 1331. As for *Xuncax v. Gramajo*, 886 F. Supp. 162, 194 (D. Mass. 1995), the court acknowledged that common law claims could be brought under § 1331, and also found that international law fell under the common law ambit, yet then strangely refused to extend § 1331 jurisdiction to claims involving international law: "To be sure, cases arising under the federal common law (as well as those arising under federal positive law) have been found to support statutory federal question jurisdiction[…]and federal common law embraces international law." Id at 193-194. Thus, the court's reasoning on this point is unpersuasive.

[17] The relevant portion of 28 U.S.C. 1332(d) states that "The district courts shall have original jurisdiction of any civil action in which the matter in controversy exceeds the sum or value of $5,000,000, exclusive of interest and costs, and is a class action in which[…]any member of a class of plaintiffs is a foreign state or a citizen or subject of a foreign state and any defendant is a citizen of a State[.]"

Defendants' counsel told Judge Castillo that this case could be worth several billion dollars. This is all that CAFA requires, and courts have previously found jurisdiction under CAFA over claims involving foreign law. See *Giannopoulos v. Iberia Lineas Aereas de Espana, S.A.*, 2011 WL 3166159 (court applied European Union law in a case where jurisdiction was founded upon CAFA); *In re Air Cargo Shipping Services Antitrust Litigation*, 2008 WL 5958061 (2008).[18]

## III.  **Plaintiffs Have Adequately Pled Claims For Which Relief Can Be Granted.**

In a Rule 12 motion, "[w]e construe the complaint in the light most favorable to the plaintiffs, accepting as true all well-pled facts alleged, taking judicial notice of matters within the public record, and **drawing all reasonable inferences in the plaintiffs' favor**." *Adkins v. VIM Recycling, Inc.,* 644 F.3d 483, 492-93 (7th Cir. 2011) (emphasis added). In fact, in its post-*Iqbal* and *Twombly* rulings, this Court has remained consistent in emphasizing that a plaintiff need not plead a detailed set of facts to survive a motion to dismiss, and that a "short and plain statement of the claim" will still suffice:

> Smith is required by Federal Rule of Civil Procedure 8(a)(2) to set forth in his complaint "a short and plain statement of the claim showing that [he] is entitled to relief." **He need not plead a detailed set of facts, so long as the complaint supplies Auxiant with "fair notice of what . . . the claim is and the grounds upon which it rests."** His claim must be "plausible on its face," which requires the court to consider whether the events alleged could have happened, not whether they did happen or likely happened.

*Smith v. Med. Benefit Administrators Group, Inc.,* 639 F.3d 277, 281 (7th Cir. 2011) (citations omitted) (emphasis added). And of course, the Court must give "'the plaintiff the benefit of imagination, so long as the hypotheses are consistent with the complaint.'" *Bissessur v. Indiana Univ. Bd. of Trustees*, 581 F.3d 599 at 603 (7th Cir. 2009), *reh'g denied* (Nov. 24, 2009) (citing *Sanjuan v. Amer. Bd. of Psychiatry and Neurology, Inc.,* 40 F.3d 247, 251 (7th Cir.1994)).

---

[18] It should also be noted that Plaintiffs have also alleged violations of Illinois and Virginia and State law. CAFA jurisdiction over these counts is indisputable.

Plaintiffs have met this burden. As this Court has noted, a well-pleaded complaint may proceed even if it appears "that actual proof of those facts is improbable, and that a recovery is very remote and unlikely." *Gonzalez v. Hardy*, 11 C 8578, 2012 WL 3292845 (N.D. Ill. Aug. 9, 2012)(internal citations omitted). The allegations in the TAC easily meet this burden.

A.    **Plaintiffs Have Adequately Alleged That Defendants Acted With The Requisite *Mens Rea* To Sustain Counts I, IV, V, VI and VIII.**

Defendant argues that Plaintiffs have failed to plead that it possessed the *mens rea* of purpose which, it argues, is required for aiding and abetting claims under the ATS. This argument misstates the *mens rea* standard under international law, which is *knowledge*, not purpose or shared intent. This is reflected in both the judgments of the Nuremberg Tribunal and the *ad hoc* U.N. Tribunals, as well as in the decisions of several U.S. appeals courts.[19]  For example, in 2011, the D.C. Circuit observed that:

> aiding and abetting liability is available under the ATS because it involves a norm established by customary international law and that the *mens rea* . . . requirements are those established by the ICTY, the ICTR, and the Nuremberg tribunals, whose opinions constitute expressions of customary international law. . . . [C]ases heard at Nuremberg . . . establish that "knowledge" suffices to meet the *mens rea* requirement for aiding and abetting liability. The decisions of the ICTY and ICTR adopt a "knowledge" *mens rea* . . . .

