**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| **MILENA JOVIC, ZIVKA MIJIC,** | ) | |
| **MIRA GRUBOR, BOSKO BJEGOVIC,** | ) | |
| **and DALIBOR MRKALJ, and all** | ) | |
| **others similarly situated,** | ) | |
| | ) | |
| | ) | **10 C 5197** |
| **Plaintiffs,** | ) | |
| | ) | **Judge John Z. Lee** |
| **v.** | ) | |
| | ) | |
| **L-3 SERVICES, INC. and** | ) | |
| **ENGILITY HOLDINGS, INC.,** | ) | |
| | ) | |
| | ) | |
| **Defendants.** | ) | |

## MEMORANDUM OPINION AND ORDER

Plaintiffs Milena Jovic, Zivka Mijic, Mira Grubor, Bosko Bjegovic, and Dalibor Mrkalj, individually and on behalf of others similarly situated, bring this suit against Defendant L-3 Services, Inc. ("L-3"), and Engility Holdings, Inc. ("Engility") (collectively, "Defendants").[1] The allegations concern MPRI Inc. ("MPRI"), a U.S. military contractor that has since been subsumed into Engility. Plaintiffs allege that MPRI assisted the Croatian military in designing and carrying out the genocide and forced displacement of ethnic Serbs located in Croatia's Krajina region in August 1995 through a military operation named "Operation Storm."

In the Third Amended Complaint, Plaintiffs bring ten different counts against Defendants. The first eight counts allege that, in violation of the Geneva Convention and other sources of international law, including customary international law, Defendants were complicit in genocide

---

[1] Defendants state that L-3 has been acquired by Engility, and thus Engility is the only proper Defendant. Defs.' Mot. Dismiss 1 n.1. Because the Court grants Defendants' motion to dismiss as to all Defendants, the distinction is of little difference.

(Count I), committed genocide (Count II), carried out a forced population transfer (Count III), aided and abetted a forced population transfer (Count IV), aided and abetted the plunder of property (Count V), aided and abetted the wanton destruction of cities, towns, and villages (Count VI), committed crimes against humanity (Count VII), and aided and abetted the commission of crimes against humanity (Count VIII). Counts IX and X allege that, in violation of Illinois and Virginia law and federal common law, MPRI conspired with the Croatian military to commit forced population transfer and destruction of property (Count IX) and conspired to commit unlawful conversion of property (Count X).

Defendants move to dismiss Plaintiffs' Third Amended Complaint for lack of subject matter jurisdiction pursuant to Federal Rule of Civil Procedure ("Rule") 12(b)(1) and for failure to state a claim upon which relief can be granted pursuant to Rule 12(b)(6). The events that are portrayed in the Third Amended Complaint are unspeakably tragic and horrific. *See, e.g.*, 3d Am. Compl. ¶¶ 75, 78. Plaintiffs lost homes, property, friends, and family in Operation Storm. *See id.* ¶ 71. But the Court is constrained in its ability to consider claims over which it lacks jurisdiction or claims that are insufficiently pleaded. Accordingly, for the reasons set forth herein, the Court grants Defendants' motion to dismiss Counts I through VIII for want of subject matter jurisdiction. The Court also grants in part and denies in part Defendants' motion as to Counts IX and X for failure to state a claim upon which relief can be granted.

### **Facts**[2]

In October 1994, Croatian military leaders resolved to carry out a major military

---

[2]    The facts are adopted from Plaintiffs' Third Amended Complaint and are accepted as true in considering this motion to dismiss.    *See Patel v. City of Chi.*, 383 F.3d 569, 572 (7th Cir. 2004); *Reynolds v. CB Sports Bar, Inc.*, 623 F.3d 1143, 1146 (7th Cir. 2010).

operation to retake Croatia's Krajina region from controlling Serbian forces.    3d Am. Compl. ¶¶

24, 31.    Seeking expertise in planning the operation—ultimately named "Operation

Storm"—Croatian leaders traveled to Virginia and met with MPRI, a military contractor run by

former United States military and intelligence officers.    *Id.* ¶¶ 32, 37-38.    MPRI was known

for providing military training, strategic advice, and planning assistance.    *Id.* ¶ 32.

During this meeting, Croatian leaders and MPRI agreed that "MPRI was to train[] and

modernize . . . the Croatian Army into a competent fighting force able to invade the Krajina

region and expel the ethnic Serbian population from Croatian territory."    *Id.* ¶ 37.    Plaintiffs

allege Croatian leaders told MPRI they wished to "'drive the Serbs out of [the] country.'"    *Id.*

The parties' formal agreement stated, however, that "MPRI's conduct was limited to providing

'democracy transition assistance' by indoctrinating Croatian armed forces with the principles of

democratization including civilian control of the military."    *Id.* ¶ 40.    Nevertheless, Plaintiffs

allege MPRI "knew, or should have known, that [Operation Storm's] implementation would

cause the deaths and/or permanent removal from the Krajina [region] of scores to thousands of

innocent Serbian civilians."    *Id.* ¶ 52.    Plaintiffs further allege that "a conspiracy existed

between" MPRI and the Croatian government, "the purpose of which was the permanent removal

of the Serb population from the Krajina region by force, fear of force, persecution, forced

displacement, transfer and deportation, [and] appropriation and destruction of property."    *Id.* ¶

62.

MPRI engaged in various activities to train and prepare Croatia's military to take back the

Krajina region from Serbian forces.    *Id.* ¶ 41.    Among these, MPRI dispatched a fourteen-

member "advisory" team to Croatia to work with the military, and MPRI stationed senior leaders

in Croatia to "enhanc[e] the morale of Croatian soldiers." *Id.* ¶¶ 41, 112. MPRI's "management, control, facilitation[,] and provision of assistance" concerning Operation Storm took place at MPRI's Virginia headquarters as well as in Croatia. *Id.* ¶ 43. Leading up to Operation Storm, MPRI personnel met with Croatian leadership ten times in Croatia and on a nearby island. *Id.* ¶ 55. Finally, on August 4, 1995, Croatian armed forces began Operation Storm.[3] *Id.* ¶ 57.