*Doe v. Exxon Mobil Corp.*, 654 F.3d 11 at 39 (2011). The Eleventh Circuit has also adopted the knowledge standard. *See Cabello v. Fernandez-Larios*, 402 F.3d 1148, 1161 (11th Cir. 2005) ("[T]o prove conspiracy or aiding and abetting, at trial, the Cabello survivors were required to prove that Fernández had **knowledge** of the death squad's illicit purpose.") (emphasis added).

The rulings of these Circuits are perfectly in line with existing international legal authority, which is instructive because "[t]he court . . . looks to customary international law to

---

[19] "Decisions of the courts established by the U.N. Security Council, the International Military Tribunal at Nuremberg established in the Agreement for the Prosecution and Punishment of the Major War Criminals of the European Axis, Aug. 8, 1945, U.N.T.S. 280[…]and the several Nuremberg tribunals are recognized as an authoritative source of customary international law." *Doe v. Exxon Mobil Corp.*, 654 F.3d 11 at 30 (2011).

determine the standard for assessing aiding and abetting liability . . . ." *Doe*, 654 F.3d at 33. The internationally recognized Nuremberg Trials applied a knowledge *mens rea* standard in determining aiding and abetting violations of international law in matters such as *The Zyklon B Case*, where the accused were convicted and sentenced to death for supplying poison gas to the Nazi regime "with knowledge" that it would be used to murder concentration camp prisoners. *See In re Tes*ch, 13 Int'l L. Rep. 250 (1947). The *Einsatzgruppen* trial convicted the accused because he was "**aware** that the people [whose names he discovered through his interrogations] would be executed when found", while another defendant was convicted because he "*knew* that executions were taking place." 4 Tr. War Crim. 569, 208 (1949) (emphasis added).[20]

Given the widespread acceptance of the knowledge standard used at Nuremberg, this standard has been accepted by the ICTY and the ICTR after thorough analyses of international law precedent:

> [I]t is not necessary for an aider and abettor to meet all the requirements of *mens rea* for a principal perpetrator. In particular, it is not necessary that he shares and identifies with the principal's criminal will and purpose, provided that his own conduct was with knowledge. That conduct may in itself be perfectly lawful; it become criminal only when combined with the principal's unlawful conduct . . . . [I]t is not necessary for the accomplice to share the *mens rea* of the perpetrator, in the sense of positive intention to commit the crime. Instead, the clear requirement in the vast majority of the cases is for the accomplice to have **knowledge that his actions will assist the perpetrator** in the commission of the crime . . . . The *mens rea* required is the knowledge that these acts assist the commission of the offence.

*Prosecutor v. Furundzija*, IT-95-17, Judgment, p. 93-94, 10 December 1998 (emphasis added).[21],[22]

---

[20] *See also United States v. Flick*, 6 Tr. War Crim. 1217 (1947) (accused convicted for contributing money and providing financial assistance to the SS because "[o]ne who **knowingly** by his influence and money contributes to the support thereof must, under settled legal principles, be deemed to be, if not a principal, certainly an accessory to such crimes.") (emphasis added).

[21] *See also Prosecutor v. Krstic*, IT-98-33-A, Appellate Judgment, p. 48, 19 April 2004 ("This, however, raises the question of whether, for liability of aiding and abetting to attach, the individual charged need only possess knowledge of the principal perpetrator's specific genocidal intent, or whether he must share

**B.  Plaintiffs Have Alleged Sufficient Facts That Defendant Purposefully Aided and Abetted Violations of International Law.**

Even were the appropriate *mens rea* standard for aiding and abetting claims under the

ATS a purpose standard, Plaintiffs have amply pled purpose in the TAC.  Despite Defendant's

efforts over the last fifteen years to conceal its role in Operation Storm (see above), Plaintiff's

complaint is remarkably detailed in its allegations and is more than sufficient to plead purpose in

---

that intent. The Appeals Chamber has previously explained, on several occasions, that an individual who aids and abets a specific intent offense may be held responsible if he assists the commission of the crime *knowing the intent behind the crime*. This principle applies to the Statute's prohibition of genocide, which is also an offence requiring a showing of specific intent. **The conviction for aiding and abetting genocide upon proof that the defendant knew about the principal perpetrator's genocidal intent is permitted by the Statute and case-law of the Tribunal**.") (emphasis added); *Prosecutor v. Ntakirutimana*, ICTR-96-10-A and ICTR-96-17-A, Appellate Judgment, p. 166, 13 December 2004 (finding that "the Trial Chamber erred in determining that the *mens rea* for aiding and abetting genocide requires intent to commit genocide"); *Prosecutor v. Blaksic*, IT-95-14-A, Appellate Judgment, p. 18, 29 July 2004 ("[K]nowledge on the part of the aider and abettor that his acts assist in the commission of the principal perpetrator's crime suffices for the *mens rea* requirement of this mode of participation[.]");*Prosecutor v. Simic*, IT-95-9-A, Appellate Judgment, pp. 35-36, 28 November 2006 ("The requisite *mens rea* for aiding and abetting is knowledge that the acts performed by the aider and abettor assist in the commission of the specific crime of the principal . . . . He need not share the intent but he must be aware of the discriminatory context in which the crime is to be committed . . . it is not necessary that the aider and abettor knows either the precise crime that was intended or the one that was . . . committed. If he is aware that one of a number of crimes will probably be committed, and one of those crimes is in fact committed, he has intended to facilitate the commission of that crime, and is guilty as an aider and abettor."); *Prosecutor v. Blagojevic and Jokic*, IT-02-60-A, Appellate Judgment, 9 May 2007; *Prosecutor v. Mrksic, et al.*, IT-95-13/1-A, Appellate Judgment, p. 68, 5 May 2009; *Prosecutor v. Milutinovic*, IT-05-87-T, Judgment, p. 38, 26 February 2009; *Prosecutor v. Semanza,* ICTR-97-20-A, Appellate Judgment, p. 119, 20 May 2005.