Plaintiffs assert that "Operation Storm resulted in the largest act of ethnic cleansing in Europe since World War II," and "thousands of innocent civilians were attacked, injured[,] and killed." *Id.* ¶ 108. Additionally, the operation expelled thousands of Serbian refugees from Krajina. *Id.* ¶ 109. During Operation Storm, Plaintiffs fled the Krajina region along with other refugees, leaving their homes and livelihood behind. *Id.* ¶¶ 76-77, 87, 90, 98-99, 103, 105. Specifically, Plaintiffs Jovic, Mijic, and Grubor lost real or personal property, or no longer have use of real or personal property, as a result of Operation Storm. *See id.* ¶¶ 76, 80, 92.

On August 17, 2010, Plaintiffs commenced this action before Judge Rubén Castillo of the Northern District of Illinois. On December 1, 2011, Judge Castillo suspended consideration of the matter until the Supreme Court issued its decision in *Kiobel v. Royal Dutch Petroleum Co.*, 132 S. Ct. 472 (2011) (granting certiorari). Then, on June 6, 2012, the case was reassigned to this Court, following which the Supreme Court issued its decision in *Kiobel*. 133 S. Ct. 1659 (2013). Plaintiffs filed their Third Amended Complaint, and Defendants moved to dismiss.

---

[3] Plaintiffs do not state specifically whether MPRI was present in Croatia during Operation Storm. Plaintiffs do allege, however, that MPRI "placed its personnel on the ground in key command and control positions to assist the Croatian military in implementing the plan and in the military's illegal targeting objectives." 3d Am. Compl. ¶ 1.

<u>**Legal Standard**</u>

Defendants move to dismiss Counts I through VIII for lack of subject matter jurisdiction under Rule 12(b)(1). They also challenge the viability of Counts IX and X under Rule 12(b)(6).

Under Rule 12(b)(1), a defendant may move to dismiss claims over which a federal court lacks subject matter jurisdiction. Subject matter jurisdiction, the "power to decide," must be conferred upon a federal court. *Flynn v. Sandahl*, 58 F.3d 283, 288 (7th Cir. 1995) (internal citations omitted); *SRT Enters., Inc. v. Direct Energy Bus., LLC*, No. 11 C 4933, 2011 WL 6379303, at *3 (N.D. Ill. Dec. 20, 2011) (internal citations omitted). In cases such as this, where a defendant has mounted a facial challenge to jurisdiction, the court need only look to the complaint to see if the plaintiff has sufficiently alleged a basis for subject matter jurisdiction. *Apex Digital, Inc. v. Sears, Roebuck & Co.*, 572 F.3d 440, 443 (7th Cir. 2009) (internal citations omitted). In doing so, the court takes the allegations in the complaint as true, viewing all facts and drawing all reasonably drawn inferences in favor of the plaintiff. *Patel*, 383 F.3d at 572. The party seeking to invoke subject matter jurisdiction bears the burden of establishing it. *See Apex Digital*, 572 F.3d at 445.

Defendants' motion for failure to state a claim under Rule 12(b)(6) challenges the sufficiency of the complaint. *Christensen v. Cnty. of Boone*, 483 F.3d 454, 457 (7th Cir. 2007). Under Rule 8(a)'s notice pleading standards, "a plaintiff's complaint need only provide a short and plain statement" of a claim entitling the pleader to relief, "sufficient to provide the defendant with fair notice of the claim and its basis." *Tamayo v. Blagojevich*, 526 F.3d 1074, 1081 (7th Cir. 2008) (internal quotations omitted). The complaint must, however, allege "enough facts to state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)

(citing *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). Facial plausibility requires that a complaint include "factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* When deciding a Rule 12(b)(6) motion, the court construes the complaint "in the light most favorable to the nonmoving party, accept well-pleaded facts as true, and draw all inferences in [plaintiff's] favor." *Reynolds*, 623 F.3d at 1146.

<u>Analysis</u>

Plaintiffs' Third Amended Complaint includes ten different counts. Counts I through VIII allege various violations of international law over which Plaintiffs assert the Court has subject matter jurisdiction under the Alien Tort Statute ("ATS"), codified in 28 U.S.C. § 1350 (2012), or under federal question jurisdiction pursuant to 28 U.S.C. § 1331 (2012) ("Section 1331"). 3d Am. Compl. ¶¶ 138-41, 143-44.[4] Furthermore, although Plaintiffs have not invoked jurisdiction under the Class Action Fairness Act, 28 U.S.C. § 1332(d) (2012), for Counts I through VIII in the Third Amended Complaint, they raise this argument in their response brief. *See* Pls.' Resp. Defs.' Mot. Dismiss at 23-24. Because these statutes do not confer subject matter over Plaintiffs' international law claims, the Court dismisses Counts I through VIII for lack of subject matter jurisdiction.

Counts IX and X allege conspiracy to commit forced population transfer and destruction of property, and conspiracy to commit unlawful conversion of property, in violation of Illinois and Virginia state law and federal common law. 3d Am. Compl. ¶¶ 43-44. The Court

---

[4] Plaintiffs do not plead a jurisdictional basis with regard to Count V, "Aiding and Abetting the Plunder of Property," but the Court presumes Plaintiffs are asserting jurisdiction under the ATS or Section 1331.

concludes that these claims are unsupported by federal common law. Additionally, the Court dismisses Count IX to the extent that it seeks to assert a state law claim for conspiracy to commit population transfer. However, the Court holds that it has jurisdiction over Counts IX and X pursuant to CAFA to the extent they allege state law claims for civil conspiracy to commit trespass to land and conversion.