[22] Defendant's reliance on a Ninth Circuit case in support of its position is puzzling, to say the least.  The Court in *Sarei v. Rio Tinto, PLC*, 671 F.3d 736, 750 (9th Cir. 2011), vacated, 133 S. Ct. 1995, 2013 U.S. LEXIS 3271 (2013), did **not** rule that the appropriate *mens rea* standard for aiding and abetting claims was intent rather than knowledge and, in fact, did not reach the issue at all.  According to the court, "We need not resolve this dispute as to *mens rea* in order to conclude that customary international law gives rise to a cause of action for aiding and abetting a war crime under the ATS." *Id*. at 765.  Similarly, the Central District of California case relied upon by Defendants, *Doe I v. Nestle, S.A.,* 748 F. Supp. 2d 1057 (C.D. Cal. 2010), is not binding and is in error to the extent that the decision failed to accurately reflect and interpret decades of international legal jurisprudence finding a knowledge standard for aiding and abetting violations.  The strong weight of authority supports Plaintiff's position that the proper *mens rea* standard for aiding and abetting a violation of international criminal law is knowledge.  There is no good reason to impose a higher standard in a civil case

aiding and abetting war crimes committed during the commission of Operation Storm in conformity with the rules of *Twombly* and *Iqbal*.[23]

Purpose is more than plausibly inferred from Plaintiffs' allegations that the Defendants were informed of the Croatian leadership's main goal (driving the Serbs out of their country) and that the Defendant dutifully went about training the Croatian military and devising a battle strategy to enable the Croatians to achieve that goal.

---

[23] These facts include the following:

- Under the agreement, MPRI was to train, and modernize as quickly as possible the Croatian Army into a competent fighting force able to invade the Krajina region and expel the ethnic Serbian population from Croatian territory. Susak specifically told MPRI negotiators that "I want to drive the Serbs out of my country" (TAC at ¶ 37);
- The plan of attack against the Serbian Krajina in 1995 was called "Operation Storm." As conceived by MPRI from its offices in Virginia, Operation Storm would be an attack on a demilitarized civilian population protected only by an UNPROFOR presence and the aforementioned lightly armed and poorly trained civilian defense networks. As designed by MPRI Operation Storm was a widespread, organized, systematic attack on a civilian population. The purpose and intent of Operation Storm was to forcibly and permanently displace the Serbian population of the Krajina region from Croatian territory. MPRI knew the purpose and intent of Operation Storm and knew, or should have known, that its implementation would cause the deaths and/or permanent removal from the Krajina of scores of thousands of innocent Serbian civilians (TAC at ¶ 52) (emphasis added);
- MPRI officials and the Croatian General Staff finalized and solidified the operational planning for Operation Storm. MPRI approved and endorsed the final operational plan and the Croatian General Staff took steps preparing for its imminent execution (TAC at ¶ 56) (emphasis added);
- MPRI had a substantial effect on the success of Operation Storm and the crimes committed during the operation including the period from August 4, 1995 through November 15, 1995 (TAC at ¶ 110);
- As a co-conspirator of the plan to expel the Krajina Serb population, MPRI and its officers and employees directly participated in the joint criminal enterprise to unlawfully accomplish this objective by designing and planning the battle strategy (TAC at ¶ 111) (emphasis added);
- [MPRI] materially assisted Croatia's preparation for and implementation of Operation Storm with the understanding, knowledge and purpose that Operation Storm would result in the plunder of public and private property in majority-Serb population areas by Croatian forces (TAC at ¶ 142) (emphasis added);
- [MPRI] materially assisted Croatia's preparation for and implementation of Operation Storm with the understanding, knowledge and purpose that Operation Storm would result in the wanton destruction of cities, towns and villages in majority Serb populations areas of the Krajina region of Croatia (TAC at ¶ 143) (emphasis added).