## I.      International Law Claims (Counts I through VIII)

Defendants move to dismiss Counts I through VIII for lack of subject matter jurisdiction. Plaintiffs argue that the Court has subject matter jurisdiction under the ATS, 28 U.S.C. § 1331, and CAFA. Specifically, Plaintiffs argue that their case falls outside the ambit of the Supreme Court's decision in *Kiobel* because substantial conduct giving rise to their claims occurred in Virginia. Additionally, Plaintiffs argue that, because federal common law incorporates customary international law, Section 1331 and CAFA independently confer federal question jurisdiction. These arguments are not well-founded.

### A.      Jurisdiction Under the ATS

The ATS is a jurisdictional statute and does not directly regulate conduct or afford relief. *Kiobel*, 133 S. Ct. at 1664. Rather, the ATS "allows federal courts to recognize certain causes of action based on sufficiently definite norms of international law." *Id.* The ATS states that "[t]he district courts shall have original jurisdiction of any civil action by an alien tort only, committed in violation of the law of nations or treaty of the United States." 28 U.S.C. § 1350. Importantly, in *Kiobel*, the Supreme Court determined that a presumption against extraterritorial

application applies to the ATS. 133 S. Ct. at 1669.[5] Thus, where acts giving rise to a tort claim take place in a foreign country, a federal court does not have jurisdiction to hear the claim under the ATS, unless the plaintiff rebuts the presumption against extraterritorial application. *Id.* The Supreme Court elaborated in *Kiobel* that "even where [] claims touch and concern the territory of the United States, they must do so with sufficient force to displace the presumption against extraterritorial application." *Id.* (citing *Morrison v. Nat'l Australia Bank Ltd.*, 561 U.S. 247, 264-73 (2010)).

In *Kiobel*, the Supreme Court did not spell out exactly under what circumstances a claim might "touch and concern the territory of the United States . . . with sufficient force to displace" the extraterritorial presumption. *See Balintulo v. Daimler AG*, 727 F.3d 174, 191 (2d Cir. 2013) (noting that "the Court had no reason to explore, much less explain, how courts should proceed when *some* of the relevant conduct occurs in the United States") (emphasis in original); *Al Shimari v. CACI Premier Tech., Inc.*, 758 F.3d 516, 526 (4th Cir. 2014) (noting that "the Supreme Court used the phrase 'relevant conduct' to frame its "touch and concern" inquiry, but never defined that term"). Seeking additional guidance, lower courts have looked to the case cited by the Supreme Court in *Kiobel*, *Morrison v. Nat'l Australia Bank Ltd.*

*Morrison* teaches that just any contact with the United States is not sufficient to overcome the presumption against extraterritorial application. As observed by the *Morrison* Court, "the presumption against extraterritorial application would be a craven watchdog indeed if it retreated to its kennel whenever *some* domestic activity is involved in the case." 561 U.S. at 266

---

[5] The Supreme Court noted the purpose behind the presumption is in large part to ward off "the danger of unwarranted judicial interference in the conduct of foreign policy." *Kiobel*, 133 S. Ct. at 1664.

(emphasis original). The Supreme Court also explained that the possibility of rebutting the presumption against extraterritorial application depends on the nature of the relevant conduct that forms the "focus" of the statute in question. *Id.*

Under *Morrison* and *Kiobel*, it is clear that federal courts lack jurisdiction over claims brought under the ATS that are based on conduct "occurring entirely outside the United States." *Daimler AG v. Bauman*, 134 S.Ct. 746, 750-51 (2014); *Balintulo*, 727 F.3d at 192 ("In *all* cases, therefore the ATS does not permit claims based on illegal conduct that occurred entirely in the territory of another sovereign.") (emphasis in original). It also is settled law that the "mere corporate presence" of the defendant in the United States is insufficient to confer jurisdiction over the claim. *Kiobel*, 133 S.Ct. at 1669. The question, then, is this: how much relevant, domestic conduct is enough to rebut *Kiobel*'s presumption against extraterritorial application?

Lower courts have struggled to answer this question. *See Mamani v. Berzain*, No. 07-22459-CIV, 2014 WL 2069491, at *9 (S.D. Fla. May 20, 2014) (collecting cases and noting that a few courts "have sustained ATS claims . . . where at least some—if not a substantial portion—of the relevant conduct occurred domestically"). Recently the Fourth Circuit noted that "the clear implication of the [Supreme] Court's 'touch and concern' language is that courts should not assume that the presumption categorically bars cases that manifest a close connection to United States territory." *Al Shimari*, 758 F.3d at 528. The Fourth Circuit also observed "that the [Supreme] Court broadly stated that the 'claims,' rather than the alleged tortious conduct, must touch and concern United States territory with sufficient force, suggesting that courts must consider all the facts that give rise to ATS claims, including the parties' identities and their relationship to the causes of action." *Id.* at 527. And the Second Circuit recently

articulated the *Kiobel* extraterritoriality analysis as "ask[ing] where the 'violation[] of the law of nations occur[red]." *Balintulo*, 727 F.3d at 192 n.28 (quoting *Kiobel*, 133 S.Ct. at 1669). In any case, "a fact-based analysis is required . . . to determine whether courts may exercise jurisdiction over certain ATS claims." *Al Shimari*, 758 F.3d at 527.[6]

Applying this loose framework to the facts of this case, the key question is whether the relevant conduct giving rise to Plaintiffs' claims "touch and concern" the territory of the United States with sufficient force to displace the presumption against extraterritorial application. Plaintiffs argue in the affirmative and point out that material events giving rise to their claims occurred in Virginia.[7] Specifically, Plaintiffs draw attention to MPRI's actions in Virginia related to the negotiation of the contract with the Croatian government and MPRI's actions in Virginia to plan and develop Operation Storm. 3d Am. Compl. ¶¶ 38, 43. Accordingly, Plaintiffs assert that they have successfully rebutted *Kiobel*'s presumption against extraterritoriality.