Moreover, conspirators are often silent as to their motives, mental state and involvement in planning and executing a crime explains, in part, why the Seventh Circuit has ruled that circumstantial evidence may be sufficient to prove the elements of a conspiracy, including the *mens rea*.[24] In *In Re Text Messaging Antitrust Litigation*, the Court explained that "[d]irect evidence of conspiracy is not a sine qua non, however. Circumstantial evidence can establish [a]…conspiracy." *In Re Text Messaging Antitrust Litigation*, 630 F.3d 622 at 229 (7[th]Cir.2010); See also *Hoffman-La Roche, Inc. v. Greenberg*, "Circumstantial evidence may provide adequate proof of conspiracy. *Hoffman-La Roche, Inc. v. Greenberg*, 447 F.2d 872, 875 (7th Cir. 1971). Given this well settled principle, Plaintiffs have more than adequately alleged facts constituting circumstantial evidence that the Defendant shared the purpose and intent of their Croatian comrades in planning, preparing and executing Operation Storm.

**C.      Plaintiffs Have Sufficiently Pled Principal Liability.**

The TAC is replete with factual allegations detailing MPRI's principal involvement in the international law violations complained of. While Defendants rightly point out that Plaintiffs were initially reluctant to include allegations against MPRI of principal liability, they are wrong in suggesting that no new facts have arisen that would support the inference of principal liability. In fact, the TAC clearly refers to a critically important fact not available to Plaintiffs at the time the SAC was filed. Paragraph 118 of the TAC explains that in April of 2011, no less than the Croatian Minister of Defense acknowledged General Carl Vuono's direct role in the planning and preparation of Operation Storm. As it has been alleged in the TAC that Operation Storm itself was designed to remove the Serbian population of the Krajina, the direct involvement of

---

[24] If proven, the factual allegations in the TAC would support the finding of a conspiracy between Defendant and the Croatian leadership. Under this conspiracy MPRI covertly assisted and guided the Croatian leadership in achieving its goal of removing the Serbian population of the Krajina. An essential element of this conspiracy was to conceal MPRI's role in the planning and preparation of Operation Storm.

General Vuono, a principal officer of MPRI at the time, has been adequately alleged in order to attach principal liability to MPRI for the crimes committed in furtherance of that Operation.

Defendants next suggest that Plaintiffs were required to bring their Genocide claims pursuant to the Proxmire Act, 18 U.S.C. §§ 1091-93. However, the Proxmire Act is a criminal statute and Plaintiffs have brought their tort claims under the umbrella of 28 U.S.C. 1350 and 28 U.S.C. 1331. While it is true that the Proxmire Act itself does not explicitly allow for civil claims, it is similarly true that it does not exclude the possibility of claims being brought pursuant to another law. See 18 U.S.C. §§ 1092.

The cases cited by the Defendants for this erroneous position are distinguishable. In *Abelesz*, the court's holding was limited to finding that claims of Holocaust expropriation of personal property from Hungarian nationals by the Hungarian national banks are not preempted by the Proxmire Act. In *Sampson v. The Republic of Germany*, the court simply held that the Proxmire Act did not apply to the Plaintiff. Moreover, Defendants provide no real authority for the proposition that the Proxmire Act provides exclusive jurisdiction of genocide claims.[25]

## D.    Plaintiffs State a Claim Under State Conspiracy Laws.

Plaintiffs have alleged numerous facts in the TAC which, taken together, more than plausibly allege a conspiracy between MPRI and the government of Franjo Tudjman to permanently expel the Serbian population from the Krajina region.[26] As noted above, "[d]irect evidence of conspiracy is not a sine qua non, however. Circumstantial evidence can establish

---

[25] Defendants argument that they cannot be liable for forced population transfer is easily refuted. Article 6 of the Rome Statute of the International Criminal Court, Article 5(d) of the ICTY Statute and numerous ICTY and ICTR judgments identify forced population transfer as a violation of international law. Not one of these sources of international law restricts principal liability to that of an occupying power.

[26] Defendant correctly cites the elements of conspiracy in Illinois and Virginia as being: (1) a combination of two or more persons, (2) for the purpose of accomplishing by some concerted action either an unlawful purpose or a lawful purpose by unlawful means, and (3) in the furtherance of which one of the conspirators committed an overt tortious or unlawful act. See *Harrell v. Colonial Holdings, Inc*, 2013 WL 550424 at 7 (2013); and *Adcock v. Brakegate, Ltd.*, 164 Ill.2d 54 at 62 (1994).

[a]…conspiracy." *In Re Text Messaging Antitrust Litigation*, 630 F.3d 622 at 229 (7th Cir.2010). There is plentiful circumstantial evidence, in addition to Plaintiffs' well-pleaded factual allegations, to sustain Plaintiffs' state law conspiracy counts.[27]

First, Plaintiffs have alleged a combination of two or more persons by pleading that officers of MPRI worked together with members of the Croatian government to achieve their various goals.  *See* TAC ¶¶ 37-40, 48, 55, 56, 111.