The allegations in the Third Amended Complaint, however, when taken as a whole, paint a different picture. First, the alleged genocide and related wrongdoing, which constitute the primary conduct giving rise to Plaintiffs' ATS claims, all occurred in Krajina, not in Virginia. *Id.* ¶ 1. Thus, even though Plaintiffs allege that MPRI assisted in the commission of genocide and related wrongdoing from Virginia, the "focus" of Plaintiffs' ATS claims—the alleged

---

[6]     Although the *Kiobel* standard may be less than clear, "this language provides the current guidance to federal courts when ATS claims involve substantial ties to United States territory." *Al Shimari*, 758 F.3d at 529. And "we cannot decline to consider the Supreme Court's guidance because it does not state a precise formula." *Id.*

genocide and related atrocities that took place as part of Operation Storm—took place in Croatia. Second, Plaintiffs' allegations do not establish that Defendants' involvement in Operation Storm consisted primarily or substantially of activities in the United States. Although Plaintiffs allege that MPRI negotiated its contract with the Croatian leadership in Virginia and conducted some planning and development activities in Virginia, Defendants' involvement occurred "also within and from Croatia itself," culminating in ten different trips to Croatia, with MPRI "plac[ing] its personnel on the ground" in Croatia. *Id.* ¶¶ 1, 55. Thus, taking Plaintiffs' allegations as true, the substantial part of MPRI's challenged conduct occurred extraterritorially, and not in Virginia. Accordingly, under *Kiobel* and *Morrison*, the allegations in the Third Amended Complaint do not overcome the presumption against extraterritorial application, and the ATS does not confer subject matter jurisdiction over Plaintiffs' international law claims.

The parties have directed the Court's attention to various decisions of other courts that have wrestled with *Kiobel*'s "touch and concern" language. Of these cases, *Giraldo v. Drummond Co., Inc.* most closely mirrors the facts of the present dispute. No. 2:09 CV 1041 RDP, 2013 WL 3873960 (N.D. Ala. July 25, 2013). There, the plaintiffs alleged that military contractors, who were headquartered in the United States, conspired with Colombian paramilitaries to commit murder and other violations of international law in Colombia. *Id.* at **2-3. Despite the fact that the alleged murders and violations of international law occurred abroad, the *Giraldo* plaintiffs argued that because various agreements, payments, and other conversations and planning efforts took place in Alabama, their claims sufficiently touched and

---

7   Plaintiffs initially argue that *Kiobel* should not apply at all because Defendants' actions took place "[e]xclusively" within the United States. Pls.' Resp. Defs.' Mot. Dismiss 17. This argument is flatly inconsistent with Plaintiffs' allegations that MPRI went to Croatia to help plan Operation Storm and that the alleged genocide and other wrongdoing took place in Croatia. 3rd Am. Compl. ¶ 1.

concerned the United States. *Id.* at **5-6. The *Giraldo* court disagreed and held that the conduct on which the plaintiffs' claims focused occurred in Colombia, and the allegations of limited domestic activity were insufficient to rebut *Kiobel*'s presumption. *Id.* at **8-9. Here, as in *Girardo*, the Court finds that the focus of Plaintiffs' claims are the alleged atrocities that took place in Croatia, and MPRI's limited domestic conduct is insufficient to overcome *Kiobel*'s presumption.

For their part, Plaintiffs direct this Court to three cases in support of their position that jurisdiction exists: *Al Shimari,* 758 F.3d 516; *Krishanti v. Rajaratnam*, No. 2:09-CV-05395 JLL, 2014 WL 1669873 (D.N.J. Apr. 28, 2014); and *Sexual Minorities Uganda v. Lively*, 960 F. Supp. 2d 304 (D. Mass. 2013).[8] But in each of those cases, the plaintiffs demonstrated relevant conduct touching and concerning the United States with sufficient force to rebut *Kiobel*'s presumption. *See Al Shimari*, 2014 WL 2922840, at **9-10 (emphasizing defendants' alleged conduct occurred pursuant to a contract executed with the United States government, resulting in "extensive" and "substantial ties" to the United States); *Krishanti*, 2014 WL 1669873, at *10 (observing that defendants' significant conduct occurred within the United States, including fundraising, money laundering, and incorporating organizations with the specific purpose of supporting crimes abroad); *Lively*, 960 F. Supp. 2d at 311-12 (noting "the tortious acts committed by Defendant took place to a substantial degree within the United States, over many years, with only infrequent actual visits to Uganda"). Here, Plaintiffs have not alleged

---

[8]     Plaintiffs also direct the Court's attention to *Balintulo*, 727 F.3d 174. In *Balintulo*, however, the court dismissed claims brought under the ATS for want of jurisdiction, applying the presumption against extraterritorial application as outlined in *Kiobel*, and citing *Morrison* for the proposition that domestic conduct must touch and concern the United States with sufficient force to rebut the presumption against extraterritoriality. *Id.* at 190-91. Thus, Plaintiffs' reliance on *Balintulo* is misplaced.

analogously substantial domestic conduct.[9]

As an additional matter, according to Plaintiffs, the Croatian military leaders involved in Operation Storm were convicted of war crimes, but their convictions subsequently were overturned.   3d Am. Compl. ¶¶ 60, 118.   As a result, consideration of Plaintiffs' international law claims here may result in the sort of "unintended clashes between our laws and those of other nations which could result in international discord," the precise danger that the presumption against extraterritorial application serves to prevent.   *Kiobel*, 133 S. Ct. at 1664 (internal citations omitted).   Such concerns were not implicated in the cases upon which Plaintiffs rely.