Second, Plaintiffs sufficiently alleged facts tending to show that the purpose of the conspiracy itself was unlawful, i.e. the illegal expulsion of the Krajina Serb population through the use of an attack, illegal under international law and in violation of U.N resolutions, to terrorize the Serbian population into fleeing their homes.  *See* TAC ¶¶ 37, 40, 41(a), 49, 52.

Third, Plaintiffs adequately allege that one of the conspirators committed an overt tortious *or* unlawful act in furtherance of the conspiracy.[28]  Contrary to Defendants' suggestion that Plaintiffs are attempting to "shoehorn" alleged international law violations into actionable

---

[27] See generally *Mexican Central Railway Company v. Gehr*, 66 Ill.App. 173 (1st Dist., 1896) affirming an Illinois tort judgment where all relevant conduct took place in Mexico.

[28] It is not a requirement that Plaintiffs actually include counts within a complaint for each individual tort committed in furtherance of a conspiracy, and even Defendants do not suggest that it is.  In fact, it is not even a requirement that individual members *actually know* who the other conspiracy members are and what actions they are taking in furtherance of the conspiracy.  See, e.g., *Jones v. City of Chicago*, 856 F.2d 985 at 992 (7th Cir., 1988): "To be liable as a conspirator you must be a voluntary participant in a common venture, although you need not have agreed on the details of the conspiratorial scheme or even know who the other conspirators are. It is enough if you understand the general objectives of the scheme, accept them, and agree, either explicitly or implicitly, to do your part to further them[.]"; and also *People of Illinois, ex rel. KGB, Inc. v. Breed-Gambino,* 2009 WL 3835452 at *6 (N.D.Ill, 2009)(internal citations omitted): "Indeed, all members of a conspiracy 'are liable for injuries caused by any unlawful acts performed pursuant to and in furtherance of the conspiracy,' regardless of whether the conspirator planned or knew about the wrongful act."

conduct[29], Plaintiffs provide numerous allegations of unlawful conduct violative of international law committed by members of the conspiracy in furtherance of the conspiracy.[30]  (*See* ¶¶ 63-71).

As the 7th Circuit has explained, in a civil claims for conspiracy, "[T]he court will ask itself *could* these things have happened, not *did* they happen."  *Swanson v. Citibank, N.A.*, 614 F.3d 400, 404 (7th Cir. 2010).  The allegations in the TAC clearly meet this threshold and Defendants' baseless arguments to the contrary should be rejected.

## III.  The Act Of State Doctrine Does Not Require Dismissal Of This Case.

The Defendant next argues that dismissal of this action is required under the Act of State doctrine.  But this doctrine is unavailable to Defendants here in light of the fact that Plaintiffs allege *jus cogens* violations of international law, and in any event this affirmative defense is not presented by the face of the TAC and the conditions for invocation of the doctrine have not been met.  Indeed, the U.S. government has already, clearly and explicitly, sat in judgment on the legality of Croatia's actions, having compared Operation Storm to the Holocaust, conditioning Croatia's NATO membership on war crimes cooperation and going so far as to state that, as a nation, "We will not compromise on this judgment."[31]

---

[29] By Defendants own definition, the third element of a claim for civil conspiracy is alleging that an overt tortious *or* unlawful act has been committed in furtherance of the conspiracy.  See Defendants Memorandum in Support of Motion to Dismiss, p. 23 f.n.14.

[30] Each action taken individually also would have constituted an actionable tort.  For example, while a widespread policy of property looting and plunder as alleged in the TAC (see, e.g., ¶¶ 64-65) certainly constitutes a violation of international law, individually they are acts of theft and conversion, actionable torts under both Virginia and Illinois law.  Unlawful destruction of property is also an actionable tort, as alleged in ¶65-66.  And, of course, it is also alleged in the TAC that numerous acts of murder, assault and battery occurred in furtherance of the conspiratorial goals.  See, e.g., ¶¶67-68.  Each and every one of these acts alleged in the TAC constitute actionable torts and unlawful acts, in addition to the violations of international law.  Thus, Plaintiffs have properly pled allegations sufficient to meet the third element of civil conspiracy liability.

[31] On November 8, 2005, U.S. Undersecretary of State Nicholas Burns compared Gotovina's crimes in Croatia to the Nazi war crimes of World War II.  "It is why we must send the despicable war criminals Radovan Karadzic, Ratko Mladic and Ante Gotovina to the Hague, as **they are responsible for Europe's worst human rights abuses since the Nazis**."  R. Nicholas Burns, Under Secretary for Political Affairs Remarks as prepared before the Senate Committee on Foreign Relations Washington, DC November 8,

The Act of State doctrine is a discretionary doctrine which permits a court in the United States to abstain from sitting in judgment of the actions of another sovereign. See generally *Banco Nacional de Cuba v. Sabbatino*, 376 U.S. 398 (1964). The Defendant has the burden of proving that the act of state doctrine should be applied. *See DRFP , LLC v. Republic Bolivariana de Venezuela*, 2013 WL 2096652 at *15 (S.D. Ohio May 14, 2013); *Magyar Nemzeti Bank*, 2011 WL 1900340 at *5. "The application of the doctrine depends on a case-by-case analysis", although there are at least two recognized factors that courts faced with an Act of State defense should consider. *Lizarbo v. Rondon*, 642 F. Supp.2d 473, 488-89 (D. Md. 2009). Defendants cannot carry their burden for several reasons.