For these reasons, the Court concludes that it lacks subject matter jurisdiction over Counts I through VIII under the ATS.[10]

### B.      Jurisdiction Under Section 1331 and CAFA

Plaintiffs also contend that 28 U.S.C. § 1331 and CAFA independently confer jurisdiction over their international law claims.   Section 1331 provides district courts with "original jurisdiction of all civil actions arising under the Constitution, laws, or treaties of the United States."   28 U.S.C. § 1331.   "Laws" in the context of Section 1331 includes federal common law, which includes the laws of nations or customary international law.   *See Sosa v. Alvarez-Machain*, 542 U.S. 692, 728-31 (2004).   CAFA, in turn, provides the district courts with "original jurisdiction of any civil action in which the matter in controversy exceeds the sum

---

[9]     Unlike in *Al-Shimari*, Plaintiffs do not allege any involvement of the U.S. government with MPRI or in Operation Storm; unlike in *Krishanti*, Plaintiffs do not allege Defendants incorporated entire organizations devoted to sustaining war crimes abroad, or laundered money to the Croatian military; and unlike in *Lively*, most of MPRI's alleged misconduct occurred abroad, rather than domestically.

[10]     Because the Court holds that it lacks jurisdiction regarding Counts I through VIII, the Court need not reach Defendants' alternative argument that Plaintiffs' ATS claims are barred by the statute of limitations.

or value of $5,000,000, exclusive of interest and costs, and is a class action in which . . . any member of a class of plaintiffs is a foreign state or a citizen or subject of a foreign state and any defendant is a citizen of a State," 28 U.S.C. § 1332(d)(2)(B), and where the size of the proposed class exceeds 100 individuals, *id.* § 1332(d)(5)(B).

Contrary to Plaintiffs' suggestions, Section 1331 and CAFA do not provide jurisdiction for claims alleging extraterritorial violations of international law where the ATS does not. As the Supreme Court stated in *Kiobel*, a presumption against extraterritorial application applies to every statute Congress enacts, unless there is "a clear indication of an extraterritorial application." 133 S. Ct. at 1664 (internal citations omitted). Indeed, if a plaintiff could bring a claim alleging a violation of the law of nations under Section 1331 or CAFA, "there would be no need for statutes such as the ATS." *Serra v. Lappin*, 600 F.3d 1191, 1197 n.7 (9th Cir. 2010) (citing *Sosa*, 542 U.S. at 760 n.19) (finding no jurisdiction under 28 U.S.C. § 1331 for international law claims). Thus, while the Supreme Court has not addressed directly the extraterritorial reach of Section 1331 or CAFA, it would be inconsistent with *Kiobel* to hold that these statutes confer jurisdiction over Plaintiffs' international law claims, while the ATS does not. *See Serra*, 600 F.3d at 1197 (holding that the ATS "is the only possible vehicle for a claim like Plaintiffs' because no other statute recognizes a general cause of action under the law of nations").

Accordingly, the Court concludes that Plaintiffs cannot assert jurisdiction under Section 1331 or CAFA for claims arising under customary international law, where the presumption

against extraterritoriality precludes jurisdiction under the ATS.[11]  Additionally, insofar as Plaintiffs purport to rely on the Geneva Convention for jurisdiction under Section 1331, courts have consistently held that the Geneva Convention provides no private right of action enforceable in U.S. courts.  *See, e.g.*, *United States v. Fort*, 921 F. Supp. 523, 526 (N.D. Ill. 1996) (citing *Ahmad v. Wigen*, 726 F. Supp. 389, 406 (E.D.N.Y. 1989)).

For all of these reasons, the Court grants Defendants' motion to dismiss Counts I through VIII for lack of subject matter jurisdiction, and they are dismissed without prejudice.

## II.     Plaintiffs' Civil Conspiracy Claims (Counts IX and X)

In Count IX, Plaintiffs allege that Defendants entered into a conspiracy to commit forced population transfer and destruction of private property.  In Count X, Plaintiffs allege that Defendants entered into a conspiracy to commit unlawful conversion of real and personal property.  Defendants move to dismiss Counts IX and X for lack of subject matter jurisdiction, or alternatively, for failure to state a claim under Rule 12(b)(6).  In response, Plaintiffs contend that jurisdiction over these state law claims exists under CAFA and argue they have properly

---

[11]     Plaintiffs assert that the decision in *Holocaust Victims of Bank Theft v. Magyar Nemzeti Bank* holds otherwise.  807 F. Supp. 2d 689 (N.D. Ill. 2011), *vacated and remanded on other grounds sub nom. Abelesz v. Magyar Nemzeti Bank*, 692 F.3d 661 (7th Cir. 2012).  The court in *Holocaust Victims*, however, found that subject matter jurisdiction existed on the basis of the ATS and reached no conclusion about jurisdiction under Section 1331 or CAFA.  *Id.* at 694.  The other cases cited by Plaintiffs, *Giannopoulos v. Iberia Lineas Aereas de Espana, S.A., No.* 11 C 775, 2011 WL 3166159 (N.D. Ill. Jul. 27, 2011), and *In re Air Cargo Shipping Services Antitrust Litig*, No. MD 06-1775(JG)(VVP), 2008 WL 5958061 (E.D.N.Y. Sept. 6, 2008), also are distinguishable because the former involved a state breach of contract claim, while the latter alleged federal antitrust claims. Neither addressed claims for violations of international law.

pleaded claims under Illinois and Virginia state law.[12]   For the reasons set forth below, the Court agrees that CAFA provides jurisdiction over Plaintiffs' state law claims to the extent that they are premised upon a civil conspiracy to commit trespass to land and conversion and that Plaintiffs have sufficiently stated such claims.   Defendants' motion is granted in all other respects.