First, and most importantly, the TAC alleges what are known as *jus cogens* violations of international law, and the law is clear that the Act of State doctrine is unavailable to defendants accused of *jus cogens* violations. the U.S. Supreme Court has explained that "[i]t should be apparent that the greater the degree of codification or consensus concerning a particular area of

---

2005 (emphasis added)(last accessed on August 5, 2013 at: http://2001-2009.state.gov/p/us/rm/2005/56602.htm); previously, Undersecretary Burns explained that the U.S. had conditioned Croatia's entry into NATO on Gotovina's capture and extradition to the ICTY: "It is furthermore the position of the United States **that Croatia will not become a member of NATO until General Gotovina is in The Hague. Our Government believes that we cannot afford to forget the massacres of the Balkan wars, and that those people responsible for those massacres should end up on trial for war crimes.** We will not compromise on this judgment. Others may want to do that, others may want to go ahead and have a more normal relationship, but not the United States. We are sticking to our principles and I made that clear in each of the meetings that I had with the leadership of this [Croatia] country today." Remarks to the Press in Sarajevo, Bosnia and Herzegovina, R. Nicholas Burns, Under Secretary for Political Affairs, Sarajevo, Bosnia and Herzegovina October 12, 2005 (last accessed on August 5, 2013 at: http://2001-2009.state.gov/p/us/rm/2005/55123.htm); finally, in December of 2005, Secretary of State Condoleza Rice expressed, on behalf of the U.S., her congratulations to Croatia for arresting Gotovina: "The United States welcomes the news that Ante Gotovina was arrested in the Canary Islands. We congratulate Croatian and Spanish authorities for their efforts that led to his arrest[…]**With the arrest of Mr. Gotovina, Croatia has now taken a major step forward toward addressing the injustices of its recent past**[…]The United States welcomes his prompt extradition to The Hague where he can stand trial for the crimes for which he has been indicted. We congratulate the International Criminal Tribunal for the Former Yugoslavia for their steadfast commitment in seeing Gotovina and other war criminals brought to justice." U.S. Stated Department cable with the subject line "Croatia: Gotovina's Capture", Secretary Condoleezza Rice Washington, DC December 8, 2005 (last accessed on August 5, 2013 at: http://2001-2009.state.gov/secretary/rm/2005/57833.htm).

international law, the more appropriate it is for the judiciary to render decisions regarding it[.]" *Banco Nacional de Cuba*, 376 U.S. at 428.[32] As the 9th Circuit explained, "violations of *jus cogens* norms are exempt from the [act of state] doctrine, since they constitute norms 'from which no derogation is permitted.' *Siderman de Blake v. Republic of Argentina*, 965 F.2d 699, 714 (9th Cir.1992) (quoting the Vienna Convention on the Law of Treaties) (internal quotations omitted)[…]Thus, Plaintiffs claims that allege *jus cogens* violations are not barred by the act of state doctrine." *Sarei v. Rio Tinto, PLC,* 2011 WL 5041927 at *17 (2011).[33] *See also Garcia v. Chapman,* 911 F. Supp.2d 1222, 12423 (S.D. Fla. 2012) ("[J]us cogen norms, which are afforded the highest status under international law, are exempt from the act of state doctrine because they 'constitute norms from which no derogation is permitted.' . . . . State torture violates such a *jus cogens* norm. 'Thus, plaintiffs' claims that allege *jus cogens* violations are not barred by the act of state doctrine.'") (quoting *Sarei*, 671 F3d at 757); *Lizarb,* 642 F. Supp.2d at 488-89 ("[T]he acts alleged in the complaint violate universally agreed upon legal principles . . . . Such acts, committed in violation of the norms of customary international law, are not deemed official acts for purposes of the act of state doctrine."). Because claims brought under the ATS must be based only upon the most egregious violations of international law, which include *jus cogens* norms, it is unsurprising that the 2nd Circuit explained that "[…]we think it would be a rare case

---

[32] This principle is confirmed by the Restatement (Third) of Foreign Relations Law, which states that "A claim arising out of an alleged violation of fundamental human rights – for instance, a claim on behalf of a victim of torture or genocide – would (if otherwise sustainable) probably not be defeated by the act of state doctrine, since the accepted international law of human rights is well established and contemplates external scrutiny of such acts." Section 443 Comment (d); *see generally* de Zayas, the Genocide Against the Armenians, 1915-1923 and the relevance of the 1948 Genocide Convention (2008).