### A.        Subject Matter Jurisdiction Under CAFA

As noted above, CAFA provides, in relevant part, that "[t]he district courts shall have original jurisdiction of any civil action in which the matter in controversy exceeds the sum or value of $5,000,000, exclusive of interest and costs, and is a class action in which . . . any member of a class of plaintiffs is a foreign state or a citizen or subject of a foreign state and any defendant is a citizen of a State."   28 U.S.C. § 1332(d)(2)(B).   Additionally, the size of the proposed class must exceed 100 individuals.   *Id.* § 1332(d)(5)(B).   As part of their state law civil conspiracy claims, Plaintiffs allege: (1) at least one member of the putative class is from Serbia and Defendants' principal place of business is Virginia; (2) the amount in controversy exceeds $5 million; and (3) the proposed class size is in excess of 100 members.   3d Am. Compl. ¶ 11.

In response, Defendants do not contest these factual assertions but argue that CAFA was not enacted in order to grant jurisdiction for extraterritorial human rights violations and further assert that "the field of human rights violations is preempted by the ATS and TVPA [the Torture

---

[12]        Plaintiffs also assert their civil conspiracy claims under federal common law. However, Plaintiffs have not cited to any instance where a federal court has recognized a cause of action for civil conspiracy to commit forced population transfer, destruction of property, or unlawful conversion of property under "federal common law," nor has this Court found any.   Thus, the Court grants Defendants' motion to dismiss Plaintiffs' conspiracy claims to the extent that the claims are based on federal common law.

Victim Protection Act of 1991], leaving no room for CAFA." Defs.' Mem. Supp. at 18. But here, we are dealing with Plaintiffs' state law claims for civil conspiracy, not their claims for violations of international law. It is well-settled that CAFA confers jurisdiction upon this Court to consider state law claims that meet the statutory requirements of CAFA. *See, e.g., Blomberg v. Serv. Corp. Int'l*, 639 F.3d 761, 764 (7th Cir. 2011) (finding federal jurisdiction under CAFA in class action alleging violations of Illinois state wage laws); *Back Doctors Ltd. v. Metro. Prop. & Cas. Inc. Co.*, 637 F.3d 827, 829-31 (7th Cir. 2011) (finding federal jurisdiction under CAFA in action alleging fraud under Illinois law). Furthermore, the absence of subject matter jurisdiction under the ATS to consider Plaintiffs' international law claims does not prevent the Court from considering Plaintiffs' state law claims under its diversity jurisdiction. *See, e.g.*, *Velez v. Sanchez*, 693 F.3d 308, 332 (2d Cir. 2012) (dismissing international law claims under the ATS, but remanding to permit the district court to consider supplemental jurisdiction over the state law claims); *William v. AES Corp.*, No. 1:14CV343 JCC/TRJ, 2014 WL 2896012, at *17 (E.D. Va. June 26, 2014) (dismissing international law claims under the ATS, but exercising diversity jurisdiction to consider the viability of state law civil conspiracy claims). Based on Plaintiffs' class assertions, which are uncontested, the Court concludes it has jurisdiction over Plaintiffs' state law claims under CAFA.

Having determined that it has the "power to decide" the viability of Plaintiffs' state law claims, the Court turns to Defendants' remaining arguments as to why these claims should be dismissed. *See SEC v. Wozniak*, 33 F.3d 13, 14 (7th Cir. 1994) ("jurisdiction is the power to decide"), *overruled on other grounds by SEC v. Enter. Trust Co.*, 559 F.3d 649 (7th Cir. 2009).

### B.     Civil Conspiracy Claims

First, Defendants contend that the state law civil conspiracy claims should be dismissed under Rule 12(b)(6) for failing to state claims. Under Virginia law, the elements of a common law civil conspiracy claim are: "(1) an agreement between two or more persons (2) to accomplish an unlawful purpose or to accomplish a lawful purpose by unlawful means, which (3) results in damage to plaintiff." *Firestone v. Wiley*, 485 F. Supp. 2d 694, 703 (E.D. Va. 2007) (citing *Glass v. Glass*, 321 S.E.2d 69, 74 (Va. 1984)).   Similarly, under Illinois law, a civil conspiracy consists of "a combination of two or more persons for the purpose of accomplishing by some concerted action either an unlawful purpose or a lawful purpose by unlawful means."   *Karas v. Strevell*, 227 Ill.2d 440, 466, 884 N.E.2d 122, 138 (Ill. 2008) (citation omitted).[13]   However, "the bare allegation of the existence of a conspiracy does not constitute an actionable wrong upon which liability for damages may be found . . . . Rather, the underlying act must constitute wrongful or tortious conduct."   *Hume & Liechty Veterinary Assocs. v. Hodes*, 632 N.E.2d 46, 48 (Ill. App. Ct. 1994) (citations omitted); *see Dunlap v. Cottman Transmission Sys., LLC*, 754 S.E.2d 313, 317 (Va. 2014) ("[A]ctions for common law civil conspiracy . . . lie only if a plaintiff sustains damages as a result of an act that is itself wrongful or tortious.").

Plaintiffs have satisfied the first element of a civil conspiracy claim by alleging that officers of MPRI and Croatian representatives met to negotiate the terms of an agreement at MPRI's offices in Virginia and worked together to achieve their common goals.   *See* 3d Am.

---

[13]     The parties assume that either Illinois or Virginia law applies to the conspiracy claims and have not addressed which state's law should apply.   Furthermore, it may well be that Croatian law would apply here, but again the parties are silent as to this issue.   Because there are no differences between Illinois and Virginia law material to resolving Defendants' motion and the parties do not argue that Croatian law would apply, the Court refrains from undertaking a choice-of-law analysis at this time.

Compl. ¶¶ 37-40, 48, 49, 55, 56, 111. Plaintiffs also have alleged that officers of MPRI met with members of the Croatian military in Virginia, designed and planned the battle strategy for Operation Storm in Virginia, and traveled abroad to advise Croatian officials and train the Croatian military. *Id.* ¶¶ 14, 50, 51, 111. What is more, according to Plaintiffs, MPRI "knew the purpose and intent of Operation Storm and knew, or should have known, that its implementation would cause the deaths and/or permanent removal from the Krajina of scores of thousands of innocent Serbian civilians." *Id.* ¶ 52.