[33] "A *jus cogens* norm is a special type of customary international law. A j*us cogens* norm 'is a norm accepted and recognized by the international community of states as a whole as a norm from which no derogation is permitted and which can be modified only by a subsequent norm of general international law having the same character.' Most famously, *jus cogens* norms supported the prosecutions in the Nuremberg trials." *Sampson v. The Federal Republic of Germany*, 250 F.3d 1145, 1149-50 (7th Cir. 2001)(internal citations omitted).

in which the act of state doctrine precluded suit under section 1350 [the ATS]." *Kadic v. Karadzic*, 70 F.3d 232 at 250 (2nd Cir. 1995).

Nor can Defendants demonstrate that this case "touches sharply on the national nerves of the United States." Lizarbo, 642 F. Supp.2d at 489. As demonstrated above, the U.S. government has firmly not only condemned the Krajina massacre, but it has predicated Croatian cooperation with regard to the massacre as a precondition to foreign relations with Croatia.[34] In these circumstances, where our government has already taken a firm position, the Act of State doctrine concerns are not implicated. See Lizarbo, 642 F. Supp.2d at 489 (rejecting Act of State doctrine where "the U.S. government has expressly condemned what took place at Accomarca" because that condemnation meant that that case "does not represent a sensitive foreign policy ").

Defendants attempt to undermine the consensus by suggesting that world opinion is divided over the illegality of the war crimes committed during Operation Storm.[35] Of course, at a bare minimum, such an argument goes well beyond the face of the TAC and raises a fact question not appropriate for resolution at this stage as "[t]he act of state doctrine is an affirmative

---

[34] Defendant also claims that the United States government in some way supported the outcome and execution of Operation Storm. The Third Amended Complaint contains no such allegations and, in fact, as set forth above, the available evidence suggests that the United States government has long held the position that Operation Storm resulted in mass war crimes and atrocities, and that those responsible must be held to account for their crimes. To suggest that the United States somehow approves of the crimes committed during Operation Storm is simply to ignore reality.

[35] Defendant cites to the November 2012 ICTY appellate reversal of the convictions of the Croatian generals responsible, in part, for leading Operation Storm as evidence that the controversy as to the legitimacy of the Operation persists. The November 2012 appellate judgment overturned a unanimous trial court finding of guilt and was itself subject to a vigorous dissent by two of the five appellate judges. The acquittals have spawned controversy and chaos within the Tribunal itself. In fact, not only has the Tribunal Prosecutor expressed his willingness to request a Review of the Gotovina appellate judgment, itself a rare step at the Tribunal, but judges within the Tribunal have expressed their concern that improper political pressure may have been placed upon the Presiding Judge of the Appeals Chamber and author of the Gotovina appellate decision, Theodor Meron, to reverse the convictions of Gotovina and others. These alarming developments should come as no surprise to Defence counsel, whose own law firm was hired by Croatia to lobby for a reversal of the Gotovina conviction (See Exhibits _ and _). The notion that such pressure may have been placed upon supposedly independent judges is shocking, and has led to calls for the United Nations Security Counsel to investigate any potential improprieties.

defense placing the burden on the defendant. Accordingly, dismissal on the pleadings is only proper 'on the basis of that doctrine when its applicability is shown on the face on the face of the complaint.'" *DRFP*, 2013 WL 2096652 at *16 n. 23 (quoting *Konowaloff v. Metro. Museum of Art*, 702 F,3d 140, 146 (2d Cir. 2012).[36] The argument is misplaced. World opinion is not relevant to the Act of State doctrine, as the position of the U.S. government does not always align with world opinion. In fact, the evidence will be that world opinion has uniformly coalesced around the belief that Operation Storm perpetrated numerous atrocities and violations of international law.[37]

Another Act of State doctrine factor – whether 'the government which perpetrated the challenged act of state' is still in existence" – also weighs heavily in Plaintiffs' favor. *Holocaust Victims of Bank Theft v. Magyar Nemzeti Bank*, 2011 WL 1900340 at *5 (N.D.Ill., August 11, 2011). It is recognized that "judicial involvement in a particular controversy will have less effect on foreign relations where the government in question has been removed." *Abiola v. Abubakar*, 2005 WL 3050607 at *2 (N.D.IL, 2005). Operation Storm was planned and executed during the regime of former President Franjo Tudjman, who died in 1999 at the age of 77, ending his role as

---

[36] Accordingly, "[a]s a substantive rather than a jurisdictional defense, the Act of State doctrine is more appropriately raised in a motion for summary judgment than in a motion to dismiss." *Daventree Ltd. v. Republic of Azerbaijan*, 349 F. Supp.2d 736, 755 (S.D.N.Y. 2004).