In addition, Plaintiffs have amply met the third element of a civil conspiracy claim. The Third Amended Complaint is replete with allegations that the named Plaintiffs and putative class members suffered severe injury and significant damages as a result of Defendants' actions. *Id.* ¶¶ 59, 64-67, 71-72, 76, 80, 92, 101.

Turning to the "purpose" element of a civil conspiracy claim, Plaintiffs argue that they have alleged facts demonstrating that the conspiracy was for an unlawful purpose: the forced expulsion of Krajina's Serbian population. Pls.' Resp. Defs.' Mot. Dismiss 32. But Plaintiffs have not provided any authority recognizing a cause of action under Illinois or Virginia law premised upon forced population transfer, nor has the Court found any. Accordingly, Plaintiffs' state law civil conspiracy claim is dismissed under Rule 12(b)(6) to the extent it is based upon a conspiracy to commit forced population transfer.

Although Plaintiffs have failed to state a claim for conspiracy based upon assertions of forced population transfer, they also have alleged that Croatian forces, in addition to shooting and killing countless Serbian civilians, systematically looted and destroyed Serbian-owned homes, businesses, crops and livestock in the Krajina region, including those owned by the named

Plaintiffs.  *See* 3d Am. Compl. ¶¶ 59, 64-67, 71-72, 76, 80, 92, 101.  Many of these homes subsequently were expropriated by the Croatian military.  *Id.* ¶ 69.  Based upon these and other allegations made in the Third Amended Complaint, the Court concludes that Plaintiffs have sufficiently asserted claims for civil conspiracy to commit trespass to land and conversion.

Both Illinois and Virginia law recognize claims for civil conspiracy in the context of trespass to land and conversion of personal property.  *See, e.g., Lawless v. Village of Park Forest South*, 438 N.E.2d 1299 (Ill. App. Ct. 1982 (conspiracy to commit trespass); *Allstate Life Ins. Co. v. Yurgil*, 632 N.E.2d 282 (Ill. App. Ct. 1994) (conspiracy to commit conversion); *Janet v. Rhodes*, 20 Va. Cir. 22 (Va. Cir. Ct. 1989) (conspiracy to commit conversion).  Furthermore, it bears noting that neither Illinois nor Virginia law requires that the tortious conduct occur within the state.  *See Esser v. McIntyre*, 661 N.E.2d 1138, 1141-44 (Ill. 1996) (applying Illinois negligence law where tortious conduct occurred in Mexico); *Miller v. Hays*, 600 N.E.2d 34, 36-39 (Ill. App. Ct. 1992) (applying Illinois wrongful death law where tortious conduct occurred in Colorado); *Ingersoll v. Klein*, 262 N.E.2d 593, 595-97 (Ill. 1970) (applying Illinois wrongful death law where tortious conduct occurred in Iowa); *see also Bay Tobacco, LLC v. Bell Quality Tobacco Prods., LLC*, 261 F. Supp. 2d 483, 494-95 (E.D. Va. 2003) (applying Virginia law where tortious conduct occurred in Florida).[14]  For these reasons, the Court concludes that Counts IX and X sufficiently state claims under Illinois and Virginia law for civil conspiracy to commit trespass to land and conversion and will turn to Defendants' remaining arguments for dismissal.

---

[14]  *Cf.* Jeffrey A. Meyer, *Extraterritorial Common Law: Does the Common Law Apply Abroad?*, 102 Geo. L.J. 301, 334 (2014) (discussing extraterritorial application of state common law).

## C. Statute of Limitations

Defendants posit that, under either Illinois or Virginia law, Plaintiffs' state law claims are barred by the statute of limitations. Because the Court hears Plaintiffs' conspiracy claims under diversity jurisdiction, state law provides the relevant statute of limitations. *Thomas v. Guardsmark, Inc.*, 381 F.3d 701, 707 (7th Cir. 2004) (citing *Guaranty Trust Co. v. York*, 326 U.S. 99, 110 (1945)).

Under both Illinois and Virginia law, a conspiracy claim is governed by the statute of limitations for the underlying tort. *See Mauvais-Jarvis v. Wong,* 987 N.E.2d 864, 894 (Ill. App. Ct. 2013); *Bd. of Dirs. of the Lesner Pointe Condo. v. Harbour Point Bldg. Corp.*, No. CL00-1893, 2002 WL 32072394, *9 (Va. Cir. Ct. Jun. 18, 2002). The Illinois statute of limitations for common law trespass and conversion claims is five years. *See Rosenthal v. City of Crystal Lake*, 525 N.E.2d 1176, 1184 (Ill. App. Ct. 1988) (applying 5-year limitations period to trespass to land); *Lease Resolution Corp. v. Larney*, 719 N.E.2d 165, 169-70 (Ill. App. Ct. 1999) (applying 5-year limitations period to action for conversion). The limitations period applicable to Plaintiffs' conspiracy claims under Virginia law also is five years. *See* Va. Code Ann. § 8.01-248(B) (2013); *Willard v. Moneta Bldg. Supply, Inc.*, 551 S.E.2d 596, 599-600 (Va. 2001) (noting that it is "well-established [under Virginia law] that actions for trespass or conversion constitute claims of injury to property" falling within the scope of the 5-year limitations period provided in Va. Code Ann. § 8.01-243(B)).