[37] Defendants disingenuously suggest that this Court solicit the State Department for its views. Beyond the separation of powers issues implicated by such a request, what Defendants are really saying is "maybe this Court can get the State Department to intervene because we have failed to do so." Let there be no doubt that Defendants have lobbied the State Department to intervene. Defendants are represented by the law firm Patton Boggs who purports on their website to be One of the pre-eminent public policy law firms in the United States" and is in fact regularly number one in lobbying revenue by a large margin. More pertinently, Patton Boggs represents the interests of the nation of Croatia in lobbying on its behalf in the United States. An August 5, 2011 Registration Statement filed by Patton Boggs indicates such a representation of Croatia's interests related to the Operation Storm trials conducted by the International Criminal Tribunal. Patton Boggs has likely for two years been asking the State Department to file a Statement of Interest, and the State Department certainly knows how to do so – it files more than dozen such statements in federal and state court cases each year. And, even more pertinently, such Statements of Interests are regularly disregarded by the courts. The State Department's silence here can safely be taken as an expression of its views here.

President of Croatia.[38]  Tudjman's party, the Croatian Democratic Union ("HDZ"), was defeated

in presidential elections the following year, ending the rule of the Tudjman/HDZ government

responsible for carrying out Operation Storm.[39]  Thus, the government in power in Croatia at the

time of the alleged crimes and atrocities has been out of power for more than a decade.[40]

### CONCLUSION

For all of the reasons delineated herein, Plaintiffs respectfully suggest that Defendants have failed

to carry the heavy burden required of them in a Motion to Dismiss.  As a result, the instant Motion should

be denied.  Additionally, due to the complex nature of the issues briefed, Plaintiffs request that oral

argument be scheduled in this matter.

Respectfully submitted, this 5th Day of August, 2013:


By:     /s/ Robert J. Pavich
        ROBERT J. PAVICH
        Attorneys for Plaintiffs

---

[38] See Ian Traynor, *Franjo Tudjman: Authoritarian leader whose communist past and nationalist obsessions fuelled his ruthless pursuit of an independent Croatia*, The Guardian Newspaper (Obituary), December 12, 1999, accessed on November 30, 2011 at
http://www.guardian.co.uk/news/1999/dec/13/guardianobituaries.iantraynor
[39] See *Croatia:  New Start?*, The Economist Magazine – Print Addition, February 10, 2000, accessed on July 23, 2013 at http://www.economist.com/node/329285?Story_ID=E1_PNJNRV.
[40] The Defendant suggests that because Croatia continues to celebrate Operation Storm that application of the act of state doctrine in this case is somehow required.  Quite the contrary, the international community condemned Croatia's reaction and expressed concern over the nationalist sentiment rekindled by the trial court convictions. See Croatian Times, *ICTY Prosecutor Brammertz critical of Croatian authorities' reaction to Gotovina's verdict*, November 28, 2011, accessed on November 30, 2011 at
http://www.croatiantimes.com/?id=23483&print=1; and also Human Rights Watch, *Gotovina Ruling Reaction Shows Croatia Has Yet to Come to Terms with the Past*, 5 May 2011, available at: http://www.unhcr.org/refworld/docid/4dc796bb1a.html [accessed 30 November 2011]. And while those convictions have, at least temporarily, been overturned, world opinion has not changed as to the violations of international law committed during Operation Storm.  It is highly unlikely that, contrary to Defendants' unsupported assertions, U.S. foreign policy and relations with Croatia will be in any way harmed by the continuation of this action.  First, Croatia is not even a party to this lawsuit.  Second, as mentioned above, the current Croatian government has no relation to, or connection with, the nationalist government of Franjo Tudjman which ordered Operation Storm.  Finally, if the U.S. government were so concerned with the continuation of this action, it could easily present its position to this Court, a step it has taken in other cases yet has thus far refrained form doing in the instant action.

**PAVICH LAW GROUP, P.C.**
20 South Clark Street, Suite 700
Chicago, Illinois 60603
(312) 782-8500
(312) 853-2187 (FAX)
rpavich@pavichlawgroup.com

Jeffrey A. Leon
**COMPLEX LITIGATION GROUP LLC**
513 Central Avenue, Suite 300
Highland Park, Illinois
(847) 433-4500
jeff@complexlitgroup.com

Ian H. Levin
John J. Pavich
**PAVICH LAW GROUP, P.C.**
20 South Clark Street, Suite 700
Chicago, Illinois 60603
(312) 782-8500
(312) 853-2187 (FAX)

**Certificate of Service**

I, Robert J. Pavich, an attorney for Plaintiffs, do hereby certify that on August 5, 2013, I

filed the foregoing documents and that service was performed upon all parties via the ECF filing

system.

Respectfully submitted: /s/   Robert J. Pavich
                         PAVICH LAW GROUP, P.C.
                         20 South Clark Street
                         Suite 700
                         Chicago, Illinois 60603
                         (312) 782-8500 (Telephone)
                         (312) 853-2187 (Fascimile)
                          rpavich@pavichlawgroup.com