The Court also is mindful that the statute of limitations is an affirmative defense typically unsuitable for consideration at the motion to dismiss stage. *Reiser v. Residential Funding Corp.*, 380 F.3d 1027, 1030 (7th Cir. 2004). This is because a complaint need not anticipate nor

overcome affirmative defenses, including one based on the relevant statute of limitation. *See Xechem, Inc. v. Bristol-Myers Squibb Co.*, 372 F.3d 899, 901 (7th Cir. 2004); *Gomez v. Toledo*, 446 U.S. 635, 640 (1980). Accordingly, where a defendant raises the statute of limitations as an affirmative defense at the motion to dismiss stage, a court can only dismiss a claim "when [the] complaint plainly reveals that an action is untimely under the governing statute of limitations." *Andonissamy v. Hewlett-Packard Co.*, 547 F.3d 841, 847 (7th Cir. 2008) (quoting *United States v. Lewis*, 411 F.3d 838, 842 (7th Cir. 2005)) (internal quotation omitted); *see also Indep. Trust Corp. v. Stewart Info. Servs. Corp.*, 665 F.3d 930, 935 (7th Cir. 2012) (statute of limitations is an affirmative defense). Judge Easterbrook put it this way: "Only when the plaintiff pleads itself out of court – that is, admits all the ingredients of an impenetrable defense – may a complaint that otherwise states a claim be dismissed under Rule 12(b)(6). *Xechem*, 372 F.3d at 901.

While approximately fifteen years separate the alleged conspiracy and Plaintiffs' commencement of this action, Plaintiffs have invoked the doctrines of equitable tolling and equitable estoppel and have provided numerous factual assertions in support. *See* Pls.' Resp. Defs.' Mot. Dismiss 12-17; 3d Am. Compl. ¶¶ 40, 113, 114, 120 (alleging MPRI consistently has denied its involvement in Operation Storm and has attempted to conceal it). Having reviewed the Third Amended Complaint, the Court concludes that Plaintiffs have not pleaded facts that unequivocally demonstrate that their claims are barred by the relevant statute of limitations, nor do their allegations conclusively demonstrate that the doctrines of equitable tolling or equitable estoppel would not apply. *See, e.g.,* Reiser, 380 F.3d at 1030 (noting that "[w]hether the sins of a [defendant] may be used to extend the [limitations] period" is a question that could not be tackled at the motion-to-dismiss stage). For these reasons, the Court denies Defendants' motion

22

to dismiss Plaintiffs' state law conspiracy claims based upon the statute of limitations.

### D. Act of State Doctrine

Similarly, the act of state doctrine is an affirmative defense, on which the defendant carries the burden of proof. *See In re Oil Spill by Amoco Cadiz Off Coast of France on March 16, 1978*, 491 F. Supp. 161 (N.D. Ill. 1979). "The act of state doctrine is a judicial rule that generally forbids an American court to question the act of a foreign sovereign that is lawful under the sovereign's laws." *Nocula v. UGS Corp.*, 520 F.3d 719, 727-28 (7th Cir. 2008) (internal citations omitted). Courts typically consider three factors in determining whether the doctrine applies: (1) the degree of international consensus regarding the acts of the foreign government challenged by the suit; (2) the implications of the suit for United States foreign relations; and (3) whether the government accused of perpetrating the alleged wrongful acts remains in existence. *See Abiola v. Abubakar*, No. 02 C 6093, 2005 WL 3050607, at *2 (N.D. Ill. Nov. 8, 2005) (internal citations omitted). *See generally Banco Nacional de Cuba v. Sabbatino*, 376 U.S. 398, 428 (1964) ("It should be apparent that the greater the degree of codification or consensus concerning a particular area of international law, the more appropriate it is for the judiciary to render decisions regarding it, since the courts can then focus on the application of an agreed principle to circumstances of fact rather than on the sensitive task of establishing a principle not inconsistent with the national interest or with international justice.").

At this preliminary stage of the proceedings, the record is insufficient for the Court to conduct a meaningful analysis as to the applicability of the act of state doctrine. Although both parties have provided the Court with anecdotal interviews and resources regarding the possible impact this suit may (or may not) have on United States foreign relations, *see* Mem. Supp. Defs.'

Mot. Dismiss 28-29; Pls.' Resp. Defs.' Mot. Dismiss 33, 37, these materials, even if they were properly before the Court, fail to provide sufficient information to evaluate the foreign relations implications of proceeding with this action.[15]   Accordingly, in light of the sparse record, the Court denies Defendants' motion to dismiss based on the act of state doctrine.   *See, e.g., In re Potash Antitrust Litig.*, 686 F. Supp. 2d 816, 825 (N.D. Ill. 2010) (declining to apply act of state doctrine at pleading stage where defendant had failed to allege enough facts to show that the doctrine applied); *In re Vitamin C Antitrust Litig.*, 584 F. Supp. 2d 546, 559 (E.D.N.Y. 2008) (finding the record on a motion to dismiss "simply too ambiguous" to warrant application of act-of-state doctrine).

## Conclusion

For the reasons discussed herein, the Court grants in part and denies in part Defendants' motion to dismiss Plaintiffs' Third Amended Complaint [82].   Counts I through XIII are dismissed for lack of subject matter jurisdiction.   Counts IX is dismissed under Fed. R. Civ. P. 12(b)(6) to the extent it alleges a state claim for civil conspiracy to commit forced population transfer.   Defendants' motion is denied as to Counts IX and X to the extent they allege a state civil conspiracy to commit trespass to land and conversion.

**SO ORDERED**                    **ENTER:     9/24/14**

_____

**JOHN Z. LEE**
**United States District Judge**

---

[15]     For example, Defendants' reference to May 2012 statements by President Obama lauding the relationship between the United States and Croatia, even if relevant in evaluating the potential foreign relations impact of this suit, is hardly sufficient to demonstrate that proceeding with this action would impair U.S.-Croatian relations.   *See* Defs.' Mem. Support Mot. Dismiss 28-29 n.22.   Similarly, Plaintiffs' citation to a number of outdated comments of various U.S. government officials on Croatia's entry into NATO, if relevant, is not sufficient to demonstrate that this lawsuit would have no impact on the relationship between the United States and Croatia.   *See* Pls.' Resp. Defs.' Mot. Dismiss 33 n.31